LORI RIFKIN – 244081
RIFKIN LAW OFFICE
P.O Box 19169
Oakland, California 94169
Telephone:   (415) 685-3591
Facsimile:    (510) 255-6266
Email: lrifkin@rifkinlawoffice.org

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| Jermaine Padilla, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Jeffrey Beard, in his individual capacity and official capacity as Secretary for the California Dept. of Corrections and Rehabilitation, Michael Stainer, in his individual capacity and official capacity as Director of Adult Institutions for California Dept. of Corrections and Rehabilitation, Connie Gipson, in her individual capacity, Dave Davies, in his official capacity as Acting Warden of California State Prison Corcoran, Ernest Wagner, M.D., in his individual capacity, M. Godina, M. Drew, R. Pruneda, R. Martinez, J. Acevedo, C. Garcia, E. Silva, and Does 1-10, in their individual capacities, | |
| Defendants. | |

## JURISDICTION

Plaintiff Jermaine Padilla complains and alleges as follows:

1.      This is an action for declaratory relief and damages against California

Department of Corrections and Rehabilitation ("CDCR") officials, and supervisors,

correctional officers, and mental health staff at California State Prison Corcoran ("CSP-

1   Corcoran").  A federal court recently described a video recording capturing some of

2   Defendants' abuse of Mr. Padilla as "horrific."  The full picture of Defendants' treatment

3   of Mr. Padilla reveals what is rightfully called torture.

4       2.      Rather than providing Mr. Padilla—a human being experiencing a mental

5   health crisis so severe he was deemed "gravely disabled" by CDCR staff—with minimally

6   adequate mental health treatment, Defendants:

7           • deliberately and indefensibly permitted Mr. Padilla's mental health to

8             decompensate far beyond the point of crisis;

9           • used unreasonable and excessive force against Mr. Padilla in ways that

10            dangerously exacerbated his mental health symptoms and caused him

11            unnecessary pain and suffering;

12          • held Mr. Padilla continually strapped down in five-point restraints for almost

13            72 hours without ever washing off the copious amounts of pepper spray

14            coating his body or allowing him to use the bathroom, forcing him to urinate

15            on himself;

16          • punished Mr. Padilla for behavior symptomatic of his mental illness, and in a

17            manner that was medically contraindicated; and

18          • engaged in additional conduct that degraded and dehumanized Mr. Padilla.

19  Mr. Padilla seeks redress for these abhorrent actions, which caused him grave physical,

20  mental, and emotional pain and suffering that are ongoing today.

21      3.      In stark disregard of Mr. Padilla's civil rights and in an affront to basic

22  human decency, the actions and omissions by CDCR administrators, employees, and

23  agents described herein were sanctioned by CDCR policy and/or practice, approved

24  throughout the entire chain of command and review process, and stubbornly defended as

25  acceptable practices by senior CDCR officials in federal court testimony.

26      4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

27  and 1343 in that this case arises under federal law and seeks damages for Defendants'

28  violation of Mr. Padilla's civil rights, privileges, and immunities secured by the Eighth and

Fourteenth Amendments to the U.S. Constitution and federal law, specifically the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a.

5.     This Court has supplemental jurisdiction over the related state law claim pursuant to 28 U.S.C. § 1367(a) because Plaintiff's state law claim forms part of the same case or controversy under Article III of the United States Constitution.  Plaintiff's state law claim shares all common operative facts with his federal law claims, and the parties are identical.  Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

## VENUE

6.     Plaintiff's claims, alleged herein, arose in the Counties of Sacramento and Kings, California.  Therefore, venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2).

7.     Pursuant to Rule 3 of the Federal Rules of Civil Procedure and Local Rule 120(d), assignment to this division is proper because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in the counties served by this division.

## PARTIES

8.     Plaintiff JERMAINE PADILLA is a thirty-three year old African-American man who resides in Ventura, California.  During the time period relevant to the actions and omissions described herein, Mr. Padilla was incarcerated in the custody of CDCR.  Mr. Padilla has been, and was at all times relevant to the actions and omissions described herein, diagnosed by CDCR with serious mental illness at the Enhanced Outpatient (EOP) or higher level of care.  Mr. Padilla was incarcerated at CSP-Corcoran from approximately May 3, 2012 to November 7, 2012, and January 28, 2013 to February 14, 2013.  Between approximately November 7, 2012 and January 28, 2013, Mr. Padilla was incarcerated in the Salinas Valley Psychiatric Program, an inpatient mental health hospital within Salinas Valley State Prison.  Mr. Padilla was released from prison on or around February 14, 2013.

9.     Defendant JEFFREY BEARD is the Secretary of CDCR.  As Secretary,

1  Defendant Beard is the highest-level official in CDCR and is responsible for administering

2  and overseeing the operations of CDCR.  Upon information and belief, the use of force

3  incident described herein against Plaintiff was brought to the personal attention of

4  Secretary Beard, and he took no corrective action with respect to this incident.  Defendant

5  Beard is sued in his official and individual capacities.

6      10.   Defendant MICHAEL STAINER is the Director of the Division of Adult

7  Institutions ("DAI") for CDCR.  As Director of DAI, Defendant Stainer is responsible for

8  supervising the day-to-day administration of the 33 CDCR adult prison facilities, including

9  CSP-Corcoran, and responsible for overseeing and implementing policies, procedures, and

10 practices related to the operations of these facilities.  Defendant Stainer has personal

11 knowledge of the actions and omissions with respect to Plaintiff described herein, and

12 provided sworn testimony to a federal court that such actions and omissions did not violate

13 CDCR policy and procedure nor constitute excessive force.  Upon information and belief,

14 Defendant Stainer took no corrective action with respect to this incident.  Defendant

15 Stainer is sued in his official and individual capacities.

16     11.   Defendant CONNIE GIPSON was at all times relevant to the actions and

17 omissions described herein employed as Warden at CSP-Corcoran and legally responsible

18 for oversight of operations at CSP-Corcoran, implementation of CDCR policy and

19 procedures, staff training, safety and security of inmates housed at CSP-Corcoran, and the

20 supervisor of all other individual Defendants employed at CSP-Corcoran.  Defendant

21 Gipson was also responsible for oversight of the institutional use of force review process,

22 which, upon information and belief, ratified and approved the use of force used against Mr.

23 Padilla described herein.  Defendant Gipson is sued in her individual capacity.

24     12.   Defendant DAVE DAVIES is currently Warden at CSP-Corcoran and

25 legally responsible for oversight of operations at CSP-Corcoran, implementation of CDCR

26 policy and procedures, safety and security of inmates housed at CSP-Corcoran, and

27 oversight of the institutional use of force review process.  Defendant Davies is sued in his

28 official capacity.

13.     Defendant ERNEST WAGNER, M.D. was at all times relevant to the actions and omissions described herein a psychiatrist in the Correctional Treatment Center/Mental Health Crisis Bed unit at CSP-Corcoran.  Defendant Wagner was responsible for providing and overseeing mental health treatment to Mr. Padilla, including assessing Mr. Padilla's acuity of mental illness, prescribing appropriate medication, and formulating and/or helping to formulate Mr. Padilla's mental health treatment plan.  Defendant Wagner ordered the cell extraction that resulted in the use of force against Mr. Padilla described herein, and ordered and authorized the use of 5-point restraints against Mr. Padilla continuously for almost 72 hours.  Defendant Wagner is sued in his individual capacity.

14.     Defendant M. GODINA was at all times relevant to the actions and omissions described herein employed as a Lieutenant at CSP-Corcoran and responsible for implementation of CDCR policy and procedures, the safety and security of inmates including Mr. Padilla, and supervisor of subordinate Defendants Sergeant Drew and Correctional Officers named below.  Defendant Godina supervised and participated in the incidents complained of herein, and is sued in his/her individual capacity.

15.     Defendant M. DREW was at all times relevant to the actions and omissions described herein employed as a Sergeant at CSP-Corcoran and responsible for implementation of CDCR policy and procedures, the safety and security of inmates including Mr. Padilla, and supervisor of subordinate Defendant Correctional Officers named below.  Defendant Drew supervised and participated in the incidents complained of herein, and is sued in his/her individual capacity.

16.     Defendants R. PRUNEDA, R. MARTINEZ, J. ACEVEDO, and C. GARCIA (collectively, "Defendant CORRECTIONAL OFFICERS") were at all times relevant to the actions and omissions described herein employed as Correctional Officers at CSP-Corcoran and responsible for implementation of CDCR policy and procedures and the safety and security of inmates including Mr. Padilla.  Defendants Pruneda, Martinez, Acevedo, and Garcia were assigned to be part of the cell extraction team and participated directly in the incidents complained of herein.  They are sued in their individual capacities.

17.     Defendants DOES 1-3 are additional supervisors and officers, including a Captain (DOE 1), who were at all times relevant to the actions and omissions described herein employed at CSP-Corcoran and responsible for implementation of CDCR policy and procedures, and the safety and security of inmates including Mr. Padilla.  Defendant Does 1-3 supervised and/or participated in the incidents complained of herein. At the present time, the identities of Does 1-3 are unknown and not discoverable to Plaintiff without the relevant use of force incident report packets and unredacted video, which CDCR has refused to produce.  Plaintiff will substitute the true names of Does 1-3 when Plaintiff is able to ascertain their identities through discovery.  Does 1-3 are sued in their individual capacities.

18.     Defendant DOE 4 was at all times relevant to the actions and omissions described herein employed as a supervising officer at CSP-Corcoran.  Defendant Doe 4 was the Senior Hearing Officer responsible for adjudicating the administrative hearing on the disciplinary rule violation charged against Plaintiff. At the present time, the identity of Doe 4 is unknown and not discoverable to Plaintiff without the relevant rules violation disciplinary packet, which CDCR has refused to produce.  Plaintiff will substitute the true name of Doe 4 when Plaintiff is able to ascertain his/her identity through discovery. Defendant Doe 4 is sued in his/her individual capacity.

19.     Defendant DOE 5 was at all times relevant to the actions and omissions described herein employed as medical staff at CSP-Corcoran.  Upon information and belief, Defendant Doe 5 provided medical clearance for the use of chemical agents against Plaintiff. At the present time, the identity of Doe 5 is unknown and not discoverable to Plaintiff without the relevant use of force incident report, which CDCR has refused to produce.  Plaintiff will substitute the true name of Doe 5 when Plaintiff is able to ascertain his/her identity through discovery.   Defendant Doe 5 is sued in his/her individual capacity.

20.     Defendant DOE 6 was at all times relevant to the actions and omissions described herein employed as a psychologist in the Mental Health Crisis Bed unit at CSP-Corcoran.  Upon information and belief, Defendant Doe 6 was responsible for providing a

clinical intervention to Plaintiff prior to the use of force described herein. At the present time, the identity of Doe 6 is unknown and not discoverable to Plaintiff without the use of force incident report and unredacted video, which CDCR has refused to produce. Plaintiff will substitute the true name of Doe 6 when Plaintiff is able to ascertain his/her identity through discovery. Defendant Doe 6 is sued in his individual capacity.

21. Defendant DOE 7 was at all times relevant to the actions and omissions described herein employed at CSP-Corcoran. Upon information and belief, Defendant Doe 7 medically cleared Plaintiff after the use of force described herein. At the present time, the identity of Doe 7 is unknown and not discoverable to Plaintiff without use of force incident report and unredacted video, which CDCR has refused to produce. Plaintiff will substitute the true name of Doe 7 when Plaintiff is able to ascertain his/her identity through discovery. Defendant Doe 7 is sued in her individual capacity.

22. Defendants DOES 8-10 are supervising officers and/or administrators who were at all times relevant to the actions and omissions described herein employed at CSP-Corcoran and responsible for reviewing the reports regarding the use of force against Mr. Padilla and determining whether corrective action, investigation, and/or further action or review was warranted. At the present time, the identities of Does 8-10 are unknown and not discoverable to Plaintiff without the relevant use of force review packets, which CDCR has refused to produce. Plaintiff will substitute the true names of Does 8-10 when Plaintiff is able to ascertain their identities through discovery. Does 8-10 are sued in their individual capacities.

23. At all times relevant to the allegations herein, each Defendant was acting in the course and scope of his or her employment and under color of state law.

## FACTUAL ALLEGATIONS

24. Mr. Padilla was transferred from Wasco State Prison to CSP-Corcoran on or around May 3, 2012, after serving approximately four-and-a-half months of what was supposed to be an approximately ten-month prison term.

25. At CSP-Corcoran, Mr. Padilla was housed in an Administrative Segregation

1  Unit designated for prisoners at the Enhanced Outpatient Program ("EOP") level of mental

2  health need.  As defined by CDCR policy, the EOP level of care is for prisoners with

3  "acute onset or significant decompensation of a serious mental disorder" who are unable to

4  function in the general prison population due to their mental illness.

5      26.      Mr. Padilla has a lengthy history of serious mental illness, including periods

6  of hospitalization for inpatient mental health treatment, that was known to CDCR at the

7  time Mr. Padilla was incarcerated in CSP-Corcoran.

8      27.      When Mr. Padilla first arrived at CSP-Corcoran from Wasco State Prison, he

9  was regularly taking the psychotropic and other medications that were prescribed for him.

10     28.      Shortly after being transferred to CSP-Corcoran, mental health treatment

11  records note that Mr. Padilla manifested auditory hallucinations and his thought process

12  became illogical.  He also began refusing to take the psychotropic medications prescribed

13  for him, and did not attend any treatment groups in May.

14     29.      These types of changes in behavior can be symptoms of increasing acuity of

15  mental illness and decompensation.  However, no additional mental health treatment was

16  provided to Mr. Padilla at that time in response to these symptoms.

17     30.      Mental health treatment notes for Mr. Padilla in the first two weeks of June

18  2012 indicate that he expressed paranoia, appeared psychotic, delusional, and illogical, and

19  was responding to internal stimuli.

20     31.      June 15, 2012 treatment records noted that Mr. Padilla looked for more than

21  five minutes into an empty space, and correctional officers indicated that he was taking

22  toilet paper and throwing it away under the cell door.

23     32.      On June 18, 2012, Mr. Padilla requested that he be scheduled to see a

24  psychiatrist because his medications were not working.

25     33.      On June 20, 2012, the interdisciplinary treatment team in charge of Mr.

26  Padilla's mental health treatment plan noted that he was delusional at times but concluded

27  that his current level of care (EOP) was clinically indicated.  The treatment team decided

28  that Mr. Padilla was to be under observation for another month.  If his behavior did not

improve, the plan directed that he would be referred for inpatient treatment and hospitalization at one of the units run by the Department of State Hospitals ("DSH"). If his mental health worsened, he was to be referred to DSH immediately. In the meantime no additional treatment was provided.

34.     From June 24 through June 30, 2012, staff observed that Mr. Padilla's hygiene was poor and a strong odor was coming from his cell.

35.     On July 1, 2012, Mr. Padilla was transferred to the Mental Health Crisis Bed unit ("MHCB" or "crisis bed" unit) because of suicidal ideation and mental health decompensation. At this point, health records document that he had been refusing medications for at least three weeks.

36.     Mr. Padilla agreed to come out of his cell to be transferred to the crisis bed unit after a nurse told him he needed help, they would help him, and he could trust them.

37.     Crisis bed units are defined by CDCR policy to provide temporary inpatient mental health services for inmates in mainline settings within institutions. CDCR policies governing crisis bed units place a ten-day maximum limit on the length of stay. If those ten days are not sufficient to stabilize a patient, and if longer-term intensive care is needed, the patient is supposed to be referred to an inpatient hospital run by the Department of State Hospitals.

38.     This policy is supposed to ensure that patients who need a higher level of care in order to be stabilized are referred and transferred in a timely fashion.

39.     After Mr. Padilla was transferred to the crisis bed unit, he met with Defendant Wagner, a psychiatrist in the crisis bed unit. Dr. Wagner stated that it was clear to him that when Mr. Padilla entered the crisis bed unit, he was already "gravely disabled."

40.     In order to have an out-of-cell mental health appointment with Dr. Wagner, Mr. Padilla was required to be handcuffed, and then confined to a metal cage the approximate size of a telephone booth while Dr. Wagner sat outside the cage.

41.     During this meeting, Dr. Wagner ridiculed Mr. Padilla. For example, Mr. Padilla kept his eyes down rather than making eye contact with Dr. Wagner because he

1   was intending to communicate respect and deference.  However, Dr. Wagner responded by

2   making fun of Mr. Padilla for not looking at him.

3        42.    As a result of this interaction and Defendant Wagner's treatment of him, Mr.

4   Padilla did not want to have further meetings with Dr. Wagner.  He felt that Dr. Wagner

5   was treating him with hostility and not trying to understand what was going on for him.

6        43.    Treatment notes for July 4, 2012, Mr. Padilla's third day in the crisis bed

7   unit, reflect that Mr. Padilla was grossly disheveled, refusing showers, refusing to exit his

8   cell or to talk with clinical staff.  Some of the following days, he refused his meals.

9        44.    On July 6, 2012, health records reflect that Mr. Padilla was handcuffed and

10   brought out of his cell to attend an interdisciplinary team meeting.  Treatment team records

11   reflect diagnoses of schizoaffective disorder, bipolar disorder, and depression.  The

12   treatment team did not refer him to a higher level of treatment.

13        45.    Treatment notes for the following weeks indicate that Mr. Padilla's mental

14   health continued to deteriorate even further.  He was seen sitting naked in his cell and

15   lying naked on the floor in his own urine.  Staff documented that he was heard yelling

16   loudly, and appeared to be agitated and have an altered thought process.  Defendants still

17   did not refer Mr. Padilla to an inpatient hospitalization level of care.

18        46.    July 10, 2012 treatment notes indicate that Mr. Padilla "may require/benefit

19   from involuntary med [treatment] in the near future," and July 12, 2012 treatment notes

20   indicate that the treatment team was "considering nonemergency involuntary med tx."

21   Upon information and belief, Defendants did not take any steps at that time to initiate the

22   involuntary medication process.

23        47.    July 14, 2012 notes reflect that Mr. Padilla was "likely psychotic."  July 15

24   notes reflect that Mr. Padilla "appeared to be responding to internal stimuli," that he spent

25   most of the day unclothed, and that his cell was in disarray with trash, cartons, and an

26   unknown substance on the floor.  Treatment notes also state that his functioning seemed

27   "impaired" at the MHCB level of care.

28        48.    However, even after spending more than two weeks in the crisis bed unit—in

1  continued violation of the June 20, 2012 treatment plan and CDCR policy—Defendants

2  still failed to refer Mr. Padilla to an inpatient hospitalization level of care.

3      49.    On July 17, 2012, the interdisciplinary treatment team again considered Mr.

4  Padilla's level of care, and, despite the fact that he had been in the crisis bed for seventeen

5  days—seven days longer than the maximum permitted by CDCR policy—did not refer him

6  to a higher level of care.  The decision to retain him at the MHCB level of care noted that

7  "psychiatry will start the non emergency involuntary med application process."  However,

8  there is no evidence that Defendants, in fact, started this process.

9      50.    In fact, on or around July 18, 2012, Defendant Wagner ordered Mr. Padilla

10  discharged from the MHCB unit, despite his observation that Mr. Padilla remained

11  "grossly psychotic and disorganized."  In federal court testimony, Defendant Wagner

12  explained that his rationale for his decision to discharge Mr. Padilla was that the staff in

13  the crisis bed unit "weren't being effective.  We weren't doing anything.  And in that unit

14  you want to have—you want to be doing something for the patient.  And in my opinion, at

15  that time, he could sit in his cell outside of that unit, and he didn't need to be in that unit

16  and deteriorate, which seemed to me to be inevitable."

17      51.    Defendant Wagner testified that in his opinion "it was preferable to

18  discharge [Mr. Padilla] back to an EOP Ad[ministrative] Seg[regation] Unit for him to sit

19  in the cell and deteriorate, than refer him to a higher level of care for treatment."

20      52.    The health record indicates that on July 19, 2012, the discharge from the

21  MHCB unit was rescinded.  Upon information and belief, the discharge order was

22  rescinded by someone other than Defendant Wagner.

23      53.    Treatment notes for July 21, 2012 indicate that on that date Mr. Padilla was

24  observed to be psychotic and gravely disabled, and that he had smeared feces, peanut

25  butter, and food remains upon a dried puddle of urine, and was lying naked on the cell

26  floor.  The nursing care record states that his mental health was continuing to decline.

27  Defendants still failed to refer Mr. Padilla to a higher level of mental health treatment,

28  eleven days after the maximum stay permitted by policy.

54.     The notes for July 22, 2012 indicate that Mr. Padilla was delusional and psychotic with obvious responses to internal stimulation, and had the occasional nonsensical verbal outburst with yelling and screaming.

55.     The notes for July 23, 2012 state that Mr. Padilla's cell with disgustingly dirty, and the mattress was smeared with filth.  Staff noted that Mr. Padilla was actively responding to internal stimuli, and he told staff that he was hearing voices but he did not understand what they were saying, that he smelled urine in the air, and that Barack Obama was talking to him.

56.     On July 24, 2012, the health record reflects that unit staff observed Mr. Padilla smearing himself with feces and had flooded his cell.  Custody officers were able to place a block below Mr. Padilla's cell door to prevent any leakage to the hallway.

57.     On July 24, 2012 Defendant Wagner ordered that custody staff forcibly extract Mr. Padilla from his cell in order to administer emergency involuntary medication.

58.     As of July 24, 2012, Mr. Padilla had been in the MHCB unit for 24 days, two weeks longer than allowed under the federal-court approved CDCR policy, without being referred for a higher level of mental health treatment.  According to Dr. Wagner's federal court testimony, in his opinion, he helps patients more by keeping them in mental health crisis bed units for longer than then ten-day policy limit even while "they deteriorate" so that he can "get them eventually on involuntary medications."

59.     Following Defendant Wagner's order for the cell extraction, CDCR supervising officers assembled a cell extraction team, consisting of Defendants Godina, Drew, Pruneda, Martinez, Acevedo, Garcia, and Does 1-3.

60.     Pursuant to CDCR policy, the assembly of the cell extraction team and the subsequent use of force against Mr. Padilla was video recorded.

61.     Prior to the physical cell extraction, Defendant Doe 6 was assigned to perform a clinical intervention attempt with Mr. Padilla.  This "intervention" lasted approximately 32 seconds before Defendant Doe 6 declared it "unsuccessful."

62.     Prior to the cell extraction, Defendant Doe 5 provided medical clearance for

1  the use of chemical agents against Mr. Padilla, despite the obvious symptoms of mental

2  illness Mr. Padilla was experiencing.

3      63.     The cell extraction team, consisting of a swat team of at least seven officers

4  wearing black insect-like gas masks, and five of whom were suited up from head-to-toe in

5  white plastic biohazard suits, assembled outside Mr. Padilla's cell door.  They were armed

6  with handcuffs, leg irons, batons, a full-length plastic body shield, a cart full of fire

7  extinguisher-sized canisters of oleoresin capsicum ("OC" or "pepper" spray), and a large

8  metal triangle with a heavy chain attached.

9      64.     Mr. Padilla could see the extraction team and array of weaponry through the

10 cell window.

11     65.     To Mr. Padilla, who was in mental health crisis, the extraction team appeared

12 to be the manifestation of his nightmares.  They had a gurney with them, and he believed

13 that they were there to seize him and harvest his organs or turn him into a cyborg.

14     66.     One of Defendant officers, who identified himself as the extraction team

15 leader, stood outside the narrow glass window of the cell, and, wearing a gas mask that

16 obscured his face and the words that he said, read Mr. Padilla an "admonishment" warning

17 him that if he did not submit to voluntary restraints, he would be forcibly extracted and

18 disciplined.

19     67.     Mr. Padilla was not able to make reality-based determinations about what

20 was happening or what he was being ordered to do.  He felt overwhelmed and terrified by

21 the number of officers.

22     68.     One of the officers then administered the first blast of OC spray into Mr.

23 Padilla's cell through the food slot in the door.  The officer sprayed Mr. Padilla for

24 approximately eleven seconds.

25     69.     Mr. Padilla screamed in pain.  In response, several officers made statements

26 to the effect of "hit him with another 9, he's almost there," referring to administering

27 another blast of OC spray into the cell.

28     70.     Although Mr. Padilla was screaming in pain, yelling for help, and obvious

1   disoriented, virtually the only statements made to him by the extraction team members

2   throughout the entire extraction were shouts to "turn around" and "cuff up."

3       71.     Approximately one-and-a-half minutes after the first OC spray, Defendants

4   administered two more bursts of OC into Mr. Padilla's cell, both within thirty seconds of

5   each other.

6       72.     Less than thirty seconds later, Defendants pumped two more blasts of OC

7   into Mr. Padilla's cell.

8       73.     The extraction team members continued to yell at Mr. Padilla to "cuff up."

9   He responded by saying "I'm trying" and continuing to scream in anguish.

10      74.     Mr. Padilla was pacing and at times crawling around the cell in obvious

11  confusion.  At several points, Mr. Padilla made his way to the door of the cell.  At one of

12  these times, he offered one wrist to be cuffed up through the food slot of the cell door.  The

13  extraction team members yanked his wrist and cuffed it to a heavy metal triangle lanyard.

14  Immediately, one team member covered the food slot with a plastic shield and said several

15  times "spray him again."  Mr. Padilla then pulled his other wrist back in fear.

16      75.     The officers yelled "Cuff up or do you want more OC?" at Mr. Padilla.  Mr.

17  Padilla said, "I just want to go home."  Then they sprayed him again.

18      76.     At one point one of the Defendant officers told Mr. Padilla, "You can stop

19  the burning if you cuff up."

20      77.     The Captain overseeing the cell extraction (Defendant Doe 1) recorded in the

21  incident report that it was clear during this time that Mr. Padilla was not able to understand

22  what was going on or follow simple instructions.  The Captain concluded that Mr. Padilla

23  "was clearly not capable of submitting to handcuffs due to his mental state."

24      78.     Despite the obvious distress of Mr. Padilla, and his repeated pleas for help,

25  Defendants sprayed him with massive amounts of OC spray six separate times within the

26  span of approximately six-and-a-half minutes.

27      79.     One of the supervising officers finally decided that the team should open the

28  cell door and physically extract Mr. Padilla.

80.     The video of the incident shows that when the door was opened, Mr. Padilla appeared poised to step out of the cell peacefully, but officers immediately rushed him using the full-length shield to drive him back and pin him into the door.  At this point, one of Mr. Padilla's hands was still chained to the metal lanyard through the food slot.

81.     The video shows that the officers took Mr. Padilla to the floor, and more officers piled onto Mr. Padilla, holding him down as he continued to scream for help.

82.     While Mr. Padilla was being held down on the floor by at least four officers, he heard somebody yell, "Shut up and take it like a man."  He understood this to mean that he was going to be raped, and became even more terrified.  He screamed "Oh, no!"

83.     The team of officers holding Mr. Padilla down dragged him naked along the floor, and put him in arm and leg restraints.  One of the officers was holding him down by his neck and head.

84.     Even at this point, when Mr. Padilla was fully restrained and held down on the floor by four or more officers, one of the other officers grabbed another canister of OC spray and readied to spray Mr. Padilla again.  However, this officer was stopped by another member of the cell extraction team before he could administer more OC.

85.     The extraction team physically picked up Mr. Padilla and placed him on the gurney, naked, with his genitals exposed, and with the metal lanyard still chained to one of his wrists.  They wheeled Mr. Padilla nude on the gurney into a room that was completely bare except for a restraint bed in the middle of the room.

86.     They transferred him to the restraint bed and locked him into 5-point restraints, pursuant to orders from Defendant Wagner.

87.     At no point during the use of chemical agents and physical force did any of the individual Defendants attempt to intervene or stop the force being used against Mr. Padilla.

88.     Defendants did not decontaminate Mr. Padilla from the massive amounts of OC spray that were pumped into his cell.

89.     As Mr. Padilla was being wheeled into the room and put in restraints, he is

1  heard on the video to say "Don't do this to me," "Why is this happening?" "This ain't

2  right," "I didn't do anything," and "Why isn't anybody listening to me?"  No staff

3  answered him or addressed his statements or concerns in any way.

4      90.    Mr. Padilla further stated, "I didn't do nothing wrong…I don't want to

5  decapitate nobody…I don't want to kill people…I don't want this to happen to me."

6  Again, no staff answered or responded to him.

7      91.    Mr. Padilla was scared that Defendants were going to cut off his limbs with a

8  chainsaw, put a fake heart in his chest, or do experiments on him.  It seemed to him that

9  everything he feared from his hallucinations was coming true.

10     92.    At least six members of the extraction team continued to hold Mr. Padilla

11 down on the restraint bed while involuntary medication was administered by needle.

12     93.    Two officers held his head down, and a spit mask and towel were at times

13 pulled up to cover his face and mouth.  Mr. Padilla felts as though they were choking him

14 and pressing down on his neck so hard he thought his head might come off.

15     94.    Mr. Padilla is heard on the video to express pain and fear, saying: "Why is

16 my skin falling off?" "I can't breathe."  "My head hurts."  "I don't want to be executed"

17 and "My wrist is falling off."  None of the staff attempted to engage him in verbal

18 communication or respond to his concerns, other than one officer telling him to "relax."

19     95.    The video shows that the incident up until this point lasted for approximately

20 thirty minutes.  At the end of the video, Defendant Doe 7 states that Mr. Padilla was

21 "medically cleared" and the video ends.

22     96.    Defendant Wagner was present and observed the entire cell extraction.

23     97.    Despite Mr. Padilla's cries for help throughout the incident, no custody,

24 medical, or mental health staff attempted to engage in effective communication or de-

25 escalation techniques with Mr. Padilla that are standard in the field for engaging with

26 patients with mental illness.

27     98.    Days later, one of the custody officers involved came to Mr. Padilla's cell

28 and "congratulated" him on the violence of the cell extraction.

COMPLAINT – JURY TRIAL DEMANDED

99.     Per Defendant Wagner's orders, after the cell extraction, Defendants kept Mr. Padilla in 5-point restraints on the bed continuously for almost 72 hours.

100.    Defendant Wagner did not ensure that Mr. Padilla was decontaminated from the OC spray prior to being placed in five-point restraints, nor during the time that Mr. Padilla was kept in restraints.

101.    Defendants never decontaminated Mr. Padilla from the OC spray, and he was not allowed to stand up to use the bathroom, meaning that he was forced to urinate on himself.  The health records note that he urinated on himself, the bed, and the floor.

102.    Mr. Padilla repeatedly made requests to staff that he be released from the five-point restraints.

103.    After the violent cell extraction, strapped down to the bed, with staff including Defendant Wagner standing over him, Mr. Padilla felt extremely vulnerable, scared, and dehumanized.

104.    Defendant Wagner repeatedly ordered the continuation of the 5-point restraints because, according to the treatment notes, Mr. Padilla refused to take responsibility for the incident.

105.    However, in testimony in federal court, Defendant Wagner acknowledged that Mr. Padilla was gravely disabled at that time, and that Mr. Padilla's mental state prevented him from being able to comply with the conditions Dr. Wagner set for removal from the 5-point restraints.

106.    CDCR policy specifically provides that restraint "shall never be used as punishment or for the convenience of staff."  It further states that "[t]hreatening inmate-patients with restraint and/or seclusion is considered psychological abuse and is prohibited."

107.    Finally, after Defendants kept Mr. Padilla in 5-point restraints continuously for almost three days pursuant to Dr. Wagner's orders, another psychiatrist on the unit ordered Mr. Padilla to be released from the 5-point restraints.

108.    When Defendants released Mr. Padilla from 5-point restraints, they returned

1  him to a cell on the Mental Health Crisis Bed unit.  Even after this incident, Defendants

2  still failed to refer Mr. Padilla to a higher level of mental health care.

3      109.    The CDCR use of force policy required that all uses of force be reviewed by

4  various levels of supervising officers and a review committee at the institution.

5      110.    Defendants Does 8-10 are the supervising officers and/or administrators who

6  reviewed the reports regarding the use of force against Mr. Padilla.  The only critique they

7  offered of the incident was that the video should not have shown Mr. Padilla's exposed

8  genitals for as long as it did.   Defendants determined that no corrective action,

9  investigation, and/or further action or review of this use of force was warranted.

10     111.    Top CDCR administrators, including Defendant Stainer, repeatedly defended

11 this use of force and restraint against Mr. Padilla as acceptable "tactics" within CDCR

12 policy and not excessive.

13     112.    A federal court recently found this video, among others, to be "horrific" and

14 "illustrative of one or more of the objective components of the underlying constitutional

15 violation" found in the court's 1995 order holding the provision of mental health treatment

16 in CDCR unconstitutional.  *Coleman v. Brown*, Case No. 2:90-cv-00520-LKK-DAD, ECF

17 No. 5131 at 16:18-21 (E.D.Cal. April 10, 2014).

18     113.    After the cell extraction on July 24, 2012, Mr. Padilla was kept in the crisis

19 bed unit for another 21 days until on or around August 14, 2012.  During that time,

20 Defendants still did not refer him to a higher level of mental health treatment, in

21 contravention of CDCR policy.

22     114.    Mr. Padilla spent an approximate total of 45 days in the crisis bed unit, 35

23 days more than allowed by CDCR policy.

24     115.    Treatment records indicate that, after the July 24, 2012 incident, Mr. Padilla

25 expressed fear of staff and fear that he would be hurt or killed by staff if he came out of his

26 cell.  One mental health note states that the treatment team met with Mr. Padilla cellfront

27 because he "says he's afraid we'll hurt him if he comes out to see us."

28     116.    The treatment team notes on July 24, 2012 indicate that they had "just"

pursued an involuntary medication treatment order for Mr. Padilla, and, therefore, would not refer him to a higher level of care.  Instead, they opted to "continue" with his current treatment plan.

117.    Mental health treatment records from July 24, 2012 through August 15, 2012 repeatedly noted that staff decided not to refer Mr. Padilla to a higher level of care because they were most concerned with getting the involuntary medication order approved.

118.    On or around August 14, 2012, Defendants discharged Mr. Padilla from the Mental Health Crisis Bed unit and re-housed him in the Administrative Segregation Unit at CSP-Corcoran.

119.    At this lower level of care, Mr. Padilla's mental health again worsened and he experienced repeated mental health crises.  Within the next several months, Defendants moved him back and forth between the Administrative Segregation Unit and the Mental Health Crisis Bed unit for suicidal ideation.  Again, Defendants failed to refer him to an inpatient hospitalization level of mental health treatment.

120.    Despite the continuing deterioration of Mr. Padilla's health, on or around August 30, 2012, a classification determination was made that his mental health was "unlikely to decompensate while retained in ASU."

121.    Mr. Padilla's mental health continued to deteriorate and treatment records note that he expressed fear that correctional officers were going to kill him and his family.

122.    Treatment records from one month after the cell extraction also indicate that Mr. Padilla continued to complain of pain in his left wrist, which had been shackled to the heavy metal triangle lanyard and pulled during the extraction and restraint process. Medical staff noted damage, numbness, and scarring to Mr. Padilla's left wrist.

123.    Finally, on or around October 3, 2012—approximately four months after Mr. Padilla's initial admission to the crisis bed unit at CSP-Corcoran—a psychiatrist in the Administrative Segregation Unit referred Mr. Padilla to an inpatient hospital run by the Department of State Hospitals.

124.    Mr. Padilla was not actually transferred out of the Administrative

1   Segregation Unit at CSP-Corcoran to an inpatient hospital placement at Salinas Valley

2   Psychiatric Program until on or around November 7, 2012—approximately five months

3   after what should have been the maximum ten-day stay in the Mental Health Crisis Bed

4   prior to referral to inpatient treatment, according to CDCR policy.

5        125.    Once at this inpatient level of care, treatment notes reflect that Mr. Padilla's

6   mental health stabilized and he was free of any behavioral issues during his entire stay at

7   Salinas Valley Psychiatric Program.

8        126.    On or around January 24, 2013, Mr. Padilla was discharged from the

9   inpatient hospital back to CSP-Corcoran.  Treatment notes indicate that Mr. Padilla was

10  discharged from the inpatient level of care because he had an upcoming parole date, not

11  because he no longer needed an inpatient level of mental health treatment.

12       127.    In connection with the July 24, 2012 cell extraction, Defendants charged Mr.

13  Padilla with a rule violation for "obstructing a peace officer in the performance of his

14  duties in the use of force."

15       128.    As part of the disciplinary hearing process, a CDCR clinician completed a

16  mental health assessment of Mr. Padilla related to the rule violation that was charged.  This

17  clinician concluded that, at the time of the cell extraction, Mr. Padilla's mental health state

18  included "delusions/false thoughts/paranoia" and that Mr. Padilla "didn't seem to

19  understand consequences of not complying with a custody officer."  The clinician found

20  that Mr. Padilla would "benefit from therapy & activities that provide reality orientation…

21  social interaction/talking with others and things that help prompt his memory."

22       129.    Despite this mental health assessment, the hearing officer, Defendant Doe 4,

23  found Mr. Padilla guilty of "obstructing a peace officer in the performance of his duties in

24  the use of force." Defendant Doe 4 assessed Mr. Padilla 90 days loss of credit, thus

25  extending the length of his prison term.  Defendant Doe 4 also punished Mr. Padilla with

26  30 days loss of privileges including loss of dayroom, TV/radio, visits, family visits, special

27  purchase, telephone, and quarterly package, effective upon release from the Mental Health

28  Crisis Bed.  This means that even when Mr. Padilla was released from the crisis bed, he

would be deprived of virtually all of his opportunities for external stimuli and totally contradicted every recommendation made by the clinician in the Mental Health Assessment.  Defendant Doe 4 also referred Mr. Padilla to the Institutional Classification Committee for consideration of additional segregation or Secure Housing Unit (SHU) time.

130.    During Mr. Padilla's incarceration in 2012, he was repeatedly charged with and found guilty of rule violations for behavior that was related to his mental illness.  The disciplinary sanctions imposed for these rule violations, including the rule violation for the July 24 cell extraction incident, substantially extended the length of time Mr. Padilla was incarcerated in CDCR.

131.    Even though the alleged rule violations were related to mental illness, because of these disciplinary sanctions, Defendants restricted Mr. Padilla to Administrative Segregation Units for most of his incarceration.

132.    As a result of Defendants' actions and omissions described above, Mr. Padilla experienced and continues to experience severe physical, mental, and emotional pain and suffering.

133.    Defendants' actions and omissions described above exacerbated the symptoms of Mr. Padilla's mental illness.

134.    As a result of Defendants' actions and omissions described above, Mr. Padilla continues to experience trauma and will continue to experience trauma in the future.

135.    As a result of Defendants' actions and omissions described above, Mr. Padilla's relationships with his family have been disrupted and undermined.

136.    Defendants' inhumane treatment of Mr. Padilla destroyed his feelings of self-worth, and continues to severely debilitate him today.

137.    After the video of this use of force against Mr. Padilla and several other videos recently became public through a federal court proceeding, Defendants allegedly made changes to the CDCR use of force policy.  However, the federal court overseeing

1  mental health treatment in CDCR prisons held in April 2014 that, even after these changes,

2  CDCR's "policy concerning controlled use of force on the seriously mentally ill inmate

3  fails to require consideration of the inmate's ability to conform his or her conduct to the

4  order or directive giving rise to the use of force." *Coleman v. Brown*, Case No. 2:90-cv-

5  00520-LKK-DAD, ECF No. 5131 at 29:1-5 (E.D.Cal. April 10, 2014).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Unreasonable and Excessive Use of Force*

*(Eighth and Fourteenth Amendments to U.S. Constitution and 42 U.S.C. § 1983)*

*Against Defendants Beard, Stainer, Gipson, Davies, Wagner, Godina, Drew, Pruneda,*

*Martinez, Acevedo, Garcia, Does 1-3, and Does 8-10*

12      138.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1

13  through 137 as though fully set forth herein.

14      139.    Defendants' use of force and restraint against Mr. Padilla was unnecessary,

15  excessive, and unreasonable under the circumstances.

16      140.    Defendants acted maliciously, sadistically, or for the purpose of causing

17  harm to Mr. Padilla.

18      141.    Defendants' use of force and restraint against Mr. Padilla was a "controlled"

19  use of force, meaning that Defendants had time to reflect on the force to be used.

20      142.    Defendants' use of force policies, both in design and implementation,

21  demonstrated deliberate indifference to Mr. Padilla's mental illness and the harms that

22  could be caused by this type of use of force against Mr. Padilla.

23      143.    Defendants' use of force and restraint against Mr. Padilla violated his rights

24  under the Eighth and Fourteenth Amendments of the U.S. Constitution.

25      144.    Defendants' unlawful use of force and restraint caused Mr. Padilla short-

26  term and long-term physical, mental, and emotional pain and suffering and exacerbated the

27  symptoms of his mental illness.

28      145.    CDCR's policies, practices, or customs were a cause of Mr. Padilla's injuries

because these policies, practices, or customs permitted unreasonable use of force against Mr. Padilla and evidenced deliberate indifference to Mr. Padilla's constitutional rights.

146.    Defendants have been on notice since at least 1995 that use of force by custody staff against prisoners with mental illness in a manner "without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses" violates prisoners' Constitutional rights. *Coleman v. Wilson*, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995).

147.    However, Defendants adopted policies, procedures, and practices that permitted and condoned the unreasonable use of force and restraint against Mr. Padilla.

148.    Defendants also failed to provide adequate training and supervision to administrators and officers with respect to constitutional limits on the use of force and restraint and failed to provide adequate training and supervision to officers with respect to the proper procedures to be followed in dealing with mentally ill persons in need of medical or psychological treatment.

149.    Defendants Gipson, Godina, Drew, and Does 1-3 were supervisory staff responsible for ensuring that actions taken with respect to Plaintiff did not violate his rights or cause him harm and participated directly in the unreasonable and unnecessary use of force and restraint against Plaintiff.

150.    On information and belief, Defendants Gipson and Does 8-10 specifically approved and ratified the use of force against Mr. Padilla through the entire chain of command, and the use of force review process.

151.    Defendant Stainer found the use of force against Mr. Padilla to be within CDCR policy and procedure and not excessive.

152.    On information and belief, Defendant Beard ratified the use of force against Mr. Padilla by failing to take any corrective action.

153.    As a direct and legal result of Defendants' acts and omissions, Plaintiff suffered damages, including, without limitation, pain and suffering; emotional distress; attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

154.    Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, oppressive and despicable conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

SECOND CLAIM FOR RELIEF

*Failure to Provide Adequate Medical and Mental Health Treatment*

*(Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)*

*Against ALL Defendants*

155.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 154 as though fully set forth herein.

156.    Defendants failed to provide Mr. Padilla with minimally adequate mental health treatment under Constitutional standards and Defendants' own policies and procedures.

157.    Defendants repeatedly failed to timely refer or transfer Mr. Padilla to a higher level of mental health treatment, despite his need for inpatient hospitalization, in contravention of the Constitution and their own policies.

158.    Defendants deliberately allowed Mr. Padilla's health to decompensate based on their rationale that it would be easier for them to successfully obtain an involuntary medication order if he were further decompensated, in violation of Constitutional standards and Defendants' own policies.

159.    Further, by using force against Mr. Padilla without regard to whether his beahvior was related to mental illness or the impact of those measures on his mental illness, Defendants violated Mr. Padilla's Constitutional right to adequate mental health treatment.

160.    Defendants have been on notice since at least 1994 that disciplining prisoners with mental illness without differentiating "between an inmate who is acting out as a result of mental illness and an inmate who is acting out for other reasons" and

24

subjecting prisoners who "act out as a result of mental illness" to punitive measures rather than provided with necessary care in conjunction with appropriate discipline" violates prisoners' Constitutional rights. *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS 20786 at *49 n.29 & 71  (E.D. Cal. June 6, 1994) (internal citations omitted).

161.    By disciplining Mr. Padilla for actions found by CDCR's own mental health staff to be related to his mental illness and imposing a punishment found by CDCR's own mental health staff to be detrimental to his mental health, Defendants violated Mr. Padilla's Constitutional right to adequate mental health treatment.

162.    The use of force and discipline against Plaintiff without regard to his mental illness constituted caused him physical, mental, and emotional pain and suffering, and exacerbated the symptoms of his mental illness.

163.    Defendant Doe 5 medically cleared the use of chemical agents against Mr. Padilla, despite mental health contraindications.

164.    Prior to the use of force against Plaintiff, Defendant Doe 6 failed to provide or attempt to provide a clinical intervention that met the minimum acceptable standard in the mental health field.

165.    Defendant Doe 7 specifically medically cleared Plaintiff following the use of force, despite the fact that Plaintiff was not properly decontaminated and was complaining of pain.

166.    After the use of force and restraints on Plaintiff, Defendants failed to provide him with Constitutionally appropriate medical and mental health care, including thorough decontamination from the pepper spray, and mental health treatment to address his increased distress.  Instead, Defendants subjected Mr. Padilla to almost 72 hours of 5-point restraints and additional degrading and dehumanizing treatment that further exacerbated his illness and caused him additional pain and suffering.

167.    Defendants failed to refer Mr. Padilla to an appropriate level of mental health treatment for more than four months after they identified the need for inpatient hospitalization, and failed to actually transfer Mr. Padilla to an appropriate level of mental

1  health treatment for more than five months.

2      168.   Defendants' failure to provide Plaintiff with adequate and appropriate

3  medical and mental health treatment caused him unnecessary pain and suffering and

4  exacerbated the symptoms of his mental illness.

5      169.   As a direct and legal result of Defendants' acts and omissions, Plaintiffs

6  suffered damages, including, without limitation, pain and suffering; emotional distress;

7  attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

8      170.   Defendants, by engaging in the aforementioned acts or omissions and/or in

9  ratifying such acts or omissions, engaged in willful, malicious, intentional, oppressive and

10  despicable conduct, and/or acted with willful and conscious disregard of the rights,

11  welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary

12  damages in an amount to be determined at trial.

13  THIRD CLAIM FOR RELIEF

14  *Failure to Protect from Harm*

15  *(Eighth and Fourteenth Amendments to U.S. Constitution and 42 U.S.C. § 1983)*

16  *Against Defendants Beard, Stainer, Gipson, Davies, Wagner, Godina, Drew, Pruneda,*

17  *Martinez, Acevedo, Garcia, Does 1-3, and Does 5-10*

18      171.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1

19  through 170 as though fully set forth herein.

20      172.   Defendants failed to protect Mr. Padilla from harm by deliberately

21  withholding necessary mental health treatment and allowing Mr. Padilla's mental health to

22  decompensate.

23      173.   Defendants failed to protect Mr. Padilla from harm by using unreasonable

24  and unnecessary force and restraint against him.

25      174.   Each Defendant knew that the other Defendants were using, or were

26  threatening to use, unreasonable force against Plaintiff.  Each Defendant could have taken

27  action to stop the use of unreasonable force against Plaintiff but refused or failed to do so.

28      175.   Each Defendant could have taken action to stop the ensuing actions and

1  omissions following the use of force that caused further harm to Plaintiff, but refused or

2  failed to do so.

3      176.   Defendant Doe 5 specifically provided medical clearance for the use of force

4  against Plaintiff.

5      177.   Defendant Doe 7 specifically medically cleared Plaintiff following the use of

6  force, despite the fact that Plaintiff was not properly decontaminated.

7      178.   Supervisory Defendants were responsible for ensuring that all other

8  Defendants were appropriately trained in order to protect Plaintiff from harm, that policies

9  and procedures were in place to sufficiently protect Plaintiff from harm, and were

10  responsible for reviewing the use of force against Plaintiff.

11      179.   Each Defendant failed to protect Plaintiff in violation of his rights under the

12  Eighth and Fourteenth Amendments to the United States Constitution.

13      180.   As a direct and legal result of Defendants' acts and omissions, Plaintiffs

14  suffered damages, including, without limitation, pain and suffering; emotional distress;

15  attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

16      181.   Defendants, by engaging in the aforementioned acts or omissions and/or in

17  ratifying such acts or omissions, engaged in willful, malicious, intentional, oppressive and

18  despicable conduct, and/or acted with willful and conscious disregard of the rights,

19  welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary

20  damages in an amount to be determined at trial.

21  FOURTH CLAIM FOR RELIEF

22  *Violation of Due Process*

23  *(Fourteenth Amendment to U.S. Constitution and 42 U.S.C. § 1983)*

24  *Against Defendants Beard, Stainer, Gipson, Davies, and Doe 4*

25      182.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1

26  through 181 as though fully set forth herein.

27      183.   Defendants violated Plaintiff's right to procedural due process during the

28  disciplinary process.

184.   Defendants charged Plaintiff with multiple rule violations for behaviors related to his mental illness, and found Plaintiff guilty of all of these rule violations without sufficient regard for his mental illness.

185.   Defendants disciplined and sanctioned Plaintiff for behaviors related to his mental illness and imposed sanctions that exacerbated his mental illness without sufficient regard for these effects.

186.   Defendant Doe 4 was the Senior Hearing Officer at Plaintiff's disciplinary hearing for the July 24, 2012 disciplinary charge.  Defendant Doe 4 found Plaintiff guilty of "Obstructing a Peace Officer Resulting in the Use of Physical Force" and administered discipline despite a mental health clinician's determination that Plaintiff's mental illness appeared to contribute to the behavior that led to the alleged rule violation.

187.   Defendants' imposition of discipline against Plaintiff despite the foregoing actions and omissions violated Plaintiff's right to procedural due process under the Fourteenth Amendment.

188.   As a direct and legal result of Defendants' acts and omissions, Plaintiffs suffered damages, including, without limitation, pain and suffering; emotional distress; attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

189.   Defendants, by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, oppressive and despicable conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF

*Discrimination on Basis of Disability*

*(Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and*

*Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a)*

*Against ALL Defendants*

190.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1

28

1  through 189 as though fully set forth herein.

2      191.   At all relevant times, Plaintiff suffered from a "disability" within the

3  meaning and scope of 42 U.S.C. §12102 as a result of his mental impairment, which was

4  recognized and documented by CDCR.  Accordingly, Plaintiff was a member of the class

5  of persons protected by the ADA and Section 504 of the Rehabilitation Act, which make it

6  unlawful for a public entity and entities receiving federal funds to discriminate against an

7  individual with a disability, or to deny the benefits of the services, programs, or activities

8  of a public entity or entity receiving federal funds to a person with a disability.

9      192.   Defendants discriminated against Plaintiff because of his disabilities and

10  denied him the benefits of public services, programs and activities as a result of his

11  disabilities by, among other things; failing to provide proper and reasonable training to

12  CDCR officers regarding how to respond to persons with physical and mental

13  impairments; failing to respond reasonably in dealing with a mentally ill person who was

14  experiencing an episode of psychological distress; and by disciplining Plaintiff for actions

15  found by CDCR's own mental health staff to be related to his mental illness and imposing

16  a punishment found by CDCR's own mental health staff to be detrimental to his mental

17  health.

18      193.   The acts and omissions of Defendants violated the ADA and Section 504,

19  which prohibit discrimination on the basis of physical and mental disability, and protect

20  persons such as Plaintiff from the type of injuries and damages set forth herein.

21      194.   Defendants Beard, Stainer, and Davies, sued in their official capacities, are

22  not entitled to immunity from suit under the Eleventh Amendment for this cause of action.

23      195.   As a direct and legal result of Defendants' acts and omissions, Plaintiff

24  suffered damages, including, without limitation, pain and suffering; emotional distress;

25  attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

26      196.   Defendants, by engaging in the aforementioned acts or omissions and/or in

27  ratifying such acts or omissions, engaged in willful, malicious, intentional, oppressive and

28  despicable conduct, and/or acted with willful and conscious disregard of the rights,

1   welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary

2   damages in an amount to be determined at trial.

3                               SIXTH CLAIM FOR RELIEF

4                         *Professional Negligence/Medical Malpractice*

5                               *Against Defendant Wagner*

6        197.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1

7   through 196 as though fully set forth herein.

8        198.    Defendant Wagner failed to comply with professional standards in the

9   treatment of Plaintiff's serious mental illness by, among others: failing to provide

10  appropriate assessment and evaluation, failing to ensure compliance with medications,

11  failing to ensure appropriate treatment including treatment at the appropriate level of care

12  and appropriate and timely initiation of involuntary medications, ordering use of force and

13  restraints inappropriate for Plaintiff's mental illness, failing to ensure Plaintiff was

14  properly decontaminated from the OC spray, and deliberately allowing Plaintiff's mental

15  health to decompensate while widely violating CDCR policies and professional standards.

16       199.    As a direct and proximate cause of Defendant Wagner's negligence and

17  failure to meet the professional standards of care, Plaintiff suffered injuries and damages as

18  alleged herein.

19       200.    Defendant Wagner's negligent conduct was committed within the course and

20  scope of his employment.

21       201.    As a direct and legal result of Defendant Wagner's acts and omissions,

22  Plaintiff suffered damages, including, without limitation, pain and suffering; emotional

23  distress; attorneys' fees; costs of suit; other pecuniary losses not yet ascertained.

24       202.    Defendant Wagner, by engaging in the aforementioned acts or omissions

25  and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional,

26  oppressive and despicable conduct, and/or acted with willful and conscious disregard of

27  the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and

28  exemplary damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendants as follows:

a.   Issue a judgment declaring that the acts of Defendants as described herein violated the Eighth and Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

b.   For compensatory damages, in an amount to be determined at trial;

c.   For punitive damages against individual Defendants in an amount to be proven at trial;

d.   For reasonable costs of this suit and attorneys' fees; and

e.   For such further relief as the Court may deem just, proper, and appropriate.

## **DEMAND FOR JURY**

Pursuant to Fed. R. Civ. P. 38(b) and Local Rule 201, Plaintiff demands trial by jury.

DATED: May 6, 2014                    Respectfully submitted,

RIFKIN LAW OFFICE

By:  */s/ Lori Rifkin*
_____
       Lori Rifkin

Attorney for Plaintiff

31

COMPLAINT – JURY TRIAL DEMANDED