UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERMAINE PADILLA, | No.  2:14-cv-1118 KJM-CKD |
| Plaintiff, | |
| v. | ORDER |
| JEFFREY BEARD, et al., | |
| Defendants. | |

This case challenges the treatment Jermaine Padilla, a mentally ill inmate, received while housed at California State Prison - Corcoran (Corcoran).  Mr. Padilla alleges between July and August 2012 defendants unconstitutionally delayed necessary medical treatment, engaged in excessive force when treatment was finally administered, failed to protect him from harm, and discriminated against him on the basis of his disability.  Defendants disagree, and have moved for summary judgment on Mr. Padilla's claims.  Mr. Padilla has moved for partial summary judgment on certain claims.

Both matters were submitted after a hearing on September 2, 2016, at which Diana Esquivel appeared for defendants and Lori Rifkin appeared for plaintiff.  ECF No. 150.  As explained below, defendants' motion is GRANTED IN PART and plaintiff's motion is DENIED.

/////

1

1    I.    PROCEDURAL HISTORY

2            Mr. Padilla filed his original complaint on May 6, 2014, ECF No. 1, a First

3    Amended Complaint on December 2, 2014, ECF No. 25, and the operative Second Amended

4    Complaint (SAC) on February 5, 2015, ECF No. 38.

5            A.    Defendants

6            In his Second Amended Complaint, Mr. Padilla named the following twenty-two

7    defendants: (1–6) R. Pruneda, R. Martinez, J. Acevedo, C. Garcia, E. Silva, and P. Holguin,

8    correctional officers at Corcoran; (7) M. Drew, a Sergeant at Corcoran and supervisor of the

9    correctional officer defendants; (8) M. Godina, a Lieutenant at Corcoran and supervisor

10   defendants Drew and the correctional officers; (9) J. Castro, a Captain at Corcoran and supervisor

11   of defendants Godina, Drew, and the correctional officers; (10–12) D. Overley, S. Johnson, and

12   Anthony Baer, supervising officers and administrators at Corcoran; (13) Dave Davey, an acting

13   warden at Corcoran; (14) Connie Gipson, a warden at Corcoran; (15) Jeffrey Beard, the former

14   Secretary of the California Department of Corrections and Rehabilitation (CDCR); (16) Michael

15   Stainer, the former Director of the Division of Adult Institutions for the CDCR;

16   (17) M.S. Robicheaux, a  Lieutenant at Corcoran; (18) Ernest Wagner, M.D., a psychiatrist in the

17   Corcoran Mental Health Crisis Bed Unit (MHCB); (19) P. LaClaire, Ph.D., a psychologist in the

18   Corcoran MHCB; (20) J. Soa, M.D., a member of the medical staff at Corcoran; and

19   (21-22) J. Kaiser and C. Solis, nursing staff at Corcoran. *See generally* SAC.  On July 14, 2014,

20   Mr. Padilla voluntarily dismissed defendants Sao, Silva, and Solis, leaving nineteen defendants in

21   the case.  ECF No. 136.

22           B.    Claims

23           In the Second Amended Complaint, Mr. Padilla first alleges excessive use of force

24   in violation of the Eighth Amendment against the following fifteen defendants in their individual

25   capacities:  Beard, Stainer, Gipson, Wagner, Castro, Godina, Drew, Pruneda, Martinez, Acevedo,

26   Garcia, Holguin, Overley, Johnson and Baer.  SAC ¶¶ 140–156.  For his second claim,

27   Mr. Padilla alleges all nineteen defendants, in their individual capacities, failed to provide

28   adequate medical and mental health treatment in violation of the Eighth Amendment.  *Id.*

1   ¶¶ 157–172.  Third, Mr. Padilla alleges all defendants except Robicheaux and Davey, in their

2   individual capacities, failed to protect him from harm in violation of the Eighth Amendment.  *Id.*

3   ¶¶ 173–183.  Finally, in his fourth claim, Mr. Padilla alleges Beard, Stainer, and Davey, in their

4   official capacities, discriminated against him in violation of the Americans with Disabilities Act

5   (ADA) and Section 504 of the federal Rehabilitation Act.  *Id.* ¶¶ 184–189.

6            On July 15, 2016, defendants filed a motion for summary judgment, ECF No. 128,

7   and the pending amended motion on August 5, 2016, Defs.' Am. Mot., ECF No. 142.  Mr. Padilla

8   opposed the amended motion on August 19, 2016, Pl.'s Opp'n, ECF No. 143, and defendants

9   replied, Defs.' Reply, ECF No. 147.   The same day defendants filed their original motion,

10  Mr. Padilla moved for partial summary judgment, ECF No. 129, and then filed his pending

11  amended motion on August 5, 2016, Pl.'s Am. Mot., ECF No. 141.  Defendants opposed

12  Mr. Padilla's motion on August 19, 2016, Defs.' Opp'n, ECF No. 145, and Mr. Padilla replied,

13  Pl.'s Reply, ECF No. 148.

14  II.    FACTUAL BACKGROUND

15           The following facts are undisputed unless otherwise noted.  Where a genuine

16  dispute exists, the court draws reasonable inferences in favor of Mr. Padilla on defendants'

17  motion, and for defendants on Mr. Padilla's motion.  *Tolan v. Cotton*, __ U.S. __, 134 S. Ct.

18  1861, 1868 (2014).  To the extent the court relies on evidence to which a party has objected, the

19  objection is overruled.

20       A.    Mental Health Programs in California's Prison System

21           The CDCR provides inmates access to several mental health programs, three of

22  which are relevant here: (1) Enhanced Outpatient Program (EOP), (2) MHCB, and

23  (3) Department of State Hospitals Inpatient Program, or DSH.[1]  Mental Health Services Program

24  Guide (Program Guide)[2], Rifkin Decl. Ex. 33 at 442, 449, 494, ECF No. 131.  Corcoran, where

25  _____

        [1] The Department of Mental Health changed its name to the Department of State Hospitals
26  on July 1, 2012.  *See* California's Department of Mental Health Transitioning into the New
    Department of State Hospitals,
27  http://www.dsh.ca.gov/Publications/docs/Transition_Plan/Press_Release_Updated4.pdf (last
    visited November 17, 2016).
28

                                            3

1  plaintiff was housed, has EOP and MHCB levels of care; inpatient care is not available at

2  Corcoran but is provided at other state hospital and prison locations.  *Id.* at 494.

3        EOP care is provided to inmates who have a "serious mental disorder"

4  contributing to, among other things, a demonstrated "inability to program in work," or

5  "impairment in the activities of daily living including eating, grooming and personal hygiene."

6  *Id.* at 448-49.  MHCB care is provided to inmates who require twenty-four hour nursing care

7  because of a "marked impairment and dysfunction in most areas," or who present a danger to

8  themselves or others.  *Id.*  As provided by the Program Guide, inmates admitted to the MHCB are

9  required to be discharged within ten days and transferred either to the general population or

10  outpatient care, or to inpatient care.  *Id.*  Stays over ten days must be approved by the Chief of

11  Mental Health, or a designee.  *Id.*  DSH inpatient care is provided for inmates who are "so

12  severely disturbed or suicidal that treatment needs cannot be met in a CDCR treatment program,"

13  such as the EOP or MHCB, or for inmates who require "a comprehensive psychiatric

14  assessment."  *Id.* at 494.

15        B.   <u>Mr. Padilla Enters Corcoran and Transfers to EOP</u>

16        Mr. Padilla has had a long history of mental illness, which has led him to

17  numerous involuntary hospital admissions when not incarcerated and DSH inpatient care while in

18  prison.  Defs.' Undisputed Material Fact (DUMF) No. 2, ECF No. 143-1.

19        When Mr. Padilla first arrived at Corcoran in May 2012, he went through a mental

20  health screening as required by the Program Guide.  Pl.'s Undisputed Material Fact (PUMF)

21

---

22      [2] In 1995, California's Governor and certain prison officials were found to be violating the
Eighth Amendment by virtue of constitutionally inadequate delivery of mental health care to a

23  class of seriously mentally ill inmates.  *Coleman v. Wilson*, 912, 12 F. Supp. 1282 (E.D. Cal.
1995).  The Program Guide has been developed by CDCR as an integral part of its efforts to

24  remedy these Eighth Amendment violations and achieve compliance with the court's orders in the

25  *Coleman* case.  *See, e.g., Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 900-01 (E.D. Cal. &
N.D. Cal. 2009) (three judge court order).  In light of the *Coleman* court's review and approval of

26  the Program Guide, and the court's expectation that the Program Guide is being followed as the
defendants in *Coleman* come into compliance with the requirements the Constitution imposes on

27  the provision of prisoner mental health care, its provisions have weight to the extent they are
relevant to issues in this action.

28

No. 2, ECF No. 148-2; Mental Health Screening at 1, Rifkin Decl. Ex. 32, ECF No. 131.  After the screening, he was placed in the EOP.  PUMF No. 2.  When Mr. Padilla first arrived, he regularly took his prescribed medications.  PUMF No. 6.  In June 2012, however, he stopped taking his medications, started exhibiting auditory hallucinations and illogical thought processes, appeared delusional, and started talking to himself.  PUMF Nos. 7, 8; EOP Interdisciplinary Progress Notes (EOP Progress Notes) at 435, Rifkin Decl. Ex. 32.

On June 20, 2012, members of Mr. Padilla's treatment team decided they would observe him for another month in the EOP and, if his behavior did not improve, he would be referred to DSH for inpatient care.  EOP Progress Notes at 438.  The treatment team also noted if he continued to decompensate, it would recommend referring him to "D[S]H immediately."  *Id.* at 439.

C.    Mr. Padilla Transfers to Medical Health Crisis Bed (July 1, 2012)

Before a month was up, by July 1, 2012, Mr. Padilla had refused his medication for at least three weeks.  DUMF No. 3.  He began complaining of suicidal ideations and stated someone was going to kill him.  Wagner Decl. in Support of Involuntary Medication at 414, Rifkin Decl. Ex. 21.  Mr. Padilla was transferred to the MHCB unit that same day.  PUMF No. 21.  While Mr. Padilla was in the MHCB, psychiatrist Ernest Wagner and psychologist Phillip LaClaire formed the Interdisciplinary Treatment Team (IDTT) responsible for Mr. Padilla's treatment.  Wagner Dep. at 77:16–19.  The team visited Mr. Padilla almost every day of his stay and recorded progress notes describing his condition during each visit.  Wagner Dep. at 78:1–10.

D.    Mr. Padilla's Condition in MHCB Cell

From July 1 to July 24, 2012, Mr. Padilla was housed in a single cell in the MHCB unit.  Nursing Care Notes at 86–231, Rifkin Decl. Ex. 10.  Throughout his time in the MHCB, interdisciplinary progress notes from the IDTT and nursing care notes from MHCB custody nurses recorded Mr. Padilla's progress, behavior, and condition.  *See* MHCB Progress Notes, Esquivel Decl. Ex. B at 27–84, ECF No. 132-2; Nursing Care Notes at 86–231, Rifkin Decl. Ex. 10, ECF No. 131.  Mr. Padilla and defendants both cite extensively to these two sets of notes,

which coupled with the parties' undisputed material facts, provide the foundation for the factual background set forth below.

On July 2, 2012, when psychiatrist Wagner and psychologist LaClaire first saw Mr. Padilla, they noted he appeared disheveled, malodorous, and had limited to poor function as if in psychosis. MHCB Progress Notes at 27–35. Over the next three days, Mr. Padilla appeared unkempt, refused to exit his cell for his treatment team interview, and refused to take his medication. DUMF No. 6, 9; MHCB Progress Notes at 35; Nursing Care Notes at 93–100. Specifically, on July 3, he was observed eating, talking loudly to himself, and complaining that staff was trying to destroy him. Nursing Care Notes at 93–94. On July 4, he was observed speaking loudly and exhibiting mostly unintelligible outbursts while lying naked on the floor. Nursing Care Notes at 95–97. On July 5, nursing staff observed Mr. Padilla screaming on and off throughout the morning. Nursing Care Notes at 100–112.

On July 6, Mr. Padilla at first refused to attend his treatment team interview, but eventually did attend. MHCB Progress Notes at 37. Mr. Padilla was unkempt, his hair was matted, and he appeared confused. At one point in his interview, after Mr. Padilla said "excuse me, I . . . ," his head slumped and he appeared to nod off. *Id.* That day, nursing staff noted Mr. Padilla exhibited an alteration in thought process, had a flat affect, and poor eye contact. *Id.* As with prior days, Mr. Padilla refused to take his medication. *Id.*

From July 7 to 8, Mr. Padilla appeared nonresponsive, depressed, and uncooperative. MHCB Progress Notes at 38. On July 7, Mr. Padilla refused to eat breakfast and lunch, sat naked on his cell mattress, and stared out the window. *Id.* On July 8, he accepted his breakfast and lunch. *Id.*

On July 9, Drs. Wagner and LaClaire found Mr. Padilla drinking water from his sink. *Id.* While he refused to take his medicine, he appeared in no distress, and was observed lying quietly on his mattress. Nursing Care Notes at 111–113. Later that day, however, he was seen naked in his cell and nursing staff suspected he had urinated on the floor. *Id.* On July 10, Mr. Padilla refused to attend his treatment team appointment. MHCB Progress Notes at 39. He was observed resting quietly at various points throughout the day, although he continued to refuse

6

his medication.  Nursing Care Notes at 114–116.  At this point, ten days into Mr. Padilla's MHCB stay, Dr. LaClaire noted Mr. Padilla might require or benefit from involuntary medical treatment in the near future.  MHCB Progress Notes at 39.

On July 11, Mr. Padilla continued to appear quiet, and was observed sleeping for much of the day.  Nursing Care Notes at 117–119.  Similarly, on July 12, a Thursday, Mr. Padilla spent the day lying on his mattress.  *Id.* at 120–122.  Although this was his eleventh day in the MHCB, Dr. Wagner decided to continue monitoring Mr. Padilla over the weekend and to consider discharging him to EOP on Monday, July 16.  MHCB Progress Notes at 24–26.

Also on July 12, Drs. Wagner and LaClaire documented the reasons behind their decision not to refer Mr. Padilla to DSH although he had been in the MHCB for more than the ten days set as a limit by the Program Guide.  IDTT Form at 564, Rifkin Decl. Ex. 36.  The doctors noted Mr. Padilla's "psychotic symptoms [were] less pronounced."  *Id.*  They also noted, however, that Mr. Padilla "continues to refuse medical [treatment]."  *Id.*  While the doctors decided to leave him in MHCB to "continu[e] to monitor the severity of Mr. Padilla's psychotic symptoms," they noted they were "considering nonemergency involuntary medical [treatment]."  *Id.*

From July 13 to 16, Mr. Padilla appeared uncooperative, unreceptive, refused his medication, and refused to attend his treatment appointments.  Nursing Care Notes at 123–134.  In particular, on July 15, Mr. Padilla appeared "grossly psychotic and disorganized," spent most of the day unclothed, stated, "I hear Mexican voices and see my dad, " but also stated, "I'm not suicidal or homicidal," *id.* at 130.  On July 16, he appeared to be yelling, and was "clearly very psychotic."  MHCB Progress Notes at 43.  During the same time span, however, he was observed eating his food, *id.* at 38, giving up his trash for collection, *id.* at 43.

Although Dr. Wagner had noted on July 12 that he would consider discharging plaintiff to EOP on July 16, the record contains no indication of whether Dr. Wagner entertained discharge on that date.

On July 17, Mr. Padilla was observed eating lunch, lying on his mattress, and refusing to talk.  MHCB Progress Notes at 43–45; Nursing Care Notes at 50.  Dr. LaClaire

1    drafted an IDTT level of care decision note, again recommending Mr. Padilla not be referred to a

2    higher level of care.  MHCB Progress Notes at 44–45.  Dr. LaClaire noted Mr. Padilla exhibited

3    "no further deterioration in mental health with some modest improvements in his ability to

4    function." *Id.*  Dr. LaClaire also noted Mr. Padilla did not take his medications, and psychiatry

5    would start "the non-emergency involuntary med[ication] application process for signs and

6    symptoms of grave disability." *Id.* at 44.

7        On July 18, Mr. Padilla was observed eating his breakfast but remained unkempt,

8    did not reply to questions, had a flat affect, and refused his medication.  Nursing Care Notes at

9    52–53.  That day, Drs. LaClaire and Wagner initiated the process to discharge Mr. Padilla from

10   MHCB to EOP.  MHCB Progress Notes at 47.  In the discharge form, the doctors stated while

11   Mr. Padilla was psychotic, he showed no change in his condition.  *Id.*  They agreed no referral

12   would be made to DSH because Mr. Padilla would be able to benefit from a non-emergency

13   "Keyhea"[3] order for involuntary medical treatment without inpatient hospitalization.  *Id.*

14       On July 19, Dr. Wagner rescinded the order to discharge Mr. Padilla.  Wagner

15   Dep. at 122:1–17.  The parties dispute Dr. Wagner's reasons for rescission.  In his deposition,

16   Wagner testified the decision to rescind the order was either because of Mr. Padilla's

17   "deterioration or because the EOP program said they couldn't employ the level of care he needs."

18   *Id.* (verbatim transcription).  Defendants say the evidence of record suggests Dr. Wagner's

19   decision was attributed to recent changes in Mr. Padilla's mental health status, *see* Nursing Care

20   Notes at 55, but this court's review of the record had not identified any such changes with clarity

21   as the nursing notes simply report Mr. Padilla's sleeping a lot without appearing to be in distress.

22

23

24       [3] In *Keyhea v. Rushen*, 178 Cal.App.3d 526, 542 (Cal. Ct. App. 1986), the court set forth
     the substantive and procedural safeguards states must follow in seeking to involuntarily medicate
25   state prisoners with long-term psychotropic medications.  Such court orders are commonly known
     as "Keyhea" orders.  The record appears to reflect defendants sought an involuntary medication
26   order based on "grave disability" in order to continue medication following Dr. Wagner's initial
     order that Nurse Kaiser administer psychotropic medication to Mr. Padilla, as referenced below.
27   ECF No. 131 at 414-417.

28

1    Mr. Padilla characterizes the record as suggesting Dr. Wagner simply failed in his attempt to

2    transfer Mr. Padilla to EOP.

3           On July 20, Mr. Padilla was observed resting on his mattress, exhibiting a

4    "socially non interactive" demeanor and continuing to refuse medication.  Nursing Care Notes at

5    58.  On July 21, the on-call psychiatrist noted Mr. Padilla was "psychotic and gravely disabled,"

6    had not showered in twenty-one days, had smeared feces, peanut butter, and food remains upon a

7    dried puddle of urine, and was lying naked on the cell floor.  Medical Treatment Record at 372,

8    Rifkin Decl. Ex. 20.  The nurse who observed him noted Mr. Padilla was unable or unwilling to

9    care for himself in the basic ways that another inmate could.  Nursing Care Notes at 61.

10          On July 22, twenty-one days after his transfer to the MHCB, Mr. Padilla was

11   observed as filthy and unkempt, malodorous, delusional and psychotic, and talking to himself.

12   Medical Treatment Record at 373.  At one point in the day, Mr. Padilla screamed, "stay away

13   from my door, don't get near me."  Nursing Care Notes at 64.  Although his cell was scattered

14   with trash, he refused to exit his cell to obtain treatment.  MHCB Progress Notes at 53.  On

15   July 23, Mr. Padilla again refused to exit his cell, and at one point in the day, was seen fondling

16   his penis.  *Id.*  He continued in his refusal to take medication. *Id.*

17          E.      Dr. Wagner on CDCR General Practice of Not Transferring Inmates to DSH

18          As noted above, under the Program Guide, inmates admitted to the MHCB must be

19   discharged within ten days unless a longer stay is approved by the Chief of Mental Health or

20   designee.  Program Guide at 449.  At his deposition, Dr. Wagner testified he was aware of the

21   CDCR's ten-day MHCB stay policy.  Wagner Dep. at 81:14–16.  It is undisputed Mr. Padilla was

22   never discharged or referred to DSH.

23          During his deposition, Dr. Wagner explained the decision not to refer Mr. Padilla

24   to DSH reflected a general institutional practice of not transferring mentally ill inmates to DSH.

25   *See* Wagner Dep. at 83:16–18.  Dr. Wagner explained that in the MHCB referring inmates like

26   Mr. Padilla to inpatient care "wasn't a common thing we did."  *Id.*

27          When asked to explain the reason behind this practice, Dr. Wagner said: (1) "if

28   you referred a patient, it required a bunch of paperwork," (2) "to secure an admission outside of

9

1  the prison [] took usually weeks," (3) "the [DSH] was not accepting them," and (4) "it was not

2  common practice to [recommend a transfer] because of the great delay in effecting a transfer."

3  Wagner Dep.  at 83:20–84:13.  Dr. Wagner further testified it was "common knowledge" that the

4  CDCR largely lacked resources to promptly effectuate a transfer, and that the common

5  knowledge was shared among members of the MHCB treatment team.  Wagner Dep.  at 85:1–2.

6            Dr. Wagner gave another reason for his decision to decline a referral to DSH: "we

7  had the capacity to treat him."  Wagner Dep. at 86:5–6.  Dr. Wagner believed taking care of Mr.

8  Padilla in the MHCB was preferable because the transfer could be "traumatic to the patient,"

9  particularly a psychotic inmate like Mr. Padilla.  Wagner Dep. at 88:6–7.  Further, the staff at the

10  DSH did not know Mr. Padilla, so in Dr. Wagner's opinion, he and the treatment team could

11  provide better treatment if Mr. Padilla stayed in the same facility.  Wagner Dep. at 88:8–11.

12  Dr. Wagner testified another reason he did not transfer Mr. Padilla to DSH was because he "had

13  not deteriorated" and "he didn't get worse."  Wagner Dep. at 88:19–25.  Mr. Padilla was still

14  accepting much of his food, and his condition "wax[ed] and wan[ed]."  Wagner Dep. at

15  126:22-127:1, 179:1–11.  As discussed below, although Dr. Wagner never referred Mr. Padilla to

16  DSH, he eventually ordered involuntary medication.

17        F.      Dr. Wagner Orders Involuntary Treatment for Mr. Padilla

18            By July 24, 2012, Mr. Padilla was observed flooding his cell, standing in inches of

19  contaminated water that contained feces, smearing himself with feces, and attempting to ingest

20  his feces.  PUMF No. 55.  Defendants point to evidence suggesting Dr. LaClaire attempted to

21  convince Mr. Padilla to come out of his cell at some time in the morning.  LaClaire Dep. 42:10–

22  49:16.  During his attempt, Dr. LaClaire informed Mr. Padilla of the importance of taking his

23  medication, and indicated the treatment team was "worried" about him, but Mr. Padilla did not

24  respond coherently.  LaClaire Dep. 42:10–49:16.  Defendants cite to evidence showing later that

25  day, Dr. LaClaire again attempted to convince Mr. Padilla to take his medication, but, again, was

26  unsuccessful in his efforts.  *Id.*  The record does not make clear the exact time Dr. LaClaire's

27  second attempt occurred.

28

1    At approximately 12:00 p.m., MHCB custody staff attempted to communicate to

2    Mr. Padilla to get him to take his medication voluntarily, but he refused.  Crime Incident Report

3    at 9, Rifkin Decl. Ex. 2, ECF No. 131.  After this attempt to administer his medication,

4    Mr. Padilla was given a period to "cool down," from 12:00 p.m. to 12:25 p.m.  *Id.*; Pl.'s

5    Additional Undisputed Material Fact (AUMF) No. 62, ECF No. 143-1.   Almost immediately

6    after the cool down period, Dr. LaClaire engaged in a "32-second intervention" with Mr. Padilla,

7    attempting but failing to convince Mr. Padilla to come out of his cell to take his medication.

8    Crime Incident Report at 9; PUMF No. 62; *see* Clinical Intervention Video.[4]

9    Shortly after Dr. LaClaire's 32-second intervention, Dr. Wagner ordered MHCB

10   custody staff to extract Mr. Padilla from his cell to administer his medication involuntarily.

11   PUMF No. 56; DUMF No. 42.  The CDCR assembled a team of eight officers to extract

12   Mr. Padilla: (1) Captain Castro as the supervisor on site; (2) Lieutenant Godina as the incident

13   commander; (3) Sergeant Drew as the team leader responsible for administering pepper spray;

14   (4) Officer Acevedo as the "shield," the job description of the person responsible for making sure

15   the food port was covered after pepper spray was administered; (5) Officer Pruneda on the baton;

16   (6) Officer Garcia on handcuffs; (7) Officer Martinez on leg irons; and (8) Officer Holguin as

17   scribe, to log details of the extraction.  DUMF No. 43.

18                    1.    Officers Administer Pepper Spray During Extraction

19   At approximately 1:28 p.m., on July 24, Lieutenant Godina read Mr. Padilla a "cell

20   extraction admonishment," in which he ordered Mr. Padilla to voluntarily exit the cell, submit to

21   handcuffs, and take his medication.  Crime Incident Report at 9.  The Cell Extraction Video of the

22   incident shows Godina reading the admonishment outside Mr. Padilla's cell door, after having

23   donned a gas mask.  Cell Extraction Video at 3:41.[5]   Mr. Padilla did not comply with the

24   admonishment.  Crime Incident Report at 9.

25   _____

26   [4] The Clinical Intervention Video showing Dr. LaClaire's attempt to communicate with
     Mr. Padilla through his closed cell door has been lodged with and viewed by the court.

27

28   [5] The Cell Extraction Video has been lodged with and viewed by the court.

1          After Mr. Padilla did not comply, the team proceeded to extract Mr. Padilla from

2   his MHCB cell.  *Id.*  Each team member donned a gas mask; several team members wore white

3   protective suits over their uniforms.  *See generally* Cell Extraction Video at 1:00 to 3:30.  After

4   several orders for Mr. Padilla to "cuff up," to which he did not respond, Sergeant Drew dispersed

5   a total of four cans of pepper spray into Mr. Padilla's cell over a period of time: one, an MK-46,

6   and the other three, MK-9s.  Crime Incident Report at 8.  Sergeant Drew testified he "empt[ied]"

7   the MK-46 and at least one of the MK-9 cans into the cell when attempting to extract Mr. Padilla.

8   *See* Drew Dep. at 112:15-18, 113:5–10.

9          Specifically, as documented in the written incident report and generally consistent

10  with the Cell Extraction Video, within a few minutes of Lieutenant Godina's admonishment to

11  Mr. Padilla, Sergeant Drew sprayed one continuous burst from the MK-46 pepper spray can into

12  Mr. Padilla's cell through the food port.  Crime Incident Report at 20.  Within "a couple

13  minutes," Sergeant Drew emptied two MK-9 canisters through the food slot of Mr. Padilla's cell.

14  Drew Dep. at 113:4–15, 114:4–18.  Approximately "one minute" after the application of the MK-

15  9 canisters, Mr. Padilla appeared overwhelmed by the pepper spray and approached the cell door

16  in an apparent attempt to submit to cuffs.  Crime Incident Report at 20; Drew Dep. at 116:1–13.

17  The extraction team handcuffed and fastened Mr. Padilla's left wrist to a heavy metal triangle

18  attached to a lanyard also made of metal and pulled the lanyard through the front slot.  Drew Dep.

19  at 116:1–13; Wagner Dep. at 75:1-15.  The incident report notes Mr. Padilla did not submit his

20  right hand to be cuffed.  Crime Incident Report at 9.  At one point in response to an order to cuff

21  up, Mr. Padilla says "I tried."  Cell Extraction Video at 9:00.  A bit later, Mr. Padilla's right hand

22  appears to be resting in the food port opening.  *Id.* at 10:00.  Sergeant Drew says that

23  approximately "one minute" after Mr. Padilla submitted his left hand, Drew emptied the last MK-

24  9 canister into the cell.  Drew Dep. at 116:14–25.  After the first application of pepper spray, at

25  least one member of the extraction team starts to say to Mr. Padilla, "let's put you in the shower,"

26  repeating this statement or statements like it multiple times.  *See, e.g.,* Cell Extraction Video at

27  11:20.

28

1          2.      Officers Extract Mr. Padilla from Cell

2                  Approximately nine minutes after the first pepper spray can was dispersed,

3   Sergeant Drew opened the door to physically restrain Mr. Padilla.  PUMF No. 63.  The parties do

4   not dispute that at this moment Mr. Padilla resisted the officers' efforts to restrain him.  DUMF

5   No. 48.  The incident report states that Mr. Padilla became combative and physically resisted all

6   efforts to be subdued.  Crime Incident Report at 22.  The officers attempted to bring Mr. Padilla

7   to the ground by using their combined body weight, but Mr. Padilla continued to be physically

8   resistant by twisting his body back and forth.  *Id.*  At his deposition, Sergeant Drew testified the

9   officers had difficulty obtaining control because Mr. Padilla's physical strength was

10  "phenomenal."  Drew Dep. at 119:12–13.  The Cell Extraction Video does show a struggle during

11  which Mr. Padilla is wrestled to the ground, after which he appears to end up on the ground

12  behind the open cell door.  The audio track of the Video appears to record the sounds of the chain

13  attached to the lanyard clanking, and one fleeting image may show the chain wrapped around Mr.

14  Padilla's body.  At one point, it sounds as if Mr. Padilla says, "you're choking me."  *See*

15  *generally* Cell Extraction Video at 17:00-19:00.  Given that the camera's view is blocked in part

16  by officers' bodies and the open door, it is not possible for the court to distill a clear narrative of

17  exactly what was happening during this time; certainly no narrative that eliminates alternative

18  characterizations of the event for the purposes of summary judgment is possible.

19                 During the extraction, Captain Castro, the supervisor, observed Mr. Padilla was "in

20  a mental state where he could not follow[] the simplest [sic] instruction."  Crime Incident Report

21  at 21.  Dr. Wagner, who was in the nursing station across the hall at the time of the extraction,

22  testified the extraction process was "painfully difficult" for Mr. Padilla, and from hearing his

23  cries as he was pulled out of his cell, he "knew" Mr. Padilla was suffering.  Wagner Dep.

24  46:24-25; 47:14–15.  It is generally undisputed during the extraction, Mr. Padilla was screaming

25  and crying for help.  PUMF No. 67.  The audio track of the Cell Extraction Video appears to

26  record deep coughing and gagging.  Cell Extraction Video at 16:00-16:41.

27                 After several minutes of struggling, Mr. Padilla was placed on a gurney, where

28  Mr. Padilla continued to resist the officers' attempts to subdue him.  Crime Incident Report at 9;

13

Cell Extraction Video at 18:52-19:15.  While on the gurney, Mr. Padilla was taken to a nearby room where a five-point restraints bed[6] was located and officers placed him in five-point restraints; during a portion of this time Mr. Padilla is place on his back with his hands cuffed behind his back with at least one officer pressing on his chest.  Cell Extraction Video at 20:01–22:30.  Ultimately the handcuffs were removed, one of the restraints secured across Mr. Padilla's chest, and the rest of the restraints secured as well.  *Id.* at 23:00 – 25:48.  Expert Eldon Vail observed that during this time, Mr. Padilla talked about his skin peeling and his discomfort stemming from the pepper spray.  Vail Dep. at 118:16–24; *see, e.g.,* Cell Extraction Video at 23:15.  The Video records Mr. Padilla saying at one point he "can't breathe."  Cell Extraction Video at 25:22-35.  After Mr. Padilla is secured with the restraints, someone apparently starts to cover him with a blanket, but another person can be overheard saying a blanket is not a good idea prior to decontamination.  *Id.* at 27:44.

In his deposition, Sergeant Drew testified the officers anticipated taking Mr. Padilla to the shower to be decontaminated.  Drew Dep. at 121:14–17.  Specifically, Sergeant Drew asked Mr. Padilla if he wanted to decontaminate, but Mr. Padilla never answered, so Sergeant Drew assumed he did not want a shower.  *Id.*  Sergeant Drew obtained alcohol pads to swab Mr. Padilla's left wrist and every other area scratched during the extraction.  Drew Dep. at 124:17–23.  At his deposition, Drew stated he took this step to prevent systemic infection.  *Id.*  Shortly after Sergeant Drew swabbed Mr. Padilla, the officers left the area because it was the end of their shift and MHCB Nurse Kaiser arrived to resume responsibility for Mr. Padilla's care.  Drew Dep. at 125:9–10; Godina Dep. at 43:9-13.  The officers had no further interaction with Mr. Padilla.  Drew Dep. at 125:9-10.

---

[6] The five-point restraints bed was equipped, as suggested by its name, with five restraints: two restraints were attached to the bottom corners of the bed and were used for the legs, two were attached to the middle sides of the bed and were used for the arms, and one was attached to the left upper side of the bed and was used to go across the chest.  Cell Extraction Video at 20:01-22:30.  The restraints were made of cloth, and were used initially to subdue Mr. Padilla while he received involuntary medication.  *Id.*

1      After Mr. Padilla was secured in the five-point restraints, Nurse Kaiser

2   administered medication to him by gluteal injection.  Crime Incident Report at 2; Kaiser Dep.

3   58:23-25.  During this time, Nurse Kaiser was wearing a white filtration mask covering her nose

4   and mouth.  *See, e.g.,* Cell Extraction Video at 28:50.  After she administered medication, she

5   medically cleared Mr. Padilla, meaning she checked to determine if he was in any distress or

6   having difficulty breathing before making a determination that he no longer required close

7   medical attention.  DUMF No. 49; Kaiser Dep. at 81:9–25.  Mr. Padilla cites to plaintiff's expert

8   Edward Kaufman's declaration to suggest Kaiser medically cleared Mr. Padilla without

9   completing a medical exam or ensuring he was decontaminated.  Kaufman Decl. ¶ 71, Rifkin

10  Decl. Ex. 61; Kaiser Dep. at 84:8-16, 126:6-16, Rifkin Decl. Ex. 66.  At her deposition, Nurse

11  Kaiser testified she did not decontaminate Mr. Padilla because "she didn't. . . notice any pepper

12  spray" on his body.  Kaiser Dep. at 108:1–3.  Specifically, when she medically cleared Mr.

13  Padilla, she observed no "pepper spray burns all over his face. . . or . . snots pouring down his

14  nose."  Kaiser Dep. at 108:19–23 (verbatim transcription).

15      Mr. Padilla remained in the five-point restraints for approximately seventy-two

16  hours from July 24 to July 27, 2012.  PUMF No. 76.  During this time, Mr. Padilla did not

17  shower, and the pepper spray was not washed from his body.  Solis Dep. at 60:5–61:15.[7]  The

18  parties agree a fan was set up and directed toward Mr. Padilla as he was restrained; defendants

19  say this method was to diffuse the effects of the pepper spray that remained on his body.  DUMF

20  No. 50.  The only physical injury noted on Mr. Padilla after the extraction was completed was a

21  scratch to his left wrist and fingers.  Rules Violation Report at 66, Esquivel Decl. Ex. O.

22      While Mr. Padilla remained in the five-point restraints, MHCB nurses drafted

23  progress notes to record his condition for each day.  Restraint Documentation at 7, Esquivel Decl.

24  Ex. N.  During Mr. Padilla's first day on July 24, the notes say his mood was calm, his speech

25  was clear, and he was resting quietly.  *Id.*  The same day, he noted, "I am not hearing voices," and

26

27      [7] Solis is a nurse in the MHCB and was a former defendant in this case before the parties
    stipulated to his dismissal.  *See* ECF Nos. 126, 136.

28

1   was observed responding to his medication.  *Id.* at 8.  He remained calm and quiet the next day,

2   was clear when he spoke, and at one point, was able to sit up.  *Id.* at 14–27.  While he refused his

3   urinal several times and instead urinated on himself, he otherwise appeared "normal," and

4   "cooperative."  *Id.* at 23, 36.  On July 25, notes in the file say Mr. Padilla was sitting up and

5   saying, "I want to stand up, I want to get out," but he was not released.  *Id.* at 25.  On July 26, he

6   was observed yelling out intermittently, but largely remained "normal," and "calm,"

7   "cooperative," and "more compliant."  *Id.* at 37–42.  On July 26, he was observed requesting to

8   get out of his restraints, *id.* at 41, and making attempts to get out by pulling on the arms of the

9   five-point restraints.  *Id.* at 43.  Again, he was not released.  The record reflects he suffered

10   injuries in his attempt to get out of restraints, but does not make clear what those injuries were.

11   *Id.* at 46.  By July 27, Mr. Padilla spent much of the day sleeping.  *Id.* at 53.

12          In the meantime, on July 25, Dr. Wagner signed a declaration in support of an

13   application for a court order to continue involuntarily medicating Mr. Padilla.  ECF No. 131 at

14   414-417.

15          On July 27, Mr. Padilla was released from five-point restraints, after his release

16   was ordered not by Dr. Wagner but by a Dr. Wang.  DUMF No. 55; ECF No. 141-1 at 10.  Mr.

17   Padilla then showered and was placed into another cell.  Nursing Care Notes at 85.  He then

18   returned to the MHCB until August 14, and then returned to the EOP on August 15, 2012.  PUMF

19   No. 84–85.

20      G.      Mr. Padilla Receives a Rules Violation Report

21              1.      Pre-Hearing Interview

22          Following the cell extraction, Sergeant Drew issued a Rules Violation Report

23   (RVR) to Mr. Padilla for "obstructing a peace officer in the performance of his duties resulting in

24   the use of force."  PUMF No. 88.  Mr. Padilla received a copy of the report on August 1, 2012.

25   MHCB Progress Notes at 74.

26          According to CDCR policy, when an EOP or MHCB inmate is charged with a

27   disciplinary violation, a mental health clinician must assess whether the inmate's mental illness

28   contributed to the behavior leading to the RVR.  PUMF No. 90.  This in turn allows the hearing

1   officer to consider the inmate's mental illness while adjudicating the violation.  *Id.*  Accordingly,

2   CDCR psychologist Andrea Lackovic interviewed Mr. Padilla in connection with the RVR on the

3   same day he received a copy, August 1, 2012.  MHCB Progress Notes at 74.

4   After the interview, Dr. Lackovic concluded Mr. Padilla's mental illness

5   contributed to his behavior during the extraction.  DUMF No. 59.  In particular, Dr. Lackovic

6   found due to his mental state, which included delusions, false thoughts, and paranoia, Mr. Padilla

7   did not seem to understand the consequences of not complying with a custody order.  *Id.*  While

8   not making a determination of guilt, reserved for the hearing officer, Dr. Lackovic also noted that

9   if Mr. Padilla were to be found guilty of the rules violation, he would benefit from sentencing

10  conditions that took account of his need for therapy and activities that provide "reality

11  orientation," such as the ability to know the time of day or year.  RVR at 78, Rifkin Decl. Ex. 4.

12  Dr. Lackovic also concluded Mr. Padilla would benefit from social interaction, talking with

13  others, and other activities that would prompt his memory.  *Id.*  At her deposition, Dr. Lackovic

14  stated she gave the hearing officer specific information "to let [him] know, from a mental health

15  standpoint, what he would benefit from to make sure that those things aren't removed."  PUMF

16  No. 95; Lackovic Depo. at 40:23–41:8.

17  2.   RVR Hearing

18  On August 8, 2016, Lieutenant Robicheaux, a CDCR Senior Hearing officer, held

19  the RVR disciplinary hearing.  DUMF No. 62.  Staff assistant J. Alafa, who interviewed Mr.

20  Padilla at least twenty-four hours in advance of the charges brought against him and answered

21  any questions he had, attended the hearing on Mr. Padilla's behalf.  RVR at 65.  Mr. Padilla did

22  not attend this hearing, and Robicheaux as the hearing officer entered a not guilty plea for him.

23  RVR at 66.  Several pieces of evidence were presented at the hearing, including the rules

24  violation log detailing the extraction and Dr. Lackovic's mental health assessment.  *Id.*

25  After reviewing the evidence presented and the factual findings made by Sergeant

26  Drew, Lieutenant Robicheaux found Mr. Padilla guilty of the charge of obstructing a peace

27  officer in the performance of his duties.  *Id.*  Lieutenant Robicheaux assessed penalties against

28  Mr. Padilla, which included ninety days' forfeiture of credit and thirty days' loss of privileges

1    including dayroom, television and radio visits, family visits, "special purchase," telephone

2    privileges, and access to a "quarterly package."  *Id.*  The ninety day forfeiture of credit was

3    eventually restored on November 28, 2012.  Esquivel Decl. Ex. A at 6, ECF No. 132-2.[8]

4           The thirty day loss of privileges was expected to last from August 8 to

5    September 7, 2012, and was to be imposed upon Mr. Padilla's release from the MHCB.  RVR at

6    66.  The parties dispute whether the thirty days' loss of privileges was restored or rescinded; the

7    court's review of the record does not resolve the dispute.  DUMF Nos. 64, 68 (disputed with

8    explanation).

9           Mr. Padilla did not receive a copy of the adjudication until August 26, 2012, after

10   he was released from MHCB.  DUMF No. 67.

11          3.    Defendant Johnson Reviews Robicheaux's Decision

12          At the time of Mr. Padilla's extraction, defendant Johnson was the Associate

13   Warden for Health Care and Chief Disciplinary Officer (CDO).  He was tasked with reviewing

14   _____

15          [8] Exhibit A is CDCR Committee Action Summary Sheet.  Mr. Padilla objects to the
     admission of this evidence, contending defendants did not offer any testimony from anyone with
16   personal knowledge of the documents or information supporting this evidence.  ECF No. 148-3.
     The objection is overruled.

17          In a summary judgment motion, documents attached to an exhibit list can be authenticated
18   by review of their contents if they appear to be sufficiently genuine.  *Orr v. Bank of Am., NT &
     SA*, 285 F.3d 764, 778 n.24 (9th Cir. 2002); *see* Fed. R. Evid. 901(b)(4)(authenticity may be
19   satisfied by the "[a]ppearance, contents, substance, internal patterns, or other distinctive
     characteristics, taken in conjunction with circumstances."); *United States v. Whitworth*, 856 F.2d
20   1268, 1283 (9th Cir.1988) (authenticating letters by the linkage between the dates of postmarks
     and defendant's location on the days letters mailed).  In such instances, a proper foundation need
21   not be established through personal knowledge but can rest on any manner permitted by Federal
     Rule of Evidence 901(b) or 902.  *See* Fed. R. Evid. 901(b) (providing ten approaches to
22   authentication); Fed. R. Evid. 902 (self-authenticating documents need no extrinsic foundation).

23          Here, Exhibit A is attached to an exhibit list submitted in support of defendants' motion
24   for summary judgment.  *See* ECF No. 132-2.  Exhibit A purports to be a Department of State
     Hospitals Institution Classification Committee Action Summary Sheet.  It has Mr. Padilla's name
25   located at the top of the document, his inmate identification number, the date of the committee
     report, and the Committee's decision to restore the ninety day credits.  *See* Ex. A at 10.
26   Additionally, dates in the exhibit correspond with other evidence in the record, specifically
     Mr. Padilla's time in the Salina Valley Psychiatric Program.  *See* SVPP Treatment Plan, Pl.'s
27   Ex. 70, ECF No. 148-1.  The court finds the evidence is admissible.

28

                                            18

1   Robicheaux's RVR decision.  PUMF No. 108.  Part of Associate Warden Johnson's responsibility

2   as CDO was to assess whether as the hearing officer Robicheaux adequately took into account

3   information from the mental health assessment in accordance with CDCR policy.  PUMF No.

4   110.  As the CDO, Johnson had authority to recommend changes to the disposition of the RVR,

5   including altering a change, downgrading the penalties assessed, or dismissing the charge.

6   PUMF No. 109.  Associate Johnson approved Robicheaux's findings and disposition.  PUMF

7   No. 111.

8          H.     <u>CDCR Supervisors Review Force used in Cell Extraction</u>

9          Supervisors in the CDCR also were tasked with reviewing the force used in

10   Mr. Padilla's extraction.  Following an incident like Mr. Padilla's, which involved the use of

11   physical force and a chemical agent, the incident was subject to a review process in which CDCR

12   supervisors evaluated the staff's actions, determined if the force was appropriate, determined

13   whether there were policy or procedures violations, if improvement was needed, and whether any

14   deficiencies could be resolved by training or with a policy change.  DUMF No. 69.  This post-

15   incident review process involved four levels of review by members of an Institutional Executive

16   Review Committee (IERC), comprised of various managers, supervisors, and members of the

17   medical or mental-health staff.  *Id.*

18          Mr. Padilla's extraction underwent the required review as follows.  Captain

19   Overley conducted the first level Manager's Review; Associate Warden Johnson conducted the

20   second level Manager's Review; and Lieutenant Baer, who also served as administrative assistant

21   and public information officer to Warden Gipson, conducted the final institutional level review.

22   DUMF No. 71.  At hearing on the parties' cross-motions, Mr. Padilla's counsel stated Chief

23   Deputy Warden Sandor, who is not a party to this case, conducted the third level of review.  Each

24   reviewer at each level watched the extraction video, read the incident report, and reviewed the

25   evaluations of the lower level reviewers.  DUMF No. 71.  Each reviewer concluded the staff's

26   use of force during Mr. Padilla's extraction was reasonable.  *Id.*

27

28

I.      Supervisors Stainer, Gipson, and Beard

At the time of Mr. Padilla's extraction, his RVR hearing, and the RVR and use of force reviews, defendants Stainer and Gipson held supervisory positions within the CDCR.

Stainer was the Acting Deputy Director of Facility Operations within the Division of Adult Institutions (DAI) from March 2012 through August 1, 2013, when he was promoted to Director of DAI.  PUMF No. 115.  Stainer had the authority to set expectations system-wide for the proper use of force; he also had responsibility for ensuring that CDCR policies and procedures were followed with respect to the inmate disciplinary process.  PUMF No. 117.

Gipson was the Acting Warden at Corcoran in 2012, starting in June 2011.  DUMF No. 78; Gipson Dep. at 12:14.  As the Acting Warden, she had ultimate authority to determine whether corrective actions with respect to use of force were appropriate.  PAUMF No. 50. Gipson also was responsible generally for ensuring force and discipline was not used without regard for mental illness.  PUMF No. 130.  Lastly, Gipson was responsible for training CDCR staff, including custody staff and non-custody staff.  Gipson Dep. at 18:20–19:2.  The parties do not dispute Gipson never reviewed the use of force and disciplinary processes at Corcoran to determine whether they adequately accounted for inmates with mental illness.  Pl.'s UMF No. 131.

The parties do not dispute that after Stainer became aware of Robicheaux's and Johnson's decisions, imposing and affirming discipline, respectively, he did not review the RVR or direct anyone else to do so.  PUMF No. 114.  The parties dispute whether Stainer reviewed the CDCR's use of force and discipline policies for inmates with serious mental illness.  Mr. Padilla cites to evidence suggesting Stainer did not undertake any such review, Stainer Dep. at 34:16– 35:9, while defendants interpret the evidence to suggest at most Stainer did not recall taking such action, *id.*

Beard was appointed as the Secretary for the CDCR after Mr. Padilla's extraction, on December 27, 2012.  DUMF No. 73.  Before that date, he had been a consultant for CDCR since March 2011.  *Id.*  In his role as Secretary, Beard had authority to review or direct staff to complete a further review of a use of force incident that came to his attention.  Beard Dep.

120:1-9; DUMF No. 73.  It was within defendant Beard's authority as Secretary to take corrective

action with respect to an inappropriate use of force within a CDCR prison.  PAUMF No. 54.  As

both parties agree, defendant Beard never undertook a review of the use of force on Mr. Padilla,

nor directed that anyone else undertake such a review.  PAUMF No. 53.  The parties further agree

Beard learned about Mr. Padilla's extraction in 2013, one year after the extraction took place.

DUMF No. 74.   Specifically, Beard first learned of Mr. Padilla's extraction in 2013 in

connection with preparing for a hearing in the *Coleman* class action when he saw the video of Mr.

Padilla's extraction as one of several videos he reviewed.  Beard Dep. at 16:12–25.  It is

undisputed that Beard did not conduct any formal review of Mr. Padilla's extraction or instruct

anyone else to conduct such a review.  PUMF No. 53.

     J.     CDCR Policies and Training

     1.     CDCR Policies

As of July 2012, the CDCR's policies concerning the use of force and cell

extractions were set forth in Title 15 of the California Code of Regulations sections 3268 to

3268.3 and CDCR's Department Operations Manual ("DOM"), Chapter 5, Article 2.  PUMF

No. 58.  In opposition to defendants' motion and in support of his motion, Mr. Padilla has

presented expert testimony from Eldon Vail, a prior Deputy Secretary for the Washington State

Department of Corrections.  Vail Decl. ¶ 2, Rifkin Decl. Ex. 60.   In his declaration, Vail

discusses what he views as deficiencies in CDCR policies governing Mr. Padilla's cell extraction,

the use of force review process, and the RVR review.

In particular, Vail observes that CDCR policies at the time included no limitations

on the amount of pepper spray allowable in a use of force incident and no limitations on the

waiting times between applications of the spray.  *Id*. ¶ 32.  Regarding the use of force review

process, Vail notes CDCR policies did not consider the interplay of an inmate's mental illness

and the use of force, did not require asking whether the use of force was reasonable when

considered in the context of mental health, and did require consideration of whether an

application of force could exacerbate mental health symptoms.  *Id*. ¶ 48.  Vail opines that these

features of the policies rendered them deficient.  *Id*. ¶ 16.  But, Vail observes, as long as the use

1  of force was in compliance with the policies, despite the flaws in the policies, CDCR approved

2  such use.  *Id.* ¶ 46.

3          While arguing generally that supervisory liability does not attached because

4  plaintiff has not shown causation, defendants dispute this characterization of the policies.  They

5  cite to parts of Stainer's deposition suggesting it was CDCR practice to consider an inmate's

6  mental health "to some degree."  Stainer Dep. at 105:10–20.  Regarding the RVR review process,

7  Vail opines the process did not systematically account for an inmate's mental illness when

8  adjudicating prison rule violations.  Vail Decl. ¶¶ 75, 76.

9                  2.      CDCR Training

10         The parties dispute the scope of training given to the officers who carried out the

11  cell extraction.  Mr. Padilla cites to the depositions of at least four defendants involved in the cell

12  extraction in which they testified they did not recall receiving training on communicating or

13  interacting with individuals who might be in the midst of a mental health crisis.  Acevedo Dep. at

14  17:15–19; Martinez Dep. at 32:8–13; Pruneda Dep. at 21:3–22:25; Castro Dep. at 81:4–7.

15  Defendants dispute this characterization of the record and point to other parts of the record in

16  which the cell extraction officers testified they received training on identifying signs of someone

17  who might be in a mental health crisis.  Acevedo Dep. at 17:4–18:25; Castro Dep. at 79:25–82:5.

18  III.    LEGAL STANDARDS

19         A court will grant summary judgment "if . . . there is no genuine dispute as to any

20  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

21  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

22  resolved only by a finder of fact because they may reasonably be resolved in favor of either

23  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

24         The moving party bears the initial burden of showing the district court "that there

25  is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

26  477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

27  that there is a genuine issue of material fact  . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio

28  Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

1  parts of materials in the record . . . ; or show [] that the materials cited do not establish the

2  absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

3  evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

4  ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as

5  to the material facts"). Moreover, "the requirement is that there be no genuine issue of material

6  fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing

7  law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

8         The summary judgment standards do not change when parties file cross-motions

9  for summary judgment: "[e]ach motion must be considered on its own merits." *Fair Hous.*

10 *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal

11 quotation marks omitted). Thus, "the court must review the evidence submitted in support of

12 each cross-motion." *Id.*

13        In deciding a motion for summary judgment, the court draws all inferences and

14 views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

15 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a

16 whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

17 issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.*

18 *Co.*, 391 U.S. 253, 289 (1968)).

19 IV.    DISCUSSION

20        A.    Defendants' Motion for Summary Judgment

21        To review, Mr. Padilla makes the following claims: (1) unreasonable and

22 excessive force in violation of the Eighth Amendment; (2) failure to provide adequate medical

23 and mental health treatment in violation of the Eighth Amendment; (3) failure to protect from

24 harm in violation of the Eighth Amendment; and (4) disability discrimination in violation of the

25 ADA and Section 504 of the Rehabilitation Act.

26              1.    Claims Not Covered by Motion

27        For clarity, the court first reviews the several claims not covered by defendants'

28 motion. Dr. Wagner has not moved for summary judgment on claim (1) for excessive force.

23

1   Davey has not moved on claim (2) for failure to provide adequate medical treatment.

2   Accordingly, these claims will proceed to trial.

3           The parties dispute whether defendants Wagner, Castro, Godina, Drew, Pruneda,

4   Martinez, Acevedo, Garcia, Holguin, LaClaire, and Kaiser have properly moved for summary

5   judgment on claim (3) for failure to protect.  In their motion, defendants summarily argue they are

6   entitled to summary judgment on the failure to protect claim because: (1) it is derivative of

7   Mr. Padilla's excessive force claim, and (2) they are entitled to summary judgment on the

8   excessive force claim.  At hearing, defendants confirmed their position that Mr. Padilla's failure

9   to protect claim is derivative of the excessive force claim.

10          Defendants misconstrue Mr. Padilla's failure to protect claim, which the court

11  finds is not derivative of his excessive force claim.  Rather, Mr. Padilla's failure to protect claim

12  is based on a theory that defendants knew Mr. Padilla was mentally ill, but in first delaying

13  medical treatment and then forcibly extracting him from his cell, defendants were deliberately

14  indifferent to Mr. Padilla's mental illness and failed to protect against further harm to Mr. Padilla

15  after he had decompensated.  SAC ¶¶ 173–177; Pl.'s Opp'n at 23.  Mr. Padilla's excessive force

16  claim, in contrast, focuses on the cell extraction itself and is based on a theory that defendants

17  acted with malicious and sadistic intent when they attempted to extract him from his cell given

18  his condition at the time.  *See id.* ¶¶ 140–143.

19          Because defendants have not moved for summary judgment on Mr. Padilla's third

20  claim as pled in his complaint, the claim is not properly before the court on summary

21  judgment.  *Cf. Dawe v. Corr. USA*, No. 07–1790, 2010 WL 682321, at *12 (E.D. Cal. Feb. 24,

22  2010) ("While plaintiffs bear the burden of proof as to this claim, it need not be addressed

23  because defendants' argument misconstrues plaintiffs' claims.").  Accordingly, this claim against

24  the eleven defendants identified above also will proceed to trial.

25               2.      Claims Covered by Motion

26          Defendants Stainer, Gipson, Johnson, Overley, Baer, and Beard move for

27  summary judgment on claims (1) for excessive force, (2) for failure to provide adequate medical

28  treatment, and (3) for failure to protect from harm in violation of the Eighth Amendment.  Defs.'

1   Am. Mot. at 9.  Defendants Castro, Godina, Drew, Pruneda, Martinez, Acevedo, Garcia, and

2   Holguin move for summary judgment on claims (1) for excessive force and (2) for failure to

3   provide adequate medical and mental health treatment.  *Id.* at 12–15, 18.  Defendants Robicheaux,

4   Johnson, Wagner, LaClaire, and Kaiser move for summary judgment on claim (2) for failure to

5   provide adequate medical treatment.  *Id.* at 16–19.  Defendants Beard, Davey, and Stainer, as

6   official capacity defendants, move for summary judgment on claim (4) for disability

7   discrimination in violation of the ADA and the Rehabilitation Act.  *Id.* at 20.

8   3.      Grouping of Defendants and Claims

9          For purposes of analyzing defendants' motion, the defendants are best divided into

10   the following three groups: (1) mental health care providers and correctional officers reviewing

11   the RVR, including Kaiser, LaClaire, Wagner, Robicheaux, and Johnson; (2) cell extraction

12   defendants, namely the eight member team assembled to carry out the extraction, including

13   Pruneda, Martinez, Acevedo, Garcia, Holguin, Drew, Godina, and Castro; and (3) supervisory

14   defendants, including Stainer, Gipson, Johnson, Baer, Overly, Beard, and Davey.  Because

15   Johnson reviewed both Robicheaux's RVR and the use of force administered in Mr. Padilla's

16   extraction, her conduct will be assessed as that of both a mental health defendant and as a

17   supervisor.

18   <u>Mental Health and RVR Defendants</u>

19          a)      <u>Claim Two-Failure to Provide Adequate Medical and Mental</u>
              <u>Health Treatment</u>
20

21          Defendants' motion for summary judgment on behalf of the mental health

22   defendants – Wagner, LaClaire, Kaiser, Robicheaux, and Johnson – attacks plaintiff's second

23   claim, that these defendants violated his rights under the Eighth Amendment by failing to provide

24   adequate medical and mental health treatment.

25          Defendants contend Dr. Wagner did not ignore Mr. Padilla's serious medical

26   needs, and in fact provided timely and adequate mental health treatment while Mr. Padilla was

27   housed in the MHCB.  Defs.' Am. Mot. at 16, 19.  They argue Dr. Wagner's decision to delay

28   and deny medical treatment was nothing more than a "difference of opinion."  *Id.* at 18.

25

Regarding Dr. LaClaire, defendants contend summary judgment is proper because Dr. LaClaire, as a psychologist, did not have the authority to prescribe medication or transfer inmates to other levels of care. *Id.* at 18 n.2. Regarding nurse Kaiser, defendants contend no evidence shows Kaiser deliberately disregarded any medical need. *Id.* at 19. Regarding Robicheaux and Johnson, defendants contend even if they exhibited deliberate indifference to Mr. Padilla's mental health needs, no evidence in the record shows Mr. Padilla was harmed by any such indifference. *Id.*

Mr. Padilla contends the record shows Dr. Wagner ignored Mr. Padilla's medical needs by not initiating involuntary medication until Mr. Padilla's twenty-fourth day in the MHCB, not referring Mr. Padilla to DSH, and then subjecting Mr. Padilla to five-point restraints for three full days. Pl.'s Opp'n at 20. Regarding Dr. LaClaire, Mr. Padilla contends material disputes of fact regarding his authority preclude summary judgment. *Id.* Regarding Kaiser, Mr. Padilla contends her decision to "clear" Mr. Padilla without directing he be decontaminated amounted to deliberate indifference to Mr. Padilla's medical needs. *Id.* at 21. Regarding Robicheaux and Johnson, Mr. Padilla contends Robicheaux's decision to assess penalties after the RVR hearing, and Johnson's approval of Robicheaux's decision, amounted to deliberate indifference to Mr. Padilla's mental health treatment needs. *Id.* at 22.

(1)     Legal Standard

The Eighth Amendment to the United States Constitution imposes on the states an obligation to provide for the basic human needs of prison inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This obligation includes a requirement to provide access to adequate medical and mental health care. *Doty v. Cnty of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). If the state fails to meet this obligation, "it transgresses the substantive limits on state action set by the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

Where a plaintiff claims there has been a failure to provide adequate medical or mental health care, and the failure violated the Eighth Amendment, to succeed plaintiff must demonstrate defendants acted with deliberate indifference to serious medical needs. *Wilson v.*

26

1   *Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Doty*,

2   37 F.3d at 546.  The Eighth Amendment claim has an objective component and a subjective

3   component.  *See Wilson*, 501 U.S. at 298.  The objective component turns on whether the

4   deprivation of a particular medical need is "sufficiently serious."  *Id.*; *see also McGuckin v.*

5   *Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).  A medical need is said to be "serious" for Eighth

6   Amendment purposes "if the failure to treat a prisoner's condition could result in further

7   significant injury or the unnecessary and wanton infliction of pain."  *McGuckin*, 974 F.2d at 1059

8   (citation omitted).  An inmate exhibiting symptoms of psychosis has established a serious medical

9   need for purposes of the objective prong of a deliberately indifference claim.  *Atencio v. Arpaio*,

10  161 F. Supp. 3d 789, 811 (D. Ariz. 2015); *cf. Coleman v. Wilson*, 912 F. Supp. 1282, 1321 (E.D.

11  Cal. 1995) (defendants exhibited deliberate indifference to inmates' psychotic condition by

12  placing them in segregated housing).

13          The subjective component focuses on the official's state of mind and requires a

14  showing of deliberate indifference.  *See Wilson*, 501 U.S. at 299-304.  A prison official is

15  deliberately indifferent only if the official "knows of and disregards an excessive risk to inmate

16  health and safety."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Gibson v.*

17  *Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)) (internal quotation marks omitted).  This

18  subjective component "requires more than ordinary lack of due care."  *Farmer*, 511 U.S. at 835

19  (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (internal quotes omitted).  Deliberate

20  indifference "may appear when prison officials deny, delay or intentionally interfere with medical

21  treatment, or it may be shown by the way in which prison physicians provide medical care."

22  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  Mere "'indifference,'

23  'negligence,' or 'medical malpractice' will not support this [claim]."  *Lemire v. Cal. Dep't of*

24  *Corr. & Rehab.*, 726 F.3d 1062, 1081 (9th Cir. 2013) (citing *Estelle*, 429 U.S. at 105–06).  Even

25  gross negligence is insufficient to establish deliberate indifference to serious medical needs.  *Id.*

26  (citing *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)).

27          The Ninth Circuit has held a plaintiff may establish deliberate indifference to his

28  serious medical needs by showing defendants adhered to a policy or practice of systematically

1   denying medical care to inmates in his position.  *Colwell v. Bannister,* 763 F.3d 1060, 1068 (9th

2   Cir. 2014).  In *Colwell,* the plaintiff, who was blind in one eye due to cataracts, brought suit

3   against officials and supervisory medical personnel in the Nevada Department of Corrections

4   (NDOC), alleging defendants were deliberately indifferent to his serious medical needs in

5   denying his requests for cataract-removal surgery.  *Id.* at 1063.  The record suggested the NDOC

6   denied the surgery because of its "one eye policy," under which cataract surgery was

7   systematically refused for an inmate who could function in prison with only one eye.  *Id.* at 1063.

8            The district court granted defendants' motion for summary judgment.  *Id.* at 1065.

9   Although the district court held the plaintiff's cataract-induced blindness in one eye qualified as a

10  serious medical need, the court concluded defendants were not deliberately indifferent to that

11  need.  *Id.*  In the district court's view, defendants could not be deliberately indifferent because the

12  plaintiff had not shown the "one eye policy" led to further injury to his bad eye, and "medical

13  providers ha[d] determined that surgery [wa]s not medically warranted in light of the plaintiff's

14  overall visual acuity and ability to adequately function."  *Id.*  On this basis, the court held the

15  NDOC's decision to refuse surgery amounted to a "difference of opinion" over the best course of

16  medical treatment, and accordingly, the plaintiff had not shown the NDOC's conduct was

17   "medically unacceptable" or "made in conscious disregard of an excessive risk to his health."  *Id.*

18  (internal citations omitted).

19            On appeal, in *Colwell,* the Ninth Circuit agreed with the district court that the

20  plaintiff's condition was a serious medical need.  *Id.* at 1066.  The Circuit disagreed, however, on

21  the subjective component of the plaintiff's Eighth Amendment claim.  *Id.* at 1068.  First, it held

22  the plaintiff's case was not one in which there was a "difference of medical opinion about which

23  treatment [was] best for a particular patient."  *Id.*  Nor was the case one of "ordinary medical

24  mistake or negligence."  *Id.*  Instead, the undisputed facts showed the plaintiff was denied

25  treatment for his monocular blindness "solely because of an administrative policy, even in the

26  face of medical recommendations to the contrary."  *Id.*  Accordingly, a reasonable jury could find

27  the plaintiff was denied surgery "not because it wasn't medically indicated, not because his

28  condition was misdiagnosed, not because the surgery wouldn't have helped him, but because the

28

1   policy of the NDOC [wa]s to require an inmate to endure reversible blindness in one eye if he can

2   still see out of the other."  *Id.*  The Ninth Circuit dubbed this set of factors the "very definition of

3   deliberate indifference."  *Id.*  Second, the Circuit held plaintiff did not have to show the NDOC's

4   decision to "delay or deny treatment caused him harm" in addition to his blindness stemming

5   from the cataracts.  *Id.*  To require such a showing ignored the fact that as long as the "eye

6   remain[ed] untreated, [the plaintiff] continue[d] to suffer blindness in his right eye, which is harm

7   in and of itself, along with all of the other harms and dangers that flow from that."  *Id.*  The

8   record was sufficient to create a triable issue of fact regarding whether plaintiff was harmed by

9   the refusal of treatment.  *Id.*

10          In sum, in *Colwell* the Ninth Circuit held a reasonable factfinder could find NDOC

11   officials denied plaintiff treatment because his medical need conflicted with a prison policy and

12   not because non-treatment was a medically acceptable option.  *Id.* at 1070.  The district court's

13   decision was reversed and the case remanded for trial.  *Id.* at 1063.

                          (2)     Dr. Wagner

                                  (a)     Involuntary Medication and Declination of Referral
                                          to DSH

17          It is undisputed Mr. Padilla has been diagnosed with psychosis.  *See* MHCB

18   Progress Notes at 11–18.  Defendants agree Mr. Padilla has and had a serious mental and medical

19   need.  Defs.' Am. Mot. at 17 n.1.  Accordingly, whether a mental health defendant can overcome

20   plaintiff's right to a trial on his second claim turns on the subjective component of this claim.

21          The parties do not dispute Mr. Padilla was placed in the MHCB for twenty-three

22   days without a referral to DSH or the administration of involuntary medication.  PUMF No. 55.

23   There also is no dispute that at the time Dr. Wagner ordered involuntary medication, Mr. Padilla

24   had significantly decompensated; he was observed standing in inches of contaminated water that

25   contained his feces, was smearing himself with his feces, and was attempting to ingest his feces.

26   *Id.*

27          The parties do dispute one factual issue critical to determining if Dr. Wagner's

28   decision to decline referral or to delay involuntary medication amounted to deliberate

                                          29

1   indifference:  whether Mr. Padilla's medical and mental health condition "wax[ed] and wan[ed]"

2   over the relevant 24-day period, as defendants contend, or progressively decompensated, as

3   Mr. Padilla contends.  On the one hand, portions of the record could support a reasonable jury's

4   inference that Mr. Padilla's mental health did wax and wane, thereby obviating the need for

5   additional treatment.  For example, the record shows Mr. Padilla maintained a stable and calm

6   demeanor on some days, MHCB Progress Notes at 43, he was quiet and eating his meals on other

7   days, *id.* at 43–45, he gave up his trash for collection at times, Nursing Care Notes at 43, and he

8   informed MHCB staff he was not homicidal or suicidal, *id.* at 130.  On the other hand, the record

9   also could support Mr. Padilla's theory of progressive decompensation.  Mr. Padilla was naked on

10  several days, MHCB Progress Notes at 19, had already refused medication for at least three

11  weeks before his admission into the MHCB, DUMF No. 3, and appeared disheveled and

12  malodorous at several points throughout his stay, MHCB Progress Notes at 27–35.

13          It is hornbook law that on a motion for summary judgment, a court must not weigh

14  the evidence, make credibility determinations, or draw inferences from the facts adverse to the

15  non-moving party.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the

16  evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

17  judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").  Here,

18  genuine disputes of material fact preclude summary judgment.  Should the jury credit Mr.

19  Padilla's characterization of the facts, it could determine Dr. Wagner's decision to decline referral

20  to the DSH or to delay involuntary medical treatment was deliberately indifferent to Mr. Padilla's

21  decompensating medical condition.  *See Page v. Norvell*, 186 F. Supp. 2d 1134, 1139

22  (D. Or. 2000) (reasonable jury could find treatment manager was deliberately indifferent in

23  decision to deny bipolar inmate treatment despite evidence of inmate's disorder and resulting

24  anxiety from prison's prior delay of medical treatment).   That this conclusion is possible

25  precludes summary judgment.

26          An additional ground precludes summary judgment.  Should the jury credit

27  Mr. Padilla's narrative and agree his mental condition was progressively decompensating, the

28  jury also could infer Dr. Wagner's decision to decline referral to DSH was made in adherence to

1  an established and misguided policy of denying medical care for mental health inmates like

2  Mr. Padilla.  As in *Colwell*, where defendants adhered to a policy of denying cataract surgery to

3  inmates who could still manage to function with one eye, *Colwell*, 763 F.3d at 1065, the record

4  currently before this court is sufficient to support a finding that inmates like Mr. Padilla often

5  were not transferred to DSH simply because "it was not common practice to [recommend a

6  transfer]."  Wagner Dep. at 83:20–84:13.  The existence of such a policy would undermine

7  defendants' suggestion that Dr. Wagner's decision to deny referral to the DHS amounted to a

8  mere "difference of opinion," *see Colwell*, 763 F.3d at 1068, or that Dr. Wagner's decision was

9  based on a "medically acceptable option," *id.* at 1066, 1070.  A jury could find Dr. Wagner's

10  decision, in adhering to de facto institutional policy, amounted to the "very definition of

11  deliberate indifference."  *Id.* at 1068.

12                    (b)       Five-Point Restraints

13            Defendants contend summary judgment should be granted with respect to

14  Wagner's decision to keep Mr. Padilla in five-point restraint for three days because, among other

15  things, Mr. Padilla exhibited violent behavior while in the restraints.  Defs.' Am. Mot. at 18.

16  Mr. Padilla contends summary judgment should be denied because Dr. Wagner acted with

17  deliberate indifference by subjecting Mr. Padilla to five-point restraints for three days.  Pl.'s

18  Opp'n at 20.

19            The use of five-point restraints, even for extended periods of time, may be justified

20  where the inmate poses a threat to the safety and security of the prison.  *LeMaire v. Maass*,

21  12 F.3d 1444, 1460 (9th Cir. 1993).  In *LeMaire*, the Ninth Circuit overturned a district court

22  decision to grant injunctive relief from allegedly unconstitutional conditions of confinement,

23  which included prison officials subjecting violent and dangerous inmates to in-cell restraints for

24  "days at a time."  *Id.*  In reversing the district court decision, the Ninth Circuit found the use of

25  restraints justified where the inmate was "out of control" and engaging in behavior that could

26  "(A) [r]esult in major destruction of property; (B) [c]onstitute a serious health or injury hazard to

27  the inmate or others; [or] (C) [e]scalate into a serious disturbance."  *Id.*  The Circuit found the use

28  of restraints generally can pass constitutional muster only after extensive development of the

1   record and an in-depth analysis of the circumstances offered by prison officials to justify the

2   application of restraints in each case; an inmate's history of violent and disruptive behavior and

3   repeated unsuccessful attempts to control him through the use of other disciplinary measures can

4   weigh in favor of acceptable use.  *Id.*

5         Here, the parties dispute whether Mr. Padilla was violent or posed a threat to

6   himself or to staff during the relevant time frame.  In the three days Mr. Padilla was restrained,

7   progress notes documented Mr. Padilla's condition as "calm," Restraint Documentation at 7,

8   "cooperative," *id.* at 23, 36, and "normal," *id.* at 23.  Even though Mr. Padilla asked more than

9   once to get out, Dr. Wagner declined to release him from the five point restraints.  *Id.* at 25, 42.

10  Plaintiff cites evidence that Wagner set variable conditions for Padilla's release from restraints,

11  including "agreeing to take medication to stating the reason he was restrained to taking

12  responsibility for his behavior to remembering the prior condition that was set."  PUMF No. 80.

13  Plaintiff also presents evidence that Wagner testified plaintiff was not "capable of rationally

14  responding" at that time and so could not have complied with Wagner's conditions.  Wagner

15  Testimony in *Coleman* Evidentiary Hearing 672:12–18.  Rifken Decl. Ex. 35, ECF No. 131.  On

16  these facts, a jury could reasonably conclude that Dr. Wagner acted with "deliberate indifference"

17  to Mr. Padilla's mental and psychological health.  *Cf. Allen v. Sakai*, 40 F.3d 1001, 1004 (9th

18  Cir. 1994) (defendants' deprivation of outdoor privileges unconstitutional where inmate did not

19  present a "grave security risk"); *see also Williams v. Benjamin*, 77 F.3d 756, 764 (4th Cir. 1996)

20  (prolonged confinement in five-point restraints held unconstitutional where nothing in the record

21  showed the inmate did anything once "confined in the [] restraints that necessitated an application

22  of force.").  Wagner's motion is DENIED on this ground.

23        (c)    Qualified Immunity

24        Even if a defendant's conduct is unreasonable or unconstitutional, the doctrine of

25  qualified immunity can shield him from suit.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

26  This doctrine renders a government official immune from liability insofar as his conduct does not

27  violate "clearly established statutory or constitutional rights of which a reasonable person would

28  have known."  *Id.*  The qualified immunity test is two-fold.  Under one prong, the court considers

1   whether alleged facts, taken in the light most favorable to plaintiff, show defendant's conduct

2   violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under a second prong,

3   the court determines whether the constitutional right was "clearly established." *Id.*  If no

4   constitutional right was violated in the first instance, defendant is entitled to qualified immunity

5   without further analysis. *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009).  Courts in

6   their sound discretion can address the two prongs in any order. *Pearson v. Callahan*, 555 U.S.

7   223, 232, 236 (2009).

8          Because the court already has found the record could support the violation of a

9   constitutional right, the court focuses here on the "clearly established" prong, under which "the

10  salient question is . . .  whether the state of the law" at the time of an incident provided "fair

11  warning" to the defendant[] that [his] alleged [conduct] was unconstitutional." *Jones v. Cty. of*

12  *Los Angeles*, 802 F.3d 990, 1004 (9th Cir. 2015) (internal citations omitted).  In considering this

13  question, the constitutional right at issue must be defined at "the appropriate level of generality

14  . . . [the court] must not allow an overly generalized or excessively specific construction of the

15  right to guide [its] analysis." *Cunningham v. Gates*, 229 F.3d 1271, 1288 (9th Cir. 2000); *see*

16  *also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We have repeatedly told courts—and the

17  Ninth Circuit in particular—not to define clearly established law at a high level of generality."

18  (citation omitted)).  The requisite level of specificity mandates only that the unlawfulness be

19  apparent under preexisting law. *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002).  In

20  analyzing the facts, the court adopts the non-moving party's version of the facts. *Scott v. Harris*,

21  550 U.S. 372, 378 (2007).   Officials "can still be on notice that their conduct violates established

22  law, even in novel factual circumstances." *Clement*, 298 F.3d at 906.

23         The Supreme Court has provided little guidance for lower courts seeking to divine

24  whether a particular right was clearly established at the time of the injury. *Boyd v. Benton Cty.*,

25  374 F.3d 773, 781 (9th Cir. 2004).  The Ninth Circuit naturally instructs that binding precedent is

26  the starting point. *Id.*  "If the right is clearly established by decisional authority of the Supreme

27  Court or this Circuit," the court's inquiry should come to an end. *Id.*  If, on the other hand, "there

28  are relatively few cases on point, and none of them are binding," a court can "'look to whatever

33

1    decisional law is available to ascertain whether the law is clearly established for qualified

2    immunity purposes, including decisions of state courts, other circuits, and district courts.'"  *Id.*

3    (citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

4                Here, by the time Dr. Wagner denied Mr. Padilla timely medical treatment, the

5    Ninth Circuit had confirmed an official exhibits deliberate indifference when he "unduly delays"

6    an inmate's treatment.  *Hutchinson*, 838 F.2d at 394.  Further, by 2011, an Oregon district court

7    held deliberate indifference could be established on facts similar to Mr. Padilla's case.  *Yeo v.*

8    *Wash. Cty.*, No. 08–1317, 2011 WL 1118506 (D. Or. Mar. 24, 2011).  In *Yeo*, which was not

9    appealed, the plaintiff turned himself in to custody to satisfy an outstanding arrest warrant.  *Id.* at

10   *1.  At the time he turned himself in, the plaintiff was observed as "confused, disoriented, and

11   guarded."  *Id.*  When admitted, the plaintiff had informed prison officials he would need

12   medication while in custody.  *Id.*  Several days passed and he was not given his medication, even

13   though he appeared physically uncooperative, noncompliant, was observed smearing his cell with

14   urine and feces, and refused to engage custody staff.  *Id.* at *3.  As a result of his behavior, the

15   plaintiff was ultimately tasered for failing to comply with custody staff.  *Id.*

16               The district court in *Yeo* held a reasonable jury could find the county jail was

17   deliberately indifferent in delaying medical treatment, particularly where the delay exacerbated

18   the plaintiff's decompensation and ultimately led to the plaintiff's tasering.  *Id.* at *14.  Similarly

19   here, a reasonable juror could find Dr. Wagner's decision to withhold medical treatment

20   amounted to deliberate indifference to Mr. Padilla's decompensating condition and led to his cell

21   extraction.  Considering the similarities between the facts of this case and *Yeo*, this court

22   concludes the law provided fair notice that undue delay in providing necessary mental health

23   medication violated the Eighth Amendment.  *See Watkins v. City of Oakland, Cal.*, 145 F.3d

24   1087, 1093–94 (9th Cir. 1998) (affirming district court's denial of qualified immunity where it

25   was "clearly established" that a jury could hold defendant liable).

26               Regarding Dr. Wagner's decision to decline referral to DSH, by 1992 it was

27   clearly established that a prison official could be deliberately indifferent in declining to choose a

28   certain course of medical treatment for reasons unrelated to the medical needs of the prisoner.

34

1    *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992), *overruled in part on other grounds as*

2    *recognized in Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) *overruled in part by Peralta*

3    *v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

4                In *Hamilton*, the prison officials' decision to disregard a certain course of

5    treatment for the inmate plaintiff was made in adherence to terms of a contract with an outside

6    medical doctor. *Id.* at 1064.  The Ninth Circuit found the prison officials' decision exhibited

7    deliberate indifference because, rather than relying on a medical opinion from a doctor who was

8    responsible for the inmate's care, that the inmate was not fit to fly to another hospital due to a

9    recent ear injury, the officials instead relied on the contracting doctor's decision that the

10   institution's "normal procedure" of flying immediately after surgery was the best practice.  *Id.* at

11   1067.  Here, as noted above, a reasonable jury could conclude Dr. Wagner's treatment decision to

12   decline referral to DSH had less to do with Mr. Padilla's medical condition and more to do with

13   an unofficial blanket policy of not referring mentally ill inmates to DSH.  By 2012, it was clearly

14   established this could violate the Constitution.

15               Finally, regarding Dr. Wagner's decision to keep Mr. Padilla in five-point

16   restraints for seventy-two hours, as noted above, the Ninth Circuit had opined by 2012 that the

17   use of restraints for prolonged periods of time passes muster only where the circumstances justify

18   the use, such as where the inmate is violent or engaging in disruptive behavior.  *LeMaire*, 12 F.3d

19   at 1459.  The Circuit has confirmed the point more recently as well, also before 2012.  *Young v.*

20   *Cty. of L.A.*, 655 F.3d 1156, 1165 (9th Cir. 2011).  The disputed facts on this aspect of plaintiff's

21   claim preclude a finding that Dr. Wagner is entitled to qualified immunity.

22                              (3)      Dr. LaClaire

23               Defendants contend Dr. LaClaire, a psychologist, is entitled to summary judgment

24   because he did not have the authority to prescribe medication or transfer inmates to other levels of

25   care.  Defs.' Am. Mot. at 18 n.1; DUMF No. 38.  To support their contention, defendants cite to

26   California Business and Professions Code section 2904, which provides, "[t]he practice of

27   psychology shall not include prescribing drugs, performing surgery or administering

28

                                           35

electroconvulsive therapy." Cal. Bus. & Prof. Code § 2904.[9]   In opposition, Mr. Padilla cites to evidence raising a genuine dispute of fact regarding Dr. LaClaire's ability to affect the course of Mr. Padilla's treatment.  While Mr. Padilla was in the MHCB, in at least one instance, Dr. LaClaire signed a progress note indicating that Mr. Padilla may require or benefit from involuntary medical treatment in the near future.  MHCB Progress Notes at 39.  On another occasion, Dr. LaClaire worked with Dr. Wagner to complete a level of care decision form reflecting a joint decision to decline referral to DSH.  IDTT Form at 564.

A mental health professional can be deliberately indifferent even if she can do no more than "recommend" medical treatment.  *See Atencio*, 161 F. Supp. 3d at 811 (deliberate indifference established where "despite [mental health professional's] knowledge, she neither recommended that [the plaintiff] be transferred to a facility for treatment of his psychosis, nor informed the officers who would take control of [the plaintiff] for placement into the safe cell of [the plaintiff's] state of psychosis.").  A reasonable jury could conclude Dr. LaClaire had the ability to determine the course of Mr. Padilla's treatment, even if he was not specifically authorized to administer medication or singlehandedly refer Mr. Padilla to DSH.

Dr. LaClaire's motion is DENIED.

### (4)     Nurse Kaiser

Defendants contend Nurse Kaiser had no reason to infer Mr. Padilla needed to be decontaminated prior to her clearance of him, Defs.' Am. Mot. at 19, because while in constraints, Mr. Padilla was adequately decontaminated with a fan provided to defuse the effects of the pepper spray.  DUMF No. 50.  Mr. Padilla contends Kaiser's actions were inadequate because Padilla was placed in and remained in the restraints while coated with pepper spray and without a decontamination shower.  Pl.'s Opp'n at 20.

A plaintiff can establish deliberate indifference by showing prison officials failed to properly decontaminate him from the effects of pepper spray.  *See Clement*, 298 F.3d at 904.  A plaintiff must first establish, however, the defendant was subjectively aware of the risk of

---

[9] It appears undisputed that Dr. LaClaire is subject to California licensing laws.

1    serious injury from a failure to decontaminate, but disregarded that risk.  *Id.*  In *Clement*, prison

2    officials used two bursts of pepper spray, each lasting up to five seconds, after a violent fight

3    erupted in a prison cell.  *Id.* at 901.  The pepper spray vapors drifted into adjacent cells, and at

4    least two bystander inmates suffered asthma attacks or had difficulty breathing.  *Id.* at 902.

5    Several other inmates called out to prison officials for medical attention while others were

6    observed coughing and gagging.  *Id.*  In response, prison officials opened the prison door and

7    placed a fan in the doorway to address the lingering effects of the spray, but the fan was

8    insufficient to clear the spray from the cells.  *Id.*  After four hours of exposure to the pepper

9    spray, the inmates were finally escorted out of their cells and into decontamination showers.  *Id.*

10   On this record, the Ninth Circuit held the inmates could establish the prison officials were

11   deliberately indifferent to their serious medical needs.  *Id.* at 905.  In particular, the prisoners

12   could show the officers were subjectively aware of the risk of serious injury when they denied

13   medical showers for a four hour period, especially where several inmates made repeated requests

14   for attention.  *Id.*  Defendants' motion for summary judgment was denied, and the case was

15   remanded for further proceedings.  *Id.* at 906.

16            Here, Nurse Kaiser testified she observed Mr. Padilla cell's extraction, Kaiser Dep.

17   at 75:19–23, and it is undisputed Mr. Padilla was screaming and crying throughout the extraction

18   during which pepper spray was used, Pl.'s UMF No. 67.  Expert Eldon Vail observed that during

19   the extraction, Mr. Padilla talked about his skin peeling and his discomfort stemming from the

20   pepper spray.  Vail Dep. at 118:16–24.  If Vail's testimony is credited, Kaiser heard these

21   protestations.  Finally, Kaiser testified shortly after Mr. Padilla was extracted for the purposes of

22   involuntary medical treatment, she was sent to administer medication involuntarily, but was so

23   "overcome" by the pepper spray herself, she immediately left the area.  Kaiser Dep. at 76:1–8.

24   She was overcome despite wearing a filtration mask as shown in the Cell Extraction Video.  From

25   this evidence, a reasonable juror could conclude Kaiser was aware Mr. Padilla suffered pain and

26   discomfort from the pepper spray, but deliberately ignored this pain when proceeding to

27   involuntary medicate and then then clear him without ensuring he was first decontaminated.

28   *Clement*, 298 F.3d at 904.  That a fan was set up to "diffuse" the effects of the pepper spray

1    during the 72 hours Mr. Padilla remained in constraints is irrelevant to the claim against Nurse

2    Kaiser.

3                    Summary judgment is DENIED as to Nurse Kaiser.

4                          (5)    Robicheaux and Johnson

5                    The parties do not dispute that prior to his disciplinary hearing with Robicheaux,

6    Mr. Padilla had a mental health assessment interview with Dr. Lackovic, a CDCR psychologist.

7    UMF No. 59.  The parties also do not dispute Dr. Lackovic concluded Mr. Padilla's conduct

8    during the cell extraction was attributable to his mental health disorder.  *Id.*  Dr. Lackovic

9    provided this opinion for consideration, while a determination of guilt was outside her purview.

10   Dr. Lackovic went on to advise that if Mr. Padilla was found guilty, the hearing officer, during

11   the penalty phase, should consider several mental health factors in assessing the penalty, such as

12   the benefits Mr. Padilla would receive from therapy and activities providing "reality orientation,"

13   such as the time of day or year.  RVR at 69.  Dr. Lackovic also stated Mr. Padilla would benefit

14   from social interaction, talking with others, as well as other activities that would prompt his

15   memory.  *Id.*  The parties do not dispute that after considering Dr. Lackovic's findings,

16   Robicheaux found Padilla guilty and then assessed penalties against him, including ninety days'

17   forfeiture of credit and thirty days' loss of privileges including room, television and radio visits,

18   family visits, "special purchases," telephone privileges, and access to a "quarterly package."

19   RVR at 66.  It also is undisputed Johnson approved Robicheaux's disposition of Mr. Padilla's

20   rules violation.  PUMF No. 111.

21                    As noted, the parties dispute, at least in part, whether the penalties Robicheaux

22   imposed and Johnson approved were actually imposed.  Regarding the ninety day forfeiture of

23   credit, defendants have presented evidence establishing these credits were restored.   Esquivel

24   Decl. Ex. A at 6.  Regarding the thirty days' loss of privileges, defendants argue no evidence in

25   the record supports their actual imposition and corresponding harm.  Defs.' Am. Mot. at 9.  In

26   response, Mr. Padilla points to portions of the record reflecting the ninety days' restoration but

27   omitting any notation of restoration of the thirty days'.  Pl.'s Opp'n at 22; DUMF No. 68.

28

On the record before the court, the court finds a reasonable jury could conclude Mr. Padilla suffered some harm as a result of Robicheaux's RVR decision and Johnson's approval, even if not the full harm he would have suffered if the ninety days' forfeiture provision had been maintained.

Summary judgment on this claim is DENIED for Robicheaux and Johnson.

b)      <u>Summary</u>

In sum, regarding Mr. Padilla's claim for failure to provide adequate medical treatment, the motions of Wagner, LaClaire, and Kaiser, as well as Robicheaux and Johnson, are DENIED.

4.      <u>Cell Extraction Defendants</u>

a)      <u>Claim One-Excessive Force</u>

Defendants contend summary judgment should be granted for defendants Castro, Godina, Drew, Acevedo, Pruneda, Garcia, Martinez, and Holguin, identified here as the "cell extraction defendants," because they used reasonable force in a good faith effort to carry out a medical order.  Defs.' Am. Mot. at 12.  Mr. Padilla contends the evidence allows a reasonable juror to conclude each of the cell extraction defendants, in supervising or participating in Mr. Padilla's extraction, used unreasonable and excessive force.  Pl.'s Opp'n at 14–15.

(1)      Legal Standards

Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for purpose of causing harm."  *Whitley*, 475 U.S. at 320–21; *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).  To facilitate this inquiry, the Supreme Court has articulated five factors to consider: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response."  *Hudson*, 503 U.S. at 7.  Further, "the absence of serious injury is [] relevant to the Eighth Amendment inquiry, but does not end it," and officials may still be held liable for the unnecessary infliction of force.  *Id.*

39

Here, there are two separate uses of force: (1) defendants' use of pepper spray and (2) their subsequent physical extraction.

(a)     Pepper Spray

Regarding the use of pepper spray, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (citing *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)).  This is because, as a former colleague has observed, even when properly used, these agents "possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim." *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1079 (E.D. Cal. 2014) (internal citations omitted).

If an inmate complies with an officer's directives, the additional use of pepper spray thereafter amounts to excessive force.  *LaLonde v. Cnty of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000).  In *LaLonde*, the Ninth Circuit held officials engaged in excessive force when they unnecessarily prolonged the plaintiff's exposure to pepper spray after he had already surrendered to attempts to restrain him and after his hands were handcuffed behind his back.  *Id.* The Circuit concluded the use of pepper spray could "be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force." *Id.* at 960.  *See also Pinkston v. Fierro*, No. 00–6193, 2006 WL 3147685, at *8 (E.D. Cal. Nov. 1, 2006) (applying *LaLonde* to Eighth Amendment excessive force claim); *Williams v. Young*, No. 12–0318, 2015 WL 4617985, at *12 (E.D. Cal. July 31, 2015), *report and recommendation adopted*, No. 12-0318, 2015 WL 6163436 (E.D. Cal. Oct. 15, 2015) ("a fact finder could find that it was excessive [under Eighth Amendment] for [officer] to empty his pepper spray canister while plaintiff was laying on the ground, particularly in the absence of evidence demonstrating that plaintiff was physically resisting or kicking or verbally threatening.").

40

(i)      Injury

With respect to the defendants' use of pepper spray, certain cell extraction defendants wore not only protective gear but all wore gas masks, a reasonable indication the officers knew of the potentially harmful respiratory effects of pepper spray. *See* Cell Extraction Video at 3:24–5:00. Mr. Padilla was not provided any form of respiratory protection at any time; he was completely naked throughout the event allowing for skin and lung exposure. *Id.* During the extraction, starting before all four cans of pepper spray were emptied into his cell, Padilla was coughing, and appears to have been gagging and making choking sounds. *Id.* at 9:58–10:51, 11:29–11:37. Officers' comments starting after the first blast of pepper spray was administered, regarding the need for a shower, signal their awareness of the potential harmful effects and a corresponding need for decontamination. *Id*. at 11:20.

In *LaLonde*, the Ninth Circuit identified some of the painful effects of pepper spray when administered, including "gagging, coughing, and an intense burning sensation." *LaLonde*, 204 F.3d at 952. Considering at least some of these effects were observed during the cell extraction, and construing the evidence in Mr. Padilla's favor, a reasonable juror could infer Mr. Padilla sustained more than minimal injuries, including potentially chronic injuries. *See id.* This factor favors Mr. Padilla.

(ii)      Need for the Application of Force

Here, it is undisputed that Drew used four cans of pepper spray as part of the extraction process. The record shows between the third and fourth can of pepper spray, Mr. Padilla appeared "overwhelmed" by the spray and approached the cell door to put both his hands into the food slot in an apparent attempt to submit to cuffs. Crime Incident Report at 9. While Mr. Padilla put both of his hands into the food slot, officers say they were only able to cuff up his left hand. *Id.* As noted, at some point after the left cuff was on, it appears Mr. Padilla's right hand is resting in the food port of his cell door. Cell Extraction Video at 10:00. Despite Mr. Padilla's submission to cuffs, Sergeant Drew emptied another can of pepper spray into his cell. Drew Dep. at 116:14–25. Construing the evidence in Mr. Padilla's favor, a reasonable jury could find that Sergeant Drew acted unnecessarily in dispersing an additional can after Mr. Padilla's

1   attempt to submit and the successful single-cuffing.  *See LaLonde*, 204 F.3d at 961; *Pinkston*,

2   2006 WL 3147685, at *8.  That other officers failed to intervene here makes them potentially

3   liable as well.  *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (a prison official can

4   violate the Eighth Amendment by failing to intervene when another prison official is observed

5   using excessive force on a prisoner).  Accordingly, this factor favors Mr. Padilla.

6                        (iii)     Relationship between the Need and the
                                    Amount of Force Used
7

8          Defendants argue the amount of pepper spray used was directly proportionate to

9   the need to obtain compliance to orders to cuff up.  Defs.' Am. Mot. at 14–15.  But as noted

10  above, a reasonable jury could find once Padilla submitted to at least one cuff, the need for any

11  additional pepper spray was reduced if not eliminated.  This factor favors Mr. Padilla.

12                       (iv)      Threat Reasonably Perceived

13         Also regarding the use of pepper spray, defendants contend they perceived a threat

14  because Mr. Padilla was designated as psychotic, and in this condition, the defendants did not

15  know whether Mr. Padilla would attack them.  Defs.' Am. Mot. at 14.  But a jury could find the

16  officers' did not reasonably perceive a threat.  In particular, at the time Sergeant Drew

17  administered his fourth can of pepper spray, Mr. Padilla cell door was closed and he had already

18  complied in part with orders to cuff up; his left hand cuffed and attached to lanyard limited

19  attempts to physically attack a group of several officers.  *See Furnace*, 705 F.3d at 1029 (threat

20  was "likely not great" when plaintiff was locked in his cell behind a large metal door).  This

21  factor favors Mr. Padilla.

22                       (v)       Efforts to Temper the Severity of a Forceful
                                    Response
23

24         After the extraction, no cell extraction defendant left the scene until Nurse Kaiser

25  arrived to ensure Mr. Padilla received his involuntary medication.  *Id.*  On the other hand, even as

26  at least one person noted the need for decontamination when someone attempted to cover Mr.

27

28

                                              42

1   Padilla with a blanket, there is no indication any defendant took steps to provide a

2   decontamination shower or equivalent decontamination procedure. This factor favors Mr. Padilla.

3          Defendants are not entitled to summary judgment on the merits with respect to the

4   first Eighth Amendment claim to the extent it is based on the use of pepper spray.

5                     (vi)     Qualified Immunity

6          The cell extraction defendants contend, however, they are qualifiedly immune

7   because, in July 2012, the law was not clearly established on whether officers could use force,

8   including through the use of chemical agents, on a psychotic inmate based on a doctor's orders

9   that removal was necessary to involuntarily medicate the inmate. Defs.' Am. Mot. at 22. Padilla

10  contends the motion should be denied because it was "clearly established that prisoners had the

11  right to be free from unnecessary or excessive force." Pl.'s Opp'n at 24-25.

12         Construing the evidence in Mr. Padilla's favor precludes qualified immunity in the

13  face of the use of the pepper spray. As noted, a reasonable jury could conclude by the time

14  Sergeant Drew dispensed his fourth can, Mr. Padilla had complied with orders to "cuff up," at

15  least in part, and had his arm connected to the metal lanyard attached to a steel chain pulled

16  through the cell door.

17         By February 2000, it was clearly established that subjecting a plaintiff to

18  unnecessarily prolonged exposure to pepper spray after he complies with an order is

19  unconstitutional. *See LaLonde*, 204 F.3d at 960 (prolonging effects of pepper spray exposure

20  after plaintiff surrendered and was under control). Considering the governing law at the time of

21  Mr. Padilla's extraction, it would have been clear to a reasonable officer that the continued use of

22  pepper spray, after Mr. Padilla's efforts to comply, was unreasonable and excessive under the

23  circumstances. The cell extraction defendants are not entitled to qualified immunity.

24                    (b)     Physical Force

25         Regarding the use of physical force, the U.S. Supreme Court has held inmates are

26  protected from wanton uses of physical force that exceed an officer's "good-faith effort to

27  maintain or restore discipline." *Hudson*, 503 U.S. at 6–7. Not every malevolent touch by a

28  prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel

1   and unusual punishment necessarily excludes from constitutional recognition the *de minimis* uses

2   of physical force.  *Id.* at 9–10.  At the same time, guards may use force only in proportion to the

3   need for it in each situation.  *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

4                                                        (i)        Injury

5                      As noted above, while any scratches or abrasions Mr. Padilla incurred during the

6   extraction were minimal, Defs.' UMF No. 51, the apparently limited extent of these injuries does

7   not by itself provide a basis for granting summary judgment.  *Hudson*, 503 U.S. at 4.  Given the

8   minor nature of the injuries here, this factor is neutral, and the court proceeds to the other factors.

9                                                        (ii)       Need for the Application of Force

10                     The undisputed evidence shows that at the time defendants opened the cell door,

11  Mr. Padilla appeared resistant.  DUMF No. 48; *see generally* Cell Extraction Video.  A struggle

12  ensued, and the officers described Mr. Padilla as combative in response to the officers' attempts

13  to subdue him.  Crime Incident Report at 22.  In response to Mr. Padilla's behavior the extraction

14  team members say they used their combined body weight to get Mr. Padilla to the ground and

15  fully handcuffed.  *Id.*  Mr. Padilla continued in his attempts to resistance as the team transferred

16  him to the gurney and then to the room where the five-point restraint bed was located.  *Id.*  In

17  context, Mr. Padilla's combative resistance, could have been the product of decompensation, in

18  part if not completely.  While Mr. Padilla's mental illness itself does not necessarily render the

19  officers' use of physical force unconstitutional, and no evidence suggests the officers' use of

20  force was intended to punish Mr. Padilla, the complexity of the circumstances surrounding the

21  extraction and chaotic scene documented in the Cell Extraction Video call for a jury's review.

22  *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (reversing summary judgment and

23  remanding case, while noting in a case with a mentally ill suspect, "a heightened use of less-than-

24  lethal force will usually be helpful in bringing a dangerous situation to a swift end."); c*f. Jefferson

25  v. Helling*, 324 F. App'x 612, 613 (9th Cir. 2009) (unpublished; affirming summary judgment

26  finding  no Eighth Amendment violation resulted from the use of four-point restraints to subdue

27  mentally ill inmate who posed threat to his own safety).

28

1

2

                            (iii)      Relationship between the Need and the Amount of Force Used

3

        Regarding the physical force used during the extraction, and its correspondence to

4

what was required, the record including the Cell Extraction Video does not eliminate factual

5

questions regarding whether the force used to remove Mr. Padilla from his cell and place him in

6

restraints was tailored as required under the circumstances of his case to overcome his resistance,

7

subdue his non-compliance, and administer involuntary medication. *See, e.g.*, Cell Extraction

8

Video  at 18:52, 20:01-22:30; *cf. Deorle*, 272 F.3d at 1283.  Considering the court cannot

9

conclude as a matter of law the officers' use of force was proportional to the need, this factor

favors Mr. Padilla.

10

                            (iv)     Threat Reasonably Perceived

11

        When the cell door opened, Mr. Padilla appeared resistant, with only one wrist in a

12

handcuff attached to a metal lanyard that in turn was attached to a heavy, long chain.  While

13

defendants do not contend Mr. Padilla attempted to use the lanyard as a weapon, they contend

14

they did not know whether Mr. Padilla would attack them.  Mot. at 14.  They also say they

15

perceived a threat of contact with the feces covering Mr. Padilla's body.  *Id.* at 14–15.

16

        In light of the record, a reasonable jury could find on the one hand that the officers

17

reasonably perceived a threat posed by Mr. Padilla's agitated state and his soiled condition.  On

18

the other hand, the answer to this question also is informed by the number of officers assembled

19

to form a team, and the ability of the officers to don protective gear as well as gas masks to

20

protect themselves.  A jury could resolve this question either way.

21

                            (v)      Efforts to Temper the Severity of a Forceful Response

22

23

        The record supports a conclusion that the officers took some steps to temper the

24

severity of the force they used, including initially by seeking to remove Mr. Padilla from the cell

25

in an orderly manner before physically extracting him.  They provided a verbal advisement, albeit

26

through a gas mask and closed door, in an apparent effort to give Mr. Padilla time to consent to

27

exiting his cell.  When this did not work, upon Mr. Padilla's extraction from the cell, the officers

28

use of their collective weight is subject to interpretation given the lack of clarity of the written, video and audio record. *See, e.g.,* Cell Extraction Video at 20:01-22:30.  Considering the unclear and chaotic circumstances surrounding Mr. Padilla's extraction, it is not clear whether less force could have been used to restrain Mr. Padilla and whether the officers observed all measures to temper the severity of the force. *Cf. Hudson*, 503 U.S. at 6–7 (inmates are protected from wanton uses of physical force that exceed an officer's "good-faith effort to maintain or restore discipline.").  This factor requires a jury's determination.

On balance, without predetermining any outcome, the court concludes a reasonable jury could conclude the officers' use of physical force was excessive.

(vi)     Qualified Immunity

As with their use of pepper spray, the cell extraction defendants contend they are qualifiedly immune because the law was not clear enough to determine whether the use of physical force under these circumstances was excessive.  Defs.' Mot. at 23.  Defendants' argument is unavailing.  Since 1992, the legal standard articulated in *Hudson* provided officers with notice that use of force out of proportion to its need is unlawful.  *Hudson*, 503 U.S. at 7–10 (holding that guards violated Hudson's Eighth Amendment rights when they gratuitously punched and hit him, causing only minor injuries, while escorting him between prison facilities).  Recognizing that "the use of force that may be justified by [the interest in assisting one who needs psychiatric care] necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community," *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010), the facts here are not sufficiently clear to support a grant of immunity.

Summary judgment on this aspect of Mr. Padilla's claim is DENIED.

b)     Claim Two-Failure to Provide Adequate Mental Health Treatment

The cell extraction defendants contend summary judgment is proper on this claim because no evidence shows they were aware Mr. Padilla had not previously been receiving

1   adequate mental-health treatment.  Defs.' Am. Mot. at 18.  Defendants misconstrue Mr. Padilla's

2   claim, for he contends they were deliberately indifferent to Mr. Padilla's mental health needs

3   when they failed to ensure he was adequately decontaminated and treated for the effects of pepper

4   spray before placing him in five-point restraints.  SAC ¶¶ 161, 168; Pl.'s Opp'n at 21.  In reply,

5   defendants contend they were not deliberately indifferent because of the fan used to defuse the

6   effects of the pepper spray.  Defs.' Reply at 7.

7           Here, Sergeant Drew testified that shortly after he placed Mr. Padilla in five-point

8   restraints he offered Mr. Padilla a decontamination shower.   Mr. Padilla did not answer.  A

9   reasonable jury could find Sergeant Drew's refusal to provide a decontamination shower was

10  deliberately indifferent, given Mr. Padilla's decompensated state, the fact that he had just been

11  exposed to a forceful cell extraction with his movements significantly restricted by virtue of the

12  five point restraints.  Under these circumstances, a question in passing, however professionally

13  posed, does not eliminate the possibility of liability.  *Cf. Clement*, 298 F.3d at 904 (deliberate

14  indifference could be established where officers were aware of harmful effects of pepper spray

15  yet purposefully refused to provide showers).  Additionally, whether defendants' reliance on the

16  use of a fan to diffuse the effects of pepper spray is a question best left to the jury.  Defendants'

17  motion is DENIED.

18              c)      Summary

19          In sum, regarding Mr. Padilla's excessive force claim, the cell extraction

20  defendants' motion is DENIED.  Regarding Mr. Padilla's claim of failure to provide adequate

21  medical treatment due to deliberate indifference, defendants' motion is DENIED.  The court now

22  proceeds to Mr. Padilla's claims against the supervisory defendants.

23          5.      Supervisory Defendants

24          As is well-established, liability may not be imposed on supervisory personnel for

25  the actions of their employees under a theory of respondeat superior.  *Ybarra v. Reno*

26  *Thunderbird Mobile Home Village*, 723 F.2d 675, 681 (9th Cir. 1984).  Generally speaking, a

27  supervisor is liable for subordinates' constitutional violations "if the supervisor participated in or

28  directed the violations, or knew of the violations and failed to act to prevent them."  *Taylor v.*

1    *List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Supervisory liability can be established where a

2    supervisor implements "a policy so deficient that the policy itself is a repudiation of constitutional

3    rights and is the moving force of the constitutional violation."  *Redman v. Cty. of San Diego*,

4    942 F.2d 1435, 1446 (9th Cir. 1991), *abrogated on other grounds by Farmer*, 511 U.S. 825, 835;

5    *see also Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001) (plaintiff must establish causal

6    relationship between defendants' conduct and constitutional deprivation).  Since the Supreme

7    Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Circuit has had an opportunity to

8    clarify claims for supervisory liability in the context of section 1983 deliberate indifference

9    claims and has concluded "that a plaintiff may state a claim against a supervisor for deliberate

10    indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional

11    conduct by his or her subordinates."  *Starr v. Baca*, 633 F.3d 1191, 1207 (9th Cir. 2011); *see also*

12    *Hydrick v. Hunter*, 669 F.3d 937, 940–41 (9th Cir. 2012) (distinguishing details of *Starr* case as

13    precluding qualified immunity given supervisor's having been on notice of systematic problems

14    and plausible assertions of acquiescence in subordinates' unconstitutional conduct).

15         As relevant here, the Second Circuit has held supervisory liability may be imposed

16    when an official has actual or constructive notice of unconstitutional practices and demonstrates

17    "gross negligence" or "deliberate indifference" by failing to act.  *Meriwether v. Coughlin*,

18    879 F.2d 1037, 1048 (2d Cir. 1989).  In *Meriwether*, the court held supervisory defendants were

19    on notice where, among other things, there was evidence showing they heard mere rumors about

20    inmates being abused by prison officials for exercising their First Amendment rights.  *Id.*

21    Because the supervisory defendants then took no precautions to ensure the safety of the inmates,

22    the Second Circuit concluded a reasonable jury could find "defendants should have known that

23    the plaintiffs' reputations would expose them to extreme hostility from corrections officers."  *Id.*

24         a)      Claims One through Three- Eighth Amendment Violations

25         Defendants move for summary judgment on plaintiff's Eighth Amendment claims

26    against supervisory defendants Beard, Stainer, Gipson, Johnson, Overley, and Baer.  Defs.' Am.

27    Mot. at 11.  Defendants contend Mr. Padilla does not establish a causal connection between any

28    one of these supervisor's conduct and Mr. Padilla's injuries.  *Id.*  Mr. Padilla contends the

1  supervisory defendants' liability stems from (1) implementing or failing to correct

2  constitutionally deficient policies, (2) failing to train custodial officers working at the MHCB to

3  identify and communicate with prisoners experiencing symptoms of mental health crisis, and

4  (3) ratifying the use of force against Mr. Padilla.  Pl.'s Opp'n at 10–14.  The parties do not

5  discuss how the supervisory defendants' conduct is implicated by each Eighth Amendment

6  violation alleged; they instead lump the Eighth Amendment claims together without

7  differentiation.  *See* Defs.' Am. Mot. at 9–10 and Pl.'s Opp'n at 10–14.

8          Based on the evidence presented to the court, each defendant's liability is

9  discussed in turn.

10                              (1)      Stainer

11          It is undisputed that "[f]rom March 2012 to August 2013, Defendant Stainer was

12  (Acting) Deputy Director of Facility Operations within the Division of Adult Institutions (DAI)

13  for CDCR."  DUMF No. 75.  In that capacity, defendant Stainer "did not directly supervise how

14  use of force and discipline policies and procedures were carried out, but he had overall

15  responsibility for the implementation of those procedures and ensuring actions remained within

16  policy."  DUMF No. 76.  Defendant Stainer first learned about Mr. Padilla's cell extraction in

17  2013 in connection with litigation in the *Coleman* case.  DUMF No. 77.  As Deputy Director,

18  Stainer had "the authority to set expectations system-wide for how force would be used, and

19  responsibility for ensuring that CDCR policies and procedures were followed with respect to the

20  inmate disciplinary process."  PUMF No. 117; *see also* Defs.' Resp. to Pl.'s Statement of

21  Undisputed Facts, ECF No. 144, at 36..

22          At his deposition, Stainer testified he became aware of the *Coleman* case in the

23  early 1990s, when he was a sergeant at California Correctional Institution (CCI) and CCI received

24  its "first handful of triple CMS level of care inmates."  Stainer Dep. 35:10-16.[10]  While he was

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  [10] Correctional Clinical Case Management System (CCCMS) is the lowest level of mental
     health care in CDCR's Mental Health Care Delivery System.  Program Guide at 12-1-7.  It is for

27  inmates who meet the diagnostic criteria set forth in the Program Guide, *id*. at 12-1-5 to 12-1-6,
     and who demonstrate "stable functioning" in prison housing units; do not require higher levels of

28  mental health care; show symptom control or "partial remission as a result of treatment; and,

49

1   "not privy to any of the details" of the *Coleman* court orders at that point in his career, he "knew

2   there were specific things we must do or couldn't do when it came to whether, you know, the use

3   of force and any subsequent disciplinary hearings." *Id.* at 37:8-13.  At some point prior to his

4   assumption of duties at CDCR headquarters he became "privy . . . to more information about the

5   types of violations the [*Coleman*] court had found with respect to use of force and discipline in

6   inmates with mental illness." *Id.* at 37:14-25.  He testified this was "because as a warden, as a

7   chief deputy warden, as manager of a facility, as a captain, I had to know more detail as to why

8   we were doing what we were doing." *Id.* at 38:2-8.  He also testified that when he was a warden

9   and a chief deputy warden, it was his responsibility to "make sure we're not violating

10  constitutional rights of inmates regardless of mental health designation" and "to review and take

11  action if [he] became aware of anything." *Id.* at 39:1-6.  In addition, he testified that "during

12  2013, CDCR began a process of reforming its use of force policies and procedures" and that he

13  was "primarily responsible" for those reform efforts. *Id.* at 68:3-14.  This effort came about after

14  proceedings brought by plaintiffs in the *Coleman* case. *See id.* at 74:4-7.  Stainer testified that he

15  did not believe the reform efforts were aimed at addressing "systemic" issues, but instead were to

16  "implement guidelines and policies to assist staff" in avoiding "issues" and "ensuring that we

17  don't have any violation of rights of the prisoners." *Id.* at 69:24-72:3.[11]

18          Plaintiff has presented evidence that in 2013 "CDCR continued to respond to

19  prisoners who have been diagnosed as seriously mentally ill and are exhibiting symptoms of

20  serious mental illness in exactly the same manner" as in 1993, at the time of the *Coleman*

21  proceedings on which *Coleman* orders are based.  Expert Decl. of Edward Kaufman, ECF No.

22

23  generally, have "a Global Assessment of Functioning (GAF) score() of 50 and above." *Id.* at 12-

24  1-7.

25          [11] The *Coleman* court found that Mr. Stainer's testimony in those proceedings, that none
    of the force shown on six videotapes, including the videotape of Mr. Padilla's cell extraction, *see*
26  SAC at 18, "was excessive under then-existing guidelines in CDCR policy" was, "[i]n
    combination with events depicted on the videotapes . . . perhaps the best evidence that the
27  constitutional violation with respect to use of force on seriously mentally ill inmates has not yet
    been remedied." *Coleman v. Brown*, 28 F.Supp.3d 1068, 1080 (E.D.Cal. 2014).

28

131, at 1017-18.  Plaintiff's expert, Dr. Kaufman, opines that in 2013 "it was obvious that CDCR ha[d] still not trained its custody and clinical staff in appropriate methods for managing agitated psychiatric patients. . . ."  *Id*. at 1019.

Construing the evidence in the light most favorable to Mr. Padilla, a reasonable juror could find that at times relevant to the events he complains of Stainer was on notice of constitutional violations in use of force against and discipline of seriously mentally ill inmates and that CDCR policies and procedures were inadequate to prevent those violations; by not effecting timely change in those deficient policies and procedures Stainer disregarded the risks he knew or should have known existed at the time of the extraction.  *See Redman*, 942 F.2d at 1447; *Meriwether*, 879 F.2d at 1048.

Summary judgment is DENIED as to defendant Stainer.

(2)      Gipson

As warden of Corcoran in 2012, Gipson was responsible for the overall operation of the prison, including implementation of policies and procedures.  PUMF No. 127.  Gipson understood that as warden she was responsible for ensuring that use of force and discipline were no longer carried out without regard for mental illness.  PUMF No. 129.  Gipson was not aware of Mr. Padilla's extraction until after this litigation commenced.  DUMF No. 78.

The parties dispute how much Gipson knew about the *Coleman* case.  Mr. Padilla contends Gipson was aware one of the problems the *Coleman* court identified was the CDCR's use of force and discipline without regard for mental illness and the effects of such force on a mentally ill inmate.  At deposition, Gipson confirmed she had an understanding of the problems the *Coleman* court identified with respect to use of force on and discipline of inmates with mental illness, specifically that CDCR was "conducting use of force and discipline without regard for mental illness and the affects [*sic*] on mental illness."  Gipson Dep. at 56:18–24.  Defendants dispute plaintiff's characterization of the record, contending Gipson's understanding of *Coleman* was limited to a general sense of concerns about CDCR's use of more force on mentally ill inmates than others and whether RVRs were being used in a punitive manner.  *Id*. at 52:8–13 (In

51

*Coleman*, "there was concerns [*sic*] in regards to were we using more force on mentally ill inmates and whether or not the RVRs were being used in a punitive manner").

Construing the evidence in Mr. Padilla's favor, a reasonable jury could conclude that prior to Mr. Padilla's cell extraction Gipson was on "constructive notice" of the constitutional deficiencies identified by the *Coleman* court with respect to CDCR's use of force and discipline without regard to an inmate's mental illness, and that her inaction amounted to acquiescence in constitutional violations. *See Redman*, 942 F.2d at 1447; *Meriwether*, 879 F.2d. at 1048.

Summary motion is DENIED as to Gipson.

(3)     Johnson, Beard, Baer, and Overley

Johnson was the associate warden for health care at Corcoran and in this capacity supervised custody staff assigned to health care positions, including in the MHCB. PUMF No. 107. Johnson also served as the CDO for RVRs in the health care units, and as noted above, reviewed and approved Robicheaux's disposition of plaintiff's RVR. PUMF No. 108. It is undisputed that Johnson, along with Captain Overley and Lieutenant Baer, was tasked with reviewing the force used on Mr. Padilla during the cell extraction; together, this group approved such force after review. DUMF No. 71.

Regarding Beard, it is undisputed he was appointed as CDCR Secretary after Mr. Padilla's extraction, on December 27, 2012. In his role, Beard had authority to review or direct staff to complete a further review of a use of force incident that came to his attention. Beard Dep. 120:1–9; DUMF No. 73. It is undisputed that Beard did not learn of Mr. Padilla's extraction until 2013, after he became Secretary, and he was not called upon to engage in a formal review of the force used on Mr. Padilla; rather he learned of the extraction in preparation for a 2013 hearing in *Coleman*. DUMF No. 74; Beard Dep. at 16:22-25. At the times of Mr. Padilla's extraction, retention in five-point restraints, and the RVR disciplinary hearing, Beard was not in a position to implement policies or procedures. Thus, he cannot be liable on an implementation theory.

No evidence in the record shows at the times relevant to Mr. Padilla's extraction or RVR hearing, Johnson, Overley, or Baer were responsible for implementing policies or

1   procedures governing all extractions, the use of five-point restraints, or the RVR disciplinary

2   process, so they cannot be liable based on a theory of implementation.  *See Redman v. Cty. of*

3   *San Diego*, 942 F.2d at 1448–49 (prison lieutenant dismissed where no evidence in the record

4   established he was responsible for developing and promulgating policies at issue).

5           Regarding the need for training, the court also finds no evidence in the record

6   establishing defendants Johnson, Overley, and Baer were responsible for training CDCR officers.

7   In the absence of such evidence, no reasonable factfinder could conclude the supervisory

8   defendants were deliberately indifferent for failure to train.  *See Edgerly v. City & Cty. of S.F.*,

9   599 F.3d 946, 962 (9th Cir. 2010) (dismissing supervisory liability claim when no facts "suggest

10  [Sheriff] provided any training to Officers. . . ., or that he was responsible for providing formal

11  training to any officers.").

12          Regarding ratification, summary judgment in favor of these supervisory

13  defendants also is warranted.  Mr. Padilla's theory is based on ratification of the alleged

14  constitutional violations giving rise to suit here, without reference to knowledge of prior acts or

15  notice generally in light of *Coleman*.  *See*  SAC ¶¶ 152 ("On information and belief, Defendants .

16  . .  Overley, Johnson, . . . , . . . and Baer specifically approved and ratified the use of force against

17  Mr. Padilla through the entire chain of command, and the use of force review process."); *id.* ¶ 154

18  ("On information and belief, Defendant Beard ratified the use of force against Mr. Padilla by

19  failing to take any corrective action."); *see also* Pl.'s Opp'n at 21 ("each supervisor declined to

20  consider the use of force in connection to [p]laintiff's serious mental illness and his mental state

21  at the time of the extraction, and approved and ratified the use of force."); *cf. Larez v. City of*

22  *L.A.*, 946 F.2d 630, 646 (9th Cir. 1991) (chief of a police department was liable where in addition

23  to ratifying the conduct at the heart of the plaintiff's suit, he endorsed and perpetuated prior acts

24  which, in turn, "encouraged the excessive use of force."); *cf. Starr*, 652 at 1208 (plaintiff

25  adequately pled supervisory liability based on allegations of Sheriff's "knowledge of the

26  unconstitutional conditions in the jail, including his knowledge of the culpable actions of his

27  subordinates, coupled with his inaction."); *Hydrick*, 669 F.3d at  940–41 (distinguishing case

28  from *Starr* where defendant in *Starr* was "liable in his individual capacity because he knew or

53

1    should have known about the dangers in the Los Angeles County Jail, and that he was

2    deliberately indifferent to those dangers.").

3           Specifically, regarding Johnson, Overley, and Baer, Mr. Padilla does not at this

4    stage point to evidence suggesting any of these defendants knew of prior acts of excessive force

5    or received notice of prior acts in light of *Coleman*.   Accordingly, the evidence of record,

6    standing alone, is insufficient to hold Johnson, Overley, and Baer liable on a theory of

7    ratification.

8           Regarding Beard, no reasonable juror could conclude he ratified the use of force

9    on Mr. Padilla by failing to take corrective action.  Beard was appointed as Secretary of the

10   CDCR on December 27, 2012, five months after the extraction took place.  Beard was not in a

11   position to approve or sanction after the fact prior uses of force or RVRs that disregarded an

12   inmate's mental health, and thus no reasonable juror could find he acquiesced in or set in motion

13   "a series of acts by others" allowing for the alleged constitutional violations at issue.  *Larez*,

14   946 F.2d at 645–46.  Further, no evidence in the record shows he was involved in a formal post-

15   incident review of Mr. Padilla's case or sanctioned the handling of Mr. Padilla's cell extraction

16   after the fact.

17          Summary judgment is GRANTED as to Baer, Johnson, Overley, and Beard.

18                       (4)   Summary

19          In sum, because a reasonable juror could conclude Stainer and Gipson were on

20   "constructive notice" of the constitutional violations taking place at the CDCR, summary

21   judgment is DENIED on Mr. Padilla's claims (1) for excessive force, (2) for failure to provide

22   adequate medical and mental health treatment, and (3) failure to protect from harm.  Summary

23   judgment is GRANTED for Baer, Johnson, Overley, and Beard on all three Eighth Amendment

24   claims.

25   /////

26   /////

27   /////

28   /////

1
2

       b)      <u>Claim Four-Disability Discrimination against Stainer, Beard, and Davey[12]</u>

3
4
5

      Mr. Padilla asserts claims based on the American with Disabilities Act and Rehabilitation Act against Stainer, Beard and Davey in their official capacities.  SAC ¶¶ 184–189.  For this claim, Mr. Padilla seeks monetary damages, attorneys' fees, and costs of suit.  *Id.*

6
7
8
9
10
11

      Title II of the ADA applies to an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  Title II of the ADA extends to prison inmates deprived of the benefits of participation in prison programs, services, or activities because of a disability. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998).

12
13
14
15
16
17

      The Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The Ninth Circuit has interpreted the Rehabilitation Act to apply to state prisons.  *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

18
19
20
21
22

      The ADA and the Rehabilitation Act are congruent statutes in purpose and application.  *Clark v. Cal.*, 123 F.3d 1267, 1270 (9th Cir. 1997).  Accordingly, the evidence required to prove an ADA claim is the same as that for a Rehabilitation Act claim.  *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996).  To establish an ADA or Rehabilitation Act claim, the plaintiff must show (1) he is a qualified individual with a disability; (2) he was either excluded

23
24
25
26
27
28

---

[12] Mr. Padilla sues Beard and Stainer in their official capacity under the ADA and Rehabilitation Act, and for damages.  SAC ¶¶ 184–189.  The Ninth Circuit in *Duvall v. City of Kitsap* suggests official capacity defendants in an ADA case are sued based on their individual "intentional discrimination" and can be sued for damages.  260 F.3d 1124, 1133 n.5, 1138 (in reversing grant of summary judgment, allowing for merits determination of ADA and Rehabilitation Act claims against County employees sued in official capacity).  Accordingly, this analysis assesses whether Beard's and Stainer's respective individual conduct violated the ADA and Rehabilitation Act, and not whether successors should be sued in their place.

1    from participation in or denied the benefits of a public entity's services, programs or activities, or

2    was otherwise discriminated against by the public entity; and (3) such exclusion, denial of

3    benefits, or discrimination was by reason of his disability.  *Id.*  The Ninth Circuit has interpreted

4    the second prong to encompass "anything a public entity does."  *Barden v. City of Sacramento*,

5    292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of L.A.*, 250 F.3d 668, 691 (9th

6    Cir.2001)) (internal quotation marks omitted); *see also Innovative Health Sys., Inc. v. City of*

7    *White Plains*, 117 F.3d 37, 45 (2d Cir. 1997) (reasoning that the phrase "programs, services, or

8    activities" is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of

9    the context"), *superseded on other grounds, Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171

10   n. 7 (2d Cir. 2001).

11           Whereas here, the plaintiff seeks monetary damages, a plaintiff must prove

12   intentional discrimination on the part of each individual defendant.  *Duvall v. Cty. of Kitsap*,

13   260 F.3d 1124, 1138 (9th Cir. 2001).  In the Ninth Circuit, a plaintiff can establish intentional

14   discrimination by showing defendants acted in "deliberate indifference," where they were on

15   "notice" that harm to a federal protected right was substantially likely, but they failed to act upon

16   that likelihood.  *Id.*

17           Here, the parties do not dispute Mr. Padilla suffers from a serious mental illness,

18   Pl.'s UMF No. 2, which qualifies him as disabled under the ADA and the Rehabilitation Act.

19   *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (an impairment

20   includes "any mental or psychological disorder such as emotional or mental illness").

21           Mr. Padilla contends defendants discriminated against him on the basis of his

22   disability by failing to provide appropriate training to CDCR officers regarding how to respond to

23   persons with mental impairments, which resulted in "subject[ing] [Mr. Padilla] to a violent use of

24   force and then locking him down in 5-point restraints for 3 days."  Opp'n at 24.

25           The Ninth Circuit has not articulated a standard for failure-to-train claims under

26   the ADA or Rehabilitation Act.  The court therefore analogizes Mr. Padilla's ADA and

27   Rehabilitation Act to failure-to-train claims under § 1983.  *See Green v. Tri-Cty. Metro. Transp.*

28   /////

1 │ *Dist. of Oregon*, 909 F. Supp. 2d 1211, 1220 (D. Or. 2012) (analyzing ADA failure to train claim

2 │ under § 1983 standards).

3 │       A supervisor may be liable under section 1983 for failing to train subordinates

4 │ when the failure to train amounts to deliberate indifference. *Canell v. Lightner*, 143 F.3d 1210,

5 │ 1213 (9th Cir. 1998) (citing *Canton*, 489 U.S. at 388). To establish liability on a failure to train

6 │ theory, the plaintiff must show that, "in light of the duties assigned to specific officers or

7 │ employees, the need for more or different training is obvious, and the inadequacy so likely to

8 │ result in violations of constitutional rights, that the [supervisor] . . . can reasonably be said to

9 │ have been deliberately indifferent to the need." *Clement*, 298 F.3d at 905 (quoting *Canton*,

10 │ 489 U.S. at 389). A plaintiff must allege facts showing the failure to train resulted from a

11 │ defendant's "deliberate" or "conscious" choice and that a sufficient causal connection exists

12 │ between the supervisor's wrongful conduct and the alleged constitutional violation. *Canell*,

13 │ 143 F.3d at 1213 (citation omitted); *Redman*, 942 F.2d at 1446–47. Where the plaintiff submits

14 │ evidence establishing prior instances of harm to inmates, a factfinder may find the supervisors

15 │ were on "actual or constructive notice of the need to train." *Clement*, 298 F.3d at 905.

16 │       Here, the record establishes Beard, who was appointed as the CDCR Secretary on

17 │ December 27, 2012, was not in a position to provide training before Mr. Padilla's cell extraction

18 │ or disciplinary review process. Accordingly, Beard's motion for summary judgment on these

19 │ claims is GRANTED. As for Davey, no evidence in the record even suggests Davey failed to

20 │ train subordinates or otherwise discriminated against Mr. Padilla. Accordingly, Davey's motion

21 │ is GRANTED as well.

22 │       As for Stainer, the record establishes he trained CDCR officials, including high

23 │ security prison wardens. PUMF No. 116. The record does not make clear whether Stainer and

24 │ training to the cell extraction defendants, so the court cannot find as a matter of law that Stainer

25 │ was not responsible for training the officers who extracted Mr. Padilla. Assuming Stainer was

26 │ responsible for providing training, the parties dispute the scope of training given to officers who

27 │ carried out the cell extraction. Mr. Padilla points to officers who testify they did not recall

28 │ receiving training on communicating or interacting with individuals who may be in a mental

1    health crisis.  *See* Acevedo Dep. at 17:15–19; Martinez Dep. at 32:8–13; Pruneda Dep. at 21:3–

2    22:25; Castro Dep. at 81:4–7.  Defendants point to evidence establishing the officers received

3    some training in identifying signs of someone who may be in a mental health crisis.  Acevedo

4    Dep. at 17:4–18:25; Castro Dep. at 79:25–82.  Because it is unclear whether such training was

5    inadequate, and if so, whether it led to Mr. Padilla's alleged harms, namely the use of force and

6    discipline without regard to Mr. Padilla's mental illness, the ADA and Rehabilitation Act claims

7    are questions for a jury to decide.  *See Anderson*, 477 U.S. at 255 (taking care to note district

8    courts should act "with caution in granting summary judgment," and have authority to "deny

9    summary judgment in a case where there is reason to believe the better course would be to

10   proceed to a full trial."); *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir.

11   2002) (The Ninth Circuit has held courts should construe the phrase "services, programs, or

12   activities," generally to "all actions of state and local governments.").   Summary judgment on

13   this claim is DENIED.

14          B.      Mr. Padilla's Motion for Partial Summary Judgment

15              First, Mr. Padilla moves for partial summary judgment against Dr. Wagner on

16   claim (2) for failure to provide adequate medical treatment and (3) for failure to protect from

17   harm in violation of the Eighth Amendment.  Pl.'s Am. Mot. at 22.  Second, he moves for partial

18   summary judgment against Robicheaux and Johnson on claim (2) for failure to provide adequate

19   medical treatment stemming from the RVR decision.  *Id.* at 24.  Third, he moves for partial

20   summary judgment against Davey, Stainer, and Beard on claim (4) asserting disability

21   discrimination in violation of the ADA and the Rehabilitation Act.  *Id.* at 26.  Finally, he moves

22   for partial summary judgment against Stainer, Gipson, and Johnson for their supervisory liability

23   related to his Eighth Amendment violations.  *Id.* at 25.

24              1.      Claims against Dr. Wagner

25              Mr. Padilla seeks summary judgment against Dr. Wagner on his Eighth

26   Amendment claims asserting failure to provide adequate medical treatment and failure to protect

27   him from harm.  Pl.'s Am. Mot. at 22.

28   /////

1        a)       Claim 2– Failure to Provide Adequate Medical Treatment

2        Mr. Padilla contends Dr. Wagner cannot credibly dispute he acted unreasonably in

3  delaying medical treatment and denying referral to DSH.  *Id.* at 22–23.  Defendants contend

4  Dr. Wagner provided adequate mental health treatment.  Defs.' Opp'n at 5.

5        For the same reasons set forth in the discussion of defendants' motion on this

6  claim, genuine issues of material fact preclude summary judgment for plaintiff against

7  Dr. Wagner.  While the record supports the conclusion CDCR had an unofficial policy of not

8  referring mentally ill inmates to DSH,  at least two reasonable interpretations of Mr. Padilla's

9  mental condition, one favoring Mr. Padilla, and one favoring Dr. Wagner, preclude the court from

10 finding as a matter of law Mr. Padilla's medical condition required referral to DSH.  The same

11 reasonable interpretations also preclude the court from holding as a matter of law Dr. Wagner

12 unreasonably alleged medical treatment by twenty-three days.  Summary judgment on this claim

13 is DENIED.

14       b)       Claim 3-Failure to Protect from Harm

15       Mr. Padilla contends Dr. Wagner's delay in administering involuntary medication

16 and his decision not to refer Mr. Padilla to DSH also amounted to a failure to take reasonable

17 measures to prevent harm to Mr. Padilla's mental health.  Pl.'s Am. Mot. at 23.  Defendants

18 contend that by ensuring adequate and timely measures were taken, Dr. Wagner did not fail to

19 protect Mr. Padilla from harm.  Defs.' Opp'n at 5.

20       For an inmate to prevail on an Eighth Amendment claim against a prison official,

21 he must first "objectively show that he was deprived of something sufficiently serious."  *Lemire,*

22 726 F.3d at 1074 (internal quotations omitted).   "A deprivation is sufficiently serious when the

23 prison official's act or omission results 'in the denial of the minimal civilized measure of life's

24 necessities."  *Id.*  Next, the inmate must "make a subjective showing that the deprivation occurred

25 with deliberate indifference to [his] health or safety."  *Id.*  To satisfy this subjective component of

26 deliberate indifference, the inmate must show that prison officials "kn[e]w [ ] of and

27 disregard[ed]" the substantial risk of harm.  *Id.*  The officials need not have intended any harm to

28 befall the inmate; "it is enough that the official acted or failed to act despite his knowledge of a

1   substantial risk of serious harm." *Id.* (citing *Farmer*, 511 U.S. at 837, 842). Finally, to establish

2   deliberate indifference, a plaintiff must demonstrate the defendants' actions were both an actual

3   and proximate cause of his injuries. *Id.*

4          In the failure to protect context, an inmate satisfies the "sufficiently serious

5   deprivation" requirement by "show[ing] that he [was] incarcerated under conditions posing a

6   substantial risk of serious harm." *Id.* at 1075. The objective question of whether a prison

7   officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact,

8   and as such must be decided by a jury if there is any room for doubt. *Conn v. City of Reno,*

9   591 F.3d 1081, 1095 (9th Cir. 2010), *vacated by City of Reno, Nevada v. Conn*, __ U.S. __,

10  131 S. Ct. 1812 (2011), *reinstated in relevant part by Conn v. City of Reno*, 658 F.3d 897 (9th

11  Cir. 2011) (objective question of whether there was substantial risk arrestee might commit suicide

12  should be decided by jury).

13         The Ninth Circuit does not appear to have addressed directly whether the delay or

14  denial of medical treatment can support a failure to protect claim. *Lemire* does suggest a plaintiff

15  can sustain an Eighth Amendment claim by showing a defendant's deliberate indifference to the

16  risk of a plaintiff's harm to self. *Lemire,* 726 F.3d at 1078. In *Lemire*, the family of a mentally ill

17  inmate who committed suicide while in custody brought suit against CDCR officials alleging,

18  among other things, an Eighth Amendment violation for failure to protect. *Id.* at 1075. The

19  family contended the defendants were deliberately indifferent in deciding to remove floor officers

20  from the inmates' area for several hours a day in order to attend meetings. *Id.* During these

21  meetings, defendants allegedly deprived the inmate defendant of "meaningful supervision

22  protecting him from harm." *Id.* The district court granted defendants' motion for summary

23  judgment on this claim. *Id.* at 1067. The Ninth Circuit reversed, concluding a reasonable juror

24  could find the withdrawal of floor staff from the inmates' area for up to three and a half hours

25  each day created "an objectively substantial risk of harm to the unsupervised inmates," including

26  the risk of suicide. *Id.* at 1076. Specifically, the court held "a jury could infer that unsupervised

27  mentally ill inmates housed together were more likely to harm themselves or others than were

28  inmates in the regular prison population," which was enough to support a failure to protect claim.

1   *Id.*  The case was remanded for trial to determine whether the CDCR officials were deliberately

2   indifferent to the plaintiff's safety and welfare in attending meetings resulting in a lack of

3   supervision for several hours.  *Id.* at 1086.  To the Ninth Circuit, the risk of extraneous harm need

4   not be established to support a failure to protect claim. *See id.*  All that is needed is defendants'

5   deliberate indifference to the risk of harm, extraneous or self-imposed.  *Id.*

6          Here, it appears Mr. Padilla may be able to advance a strong case at trial.  But as

7   with Mr. Padilla's claim for the failure to provide adequate medical treatment, disputed issues of

8   fact regarding Mr. Padilla's mental condition while in the MHCB preclude the court from holding

9   as a matter of law that Dr. Wagner's conduct amounted to deliberate indifference to the risk of

10   "protecting him from harm," specifically his own decompensation.  *Id.* at 1067.  Accordingly,

11   Mr. Padilla's motion is DENIED.

12              2.    Claim Three-Failure to Provide Adequate Medical Treatment Claim
                     against Robicheaux and Johnson

13

14          Mr. Padilla contends by punishing him for behavior related to his mental health

15   illness and without regard for the effects of disciplinary measures on his mental health,

16   Robicheaux and Johnson were deliberately indifferent to his mental health needs, which

17   amounted to failure to provide adequate mental health treatment.  Pl.'s Am. Mot. at 24.

18   Defendants contend Mr. Padilla's motion should be denied because the disciplinary measures

19   Robicheaux imposed did not interfere with Mr. Padilla's mental health treatment.  Defs.' Opp'n at

20   8.

21          As noted above in connection with defendants' motion on this claim, to establish a

22   constitutional claim under the Eighth Amendment predicated upon the failure to provide medical

23   treatment, a plaintiff must show he had a serious medical need, the defendant was deliberately

24   indifferent to that medical need, and the deliberate indifference caused harm to the plaintiff.

25   *Lemire*, 726 F.3d at 1081.  For the harm prong, the plaintiff must demonstrate the defendant's

26   actions were both an actual and proximate cause of injury. *Id.*

27          Here, also as noted in the discussion of defendant's claim, the evidence of record

28   supports the conclusion that a portion of the penalties imposed by Robicheaux were rescinded,

1   and the record is unclear regarding whether the balance of the penalties remained in effect. *See*

2   pages 17-18, 38 *supra*. While Mr. Padilla's evidence was sufficient to preclude summary

3   judgment for Robicheaux, it is insufficient to demonstrate indisputably that he suffered harm as a

4   result of the penalties Robicheaux imposed. *See Conn.,* 591 F.3d at 1098–1101 (plaintiff can

5   establish deliberate indifference if defendant's conduct "is the actual cause of [the] injury [and]

6   only if the injury would not have occurred 'but for' that conduct.").

7           Mr. Padilla's motion in this respect is DENIED.

8                 3.     <u>Claim Four-ADA and Rehabilitation Act Claims against Davey, Stainer,</u>

9                      <u>and Beard</u>

10           Mr. Padilla moves for summary judgment on his ADA and Rehabilitation Act

11   claims against supervisory defendants Davey, Stainer, and Beard acting in their official

12   capacities. Pl.'s Am. Mot. at 26. As noted above, Beard was not in a position to discriminate

13   against Mr. Padilla at the time of his extraction, subjection to five-point restraints, and RVR

14   disciplinary hearings. Second, no evidence in the record establishes Davey intentionally

15   discriminated against Mr. Padilla. Finally, disputed issues of fact regarding Mr. Padilla's "failure-

16   to-train" theory preclude summary judgment for Stainer. Summary judgment is DENIED as to

17   Stainer, and GRANTED as to Beard and Davey.

18                 4.     <u>Eighth Amendment Claims against Stainer, Gipson, and Johnson</u>

19           Mr. Padilla contends Stainer, Gipson, and Johnson should be held liable as a

20   matter of law for implementing use of force policies that did not limit the amount of pepper spray

21   used on mentally ill inmates, which in turn led to Mr. Padilla's injuries during the extraction.

22   Pl.'s Am. Mot. at 25–26. Further, Mr. Padilla contends these defendants failed to ensure CDCR

23   staff were trained to identify symptoms of an inmate's mental health crisis in order to effectively

24   respond to the situation presented by Mr. Padilla prior to his cell extraction. *Id.* at 26. As noted

25   above, Mr. Padilla does not discuss how each defendant's conduct led to a specific Eighth

26   Amendment violation. *See* Pl.'s Am. Mot. at 25–26. Accordingly, all Eighth Amendment claims

27   will rise or fall together.

28

1         Regarding Johnson, plaintiffs have pointed to no evidence establishing Johnson

2    was responsible for implementing use of force policies or training staff on how to communicate

3    with mentally ill inmates.  For this reason, Mr. Padilla's motion is DENIED as to Johnson.

4         Regarding Stainer and Gipson, even assuming Stainer and Gipson implemented

5    deficient policies or failed to train CDCR officials, Mr. Padilla has neither argued nor established

6    his Eighth Amendment rights were violated as a matter of law, and the court will not manufacture

7    this argument on Mr. Padilla's behalf.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994)

8    (courts do not "manufacture" arguments for a litigant) (citation omitted).  In the absence of any

9    argument or evidence establishing Mr. Padilla's Eighth Amendment rights were violated, "the

10   better course would be to proceed to a full trial*." Anderson*, 477 U.S. at 255

11        Summary judgment is DENIED on this claim.

12   V.     <u>CONCLUSION</u>

13        This order resolves the pending motions for summary judgment.  Defendants'

14   motion, ECF No. 142, is resolved as follows:

15      1.   Claim One—Excessive Force

16         a.   As based on the claim of excessive physical force used on Mr. Padilla, against

17            Castro, Godina, Drew, Acevedo, Pruneda, Garcia, Martinez, and Holguin,

18            DENIED;

19         b.   As based on the claim of excessive use of pepper spray during Mr. Padilla's

20            extraction, against Castro, Godina, Drew, Acevedo, Pruneda, Garcia, Martinez,

21            and Holguin, DENIED;

22         c.   As against supervisory defendants Stainer and Gipson, DENIED;

23         d.   As against supervisory defendants Beard, Johnson, Overly, and Baer,

24            GRANTED.

25      2.   Claim Two— Failure to Provide Adequate Medical and Mental Health Treatment

26         a.   As against Wagner, Kaiser, and LaClaire, DENIED;

27         b.   As against Robicheaux and Johnson, DENIED;

28

c.  As against Castro, Godina, Drew, Acevedo, Pruneda, Garcia, Martinez, and Holguin, DENIED;

d.  As against supervisory defendants Stainer and Gipson, DENIED;

e.  As against supervisory defendants Beard, Johnson, Overly, and Baer, GRANTED.

3.  Claim Three—Failure to Protect From Harm

a.  As against supervisory defendants Stainer and Gipson, DENIED;

b.  As against supervisory defendants Beard, Johnson, Overly, and Baer, GRANTED.

4.  Claim Four—Disability Discrimination in Violation of ADA and Rehabilitation Act

a.  As against defendants Beard and Davey, GRANTED;

b.  As against Stainer, DENIED.

Mr. Padilla's motion, ECF No. 141, is DENIED.

IT IS SO ORDERED.

DATED:  January 27, 2017.

_____
UNITED STATES DISTRICT JUDGE