Lori Rifkin, Esq. [S.B. # 244081]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Telephone: (415) 685-3591
Facsimile: (626) 577-7079
Email: lrifkin@hadsellstormer.com

Dan Stormer, Esq. [S.B. #101967]
Caitlan McLoon, Esq. [S.B. #302798]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        cmcloon@hadsellstormer.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| Jermaine Padilla,<br><br>    Plaintiff,<br><br>  v.<br><br>Jeffrey Beard, et al.,<br><br>    Defendants. | Case No.: 2:14-cv-01118-KJM-CKD<br><br>[Assigned to the Honorable Kimberly J. Mueller–Courtroom 3]<br><br>**PLAINTIFF JERMAINE PADILLA'S TRIAL BRIEF**<br><br>DATE:      April 17, 2017<br>TIME:      9:00 a.m.<br>CRTRM:   3<br><br>Complaint Filed:      May 6, 2014<br>Trial Date:      April 17, 2017 |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

I.   PLAINTIFF'S STATEMENT OF THE CASE ........................................................... 1

II.  PLAINTIFF'S CLAIMS ............................................................................................ 2

    A.   Failure to provide adequate medical and mental health treatment
        (8th Amendment) ............................................................................................ 2

    B.   Unreasonable and excessive use of force (8th Amendment) ......................... 4

    C.   Failure to protect from harm (8th Amendment) ............................................ 5

    D.   Discrimination on the basis of disability (ADA & Rehabilitation Act) .......... 6

    E.   Punitive Damages .......................................................................................... 7

III. KEY EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS ................................. 8

    A.   Denial of Necessary Medical Treatment and Indifference to Mental
        Health Needs .................................................................................................. 8

    B.   Excessive Force ........................................................................................... 11

    C.   Failure to Protect from Harm ....................................................................... 12

    D.   Punishment Based on Mental Illness ........................................................... 13

    E.   Supervisory Liability ................................................................................... 14

    F.   Disability Discrimination ............................................................................. 15

    G.   Punitive Damages ........................................................................................ 15

IV.  EVIDENTIARY ISSUES ........................................................................................ 16

V.   RELIEF SOUGHT .................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Coleman v. Brown*
938 F.Supp.2d 955 (E.D. Cal. 2013)........................................................................1, 3

*Coleman v. Brown*
28 F. Supp.3d 1068, 1073 (E.D. Cal. 2014)............................................................1, 3

*Coleman v. Wilson*
912 F. Supp. 1282, 1298 (E.D. Cal. 1995).............................................................1, 3

*Farmer v. Brennan*
511 U.S. 825 (1994)...............................................................................................6

*Gibson v. County of Washoe*
290 F.3d 1175 (9th Cir. 2002) ...............................................................................6

*Hansen v. Black*
885 F.2d 642 (9th Cir. 1989) .................................................................................6

*Hudson v. McMillian*
503 U.S. 1 (1992)...................................................................................................5

*Hutchinson v. United States*
838 F.2d 390 (9th Cir. 1988) .................................................................................3

*Jett v. Penner*
439 F.3d 1091 (9th Cir. 2006) ...............................................................................3

*Lemire v. Cal. Department of Correctional & Rehabilitation*
726 F.3d 1062 (9th Cir. 2013) ...............................................................................6

*M.H. v. County of Alemeda*
62 F. Supp. 3d 1049, 1081-82 (N.D. Cal. 2014)....................................................6

*Penn. Department of Correctional v. Yeskey*
524 U.S. 206 (1998)...............................................................................................7

*Redman v. Cty. of San Diego*
942 F.2d 1435 (9th Cir. 1991) ...............................................................................5

*Starr v. Baca*
633 F.3d 1191 (9th Cir. 2011) ...............................................................................5

*Whitley v. Albers*
475 U.S. 312 (1986)...............................................................................................5

*Wilson v. Seiter*
    501 U.S. 294 (1991)......................................................................................................................3

**FEDERAL STATUTES**

42 U.S.C.
    § 12131..........................................................................................................................................7

Pursuant to Local Rule 285, Plaintiff Jermaine Padilla, by and through his counsel of record, hereby submits his Trial Brief regarding his causes of action, and request for relief.

## I.        PLAINTIFF'S STATEMENT OF THE CASE

This case is about the harm suffered by Plaintiff Jermaine Padilla after Defendant administrators, medical providers, and custody officers of the California Department of Corrections and Rehabilitation ("CDCR") refused to consider and respond to his serious mental health needs while he was incarcerated at California State Prison-Corcoran from July through November 2012.  Since at least 1995, CDCR officials, medical providers, and custody officers have been on notice that the Constitution requires prisons to provide incarcerated persons with necessary mental health care and to treat prisoners in a humane manner that does not punish them for mental illness.  Specifically, in *Coleman v. Wilson* (*Coleman I*), 912 F. Supp. 1282, 1298 (E.D. Cal. 1995), a federal court found that CDCR was grossly mistreating prisoners with serious mental illness by failing to provide them adequate mental health treatment, including timely inpatient hospitalization and involuntary medication when necessary, and subjecting them to "punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses."  By 2012, almost two decades later, CDCR had still failed to correct these constitutional deprivations.  *See Coleman v. Brown* (*Coleman II*), 938 F. Supp. 2d 955, 969 & 989-90 (E.D. Cal. 2013); *Coleman v. Brown* (*Coleman III*), 28 F. Supp.3d 1068, 1073 (E.D. Cal. 2014).  CDCR Defendants' refusal to remedy these constitutional violations directly resulted in Plaintiff's grievous harm and suffering.

Mr. Padilla was incarcerated at Corcoran with a known diagnosis of paranoid schizophrenia and history of multiple inpatient psychiatric hospitalizations when he was referred to a Mental Health Crisis Bed (CDCR's "emergency room" for mental health) because of suicidality and an inability to take care of himself. Mr. Padilla's "treating" psychiatrist, Defendant Wagner, determined that Mr. Padilla was gravely disabled and not competent to make decisions about taking his psychotropic medication.  Defendant Wagner also knew that without medication and active intervention, Mr. Padilla would inevitably decompensate further, which under CDCR policies and procedures, would lead to an emergency cell extraction by custody staff.  CDCR policies required that if a patient did not stabilize

to a point where they could be released from a mental health crisis bed within 10 days, the treatment team must transfer that patient to an inpatient psychiatric hospital for long-term care.  Despite this information, Defendants Wagner and LaClaire chose to let Mr. Padilla sit untreated in a cell in the mental health crisis bed for 24 days without referring him to an inpatient psychiatric hospital and without initiating the involuntary medication process for Mr. Padilla.  Over that time Mr. Padilla continued to deteriorate to the point that he was naked, rolling in urine, and attempting to ingest his own feces.  Defendants Wagner and CDCR supervisors and officers then subjected Mr. Padilla—who was alone, disoriented, and unarmed in his cell—to a brutal cell extraction without any regard for his mental health needs, emptying one entire MK-46 canister and three entire MK-9 canisters of searing Oleoresin Capsicum ("OC") spray into his cell in less than ten minutes.  These Defendants then refused to wash off the incredibly potent OC spray which remained on him, causing great pain and suffering, while he was held in five-point restraints for three days, further exacerbating Mr. Padilla's suffering.  Even after this traumatic extraction, purportedly done in order to treat Mr. Padilla, Defendants still did not refer Mr. Padilla to the inpatient hospital as required under their own policies.  Rather, Defendants doubled down, keeping Mr. Padilla in the mental health crisis bed for an additional 20 days and disciplining him for refusing to follow orders during the cell extraction in the midst of his mental health crisis.

Defendants' conduct caused Mr. Padilla physical, psychological, and emotional pain and suffering and exacerbated his mental illness.  In the wake of Defendants' abdication of their responsibility as prison administrators, medical providers, and custody officers, Plaintiff brought the present suit seeking damages for the violation of his rights.

## II.  PLAINTIFF'S CLAIMS

Mr. Padilla has four causes of action against fifteen CDCR prison administrators, medical providers, and custody officers:

### A.  Failure to provide adequate medical and mental health treatment (8th Amendment)

Plaintiff's claim against Defendants for failure to provide adequate medical and mental health treatment under the Eighth Amendment is at the heart of his case. Plaintiff will establish this violation

by proving that Defendants acted with deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Deliberate indifference is established by showing a serious medical need such that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and showing that a defendant engaged in a purposeful act or failure to respond to this medical need such that plaintiff was harmed. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

There is no dispute in this case that Plaintiff had serious mental health and medical needs. Provision of constitutionally adequate mental health treatment requires more than "segregation and close supervision of mentally ill inmates" and includes, *inter alia*, timely access to appropriate medication, treatment, and qualified clinical staff including timely access to inpatient hospitalization and utilization of involuntary medication when necessary. *Coleman I,* 912 F. Supp. at 1298 n. 10 & 1311-13; *Coleman II*, 938 F. Supp. 2d at 969-70; *Coleman III*, 28 F. Supp. 3d at 1075. Deliberate indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Deliberate indifference to mental health needs also includes the punitive use of force and disciplinary measures against mentally ill inmates without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses. *Coleman I*, 912 F. Supp. at 1320-23. Prison officials violate the Eighth Amendment by failing to adequately train custodial officers in signs and symptoms of mental illness, resulting in officers' use of punitive measures and inability to identify conduct resulting from mental illness. *Id.*

Plaintiff's claim for failure to provide adequate mental health treatment is brought against Defendants Stainer, Gipson, Johnson, Castro, Godina, Drew, Robicheaux, Wagner, LaClaire, Kaiser, Pruneda, Martinez, Acevedo, Garcia, and Holguin in their individual capacities. Defendant Wagner was Plaintiff's treating psychiatrist and Defendant LaClaire was Plaintiff's treating psychologist. Defendant Kaiser was a nurse in the mental health crisis bed unit who medically "cleared" Plaintiff after the cell extraction. Defendants Castro, Godina, and Drew were supervising officers for the cell extraction team. Defendants Pruneda, Martinez, Acevedo, Garcia, and Holguin were part of the cell

extraction team.  Defendant Robicheaux was the Senior Hearing Officer who heard, decided, and found Plaintiff guilty of a Rules Violation following the cell extraction.  Defendant Johnson was the Associate Warden for Health Care at Corcoran, Defendant Gipson was the Warden at Corcoran, and Defendant Stainer was Director of the Division of Adult Institutions for CDCR.

Plaintiff will show Defendants' deliberate indifference to Mr. Padilla's needs in violation of the Eighth Amendment on a number of fronts, including:  1) Defendants Wagner, LaClaire, and Kaiser failed to provide necessary medical treatment even as set forth in their own policies, including failing to provide involuntary medication, refer Plaintiff to inpatient hospitalization, or even ensure Plaintiff was decontaminated from the massive amounts of OC spray used on him, resulting in Plaintiff's complete and prolonged mental health decompensation and suffering; 2) Defendants Stainer, Gipson, Johnson, Castro, Godina, and Drew implemented and/or failed to correct policies, procedures, practices, training, and supervision that resulted in the use of force and discipline against Plaintiff without regard to his mental health needs and in a manner that punished him for his mental illness and exacerbated the symptoms of his mental illness; 3) Defendants Wagner, Castro, Godina, Drew Pruneda, Martinez, Acevedo, and Garcia directed and used force and restraint against Plaintiff in a manner without regard for his mental health needs, and in a manner that punished him for his mental illness and exacerbated the symptoms of his mental illness; and 4) Defendants Robicheaux and Johnson disciplined Plaintiff for behavior resulting from his mental illness and ordered that Plaintiff be punished in a manner contraindicated for his mental health.  Crucially, the policies, procedures, and practices governing the cell extraction and discipline of Mr. Padilla have already been found unconstitutional by a federal court.

**B.     Unreasonable and excessive use of force (8th Amendment)**

The failure of Defendants to provide Plaintiff with appropriate treatment and referral to a higher level of care set him up for a violent cell extraction on July 24, 2012, in which custody officers used excessive and unnecessary force pursuant to policies and procedures that did not adequately prevent them from doing so.

This claim is brought against Defendants Stainer, Gipson, Wagner, Castro, Godina, Drew, Pruneda, Martinez, Acevedo, Garcia, and Holguin, in their individual capacities.  Plaintiff's excessive

force claim against Defendants Stainer and Gipson is based on their supervisory liability for failure to implement policies and procedures, including training, review, and supervision, that would have prevented the harm that he experienced, as well as their ratification of the use of force.  Supervisory liability can be established where a supervisor implements "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991).  "[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."  *Starr v. Baca*, 633 F.3d 1191, 1207 (9th Cir. 2011).  Here, the use of force policies and procedures governing Plaintiff's cell extraction have already been found unconstitutional with respect specifically to mentally ill inmates.  The policies and procedures were also fundamentally inadequate in that they placed no limits on the amount and duration of OC spray that could be used against an unarmed prisoner alone in a cell.

The core inquiry for Mr. Padilla's excessive force claim against Defendants Wagner, Castro, Godina, Drew, Pruneda, Martinez, Acevedo, Garcia, and Holguin is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for purpose of causing harm."  *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  In making these determination, there are five factors to consider: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response."  *Hudson*, 503 U.S. at 7.

Plaintiff alleges that these Defendants directed and used excessive force against him during the cell extraction, including emptying the entirety of an MK-46 and three MK-9 canisters of OC spray into his cell in less than ten minutes, placing a heavy metal triangle lanyard on his wrist and pulling on it, then physically assaulting him, and placing and keeping him in "5-point restraints" for three days, and failing to ever decontaminate him from the OC spray.

**C.    Failure to protect from harm (8th Amendment)**

Plaintiff also alleges that Defendants failed to protect him in violation of the Eighth Amendment.  Plaintiff will prove this claim by showing that Defendants knew of the substantial risk of

serious harm to a prisoner in his condition and failed to take reasonable measures to abate that risk, resulting in his injury.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); 912 F. Supp. at 1298-99.

Plaintiff brings this claim against Defendants Stainer, Gipson, Castro, Godina, Drew, Wagner, LaClaire, Kaiser, Pruneda, Martinez, Acevedo, Garcia, and Holguin, in their individual capacities. Supervisory Defendants including Stainer, Gipson and Johnson are liable on this claim because they were aware that the conditions under which an inmate in Plaintiff's situation was incarcerated— including conditions created by Defendants' unconstitutional policies, procedures, and practices— posed a substantial risk of harm and did not take reasonable measures to address that risk.  *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1077-78 (9th Cir. 2013); *Gibson v. County of Washoe*, 290 F.3d 1175, 1191 (9th Cir. 2002).  "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).  Failure to train prison staff may also serve as the basis for liability where the failure to train amounts to deliberate indifference to the rights of persons with whom custody staff will foreseeably come into conduct.  *See M.H. v. County of Alemeda*, 62 F. Supp. 3d 1049, 1081-82 (N.D. Cal. 2014).

Mr. Padilla alleges that Defendants Stainer, Gipson, Castro, Godina, Drew, Wagner, LaClaire, Kaiser, Pruneda, Martinez, Acevedo, Garcia, and Holguin failed to protect him from harm by refusing to provide necessary mental health treatment, refusing to adopt appropriate policies, procedures and practices with respect to prisoners in mental health crisis, failing to adequately train and supervise custody officers regarding mental illness, use of unreasonable and excessive force and restraint against him without regard for his serious mental health needs, refusing to wash off the incredibly potent OC spray, and punishing him for behaviors resulting from his mental illness and their failure to provide him necessary treatment.

### D.    Discrimination on the basis of disability (ADA & Rehabilitation Act)

Title II of the ADA applies to an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42

U.S.C. § 12131(2).  To prevail on a claim of disability discrimination under the ADA, Mr. Padilla must show that Defendants denied him benefits, services, programs, or other activities, or otherwise discriminated against him by reason of his disability.  *Penn. Dep't. of Corr. v. Yeskey*, 524 U.S. 206 (1998).  Activities, services, and programs in a prison are considered "benefits" under the ADA.  *Id.* Discrimination prohibited by the ADA includes the failure to make reasonable accommodations for the known physical and mental limitations of disabled individuals, including prisoners, unless making such accommodation would impose an undue hardship.  *Id.*  Discrimination under the ADA does not require animus or ill will.  *Id.*

Plaintiff brings his ADA/Rehab Act claim against Defendant Stainer in his official capacity. Plaintiff alleges that Defendant Stainer discriminated against him on the basis of his disabilities and/or denied him the benefits of public services, programs, and activities by failing to provide appropriate policies, procedures, practices, and training for CDCR officers regarding how to respond reasonably and effectively to persons with serious mental illness and experiencing an episode of psychological distress, and by implementing policies, procedures, practices, and training that permitted the disciplining of Plaintiff for actions found by CDCR's own mental health staff to arise from his mental illness and imposition of a punishment found by CDCR's own mental health staff to be detrimental to his mental health.

### E.    Punitive Damages

Plaintiff makes a claim for punitive damages against Defendants in their individual capacities. Punitive damages may be awarded where a defendant's conduct that harmed the plaintiff was malicious, oppressive or in reckless disregard of the plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law. An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of the plaintiff.

### III.    KEY EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIMS

Plaintiff will present the following key evidence to prove his claims:

### A.    Denial of Necessary Medical Treatment and Indifference to Mental Health Needs

Mr. Padilla was transferred to a Mental Health Crisis Bed at Corcoran on July 1, 2012, approximately one month after he arrived at the prison. Mr. Padilla had already been diagnosed by CDCR with serious mental illness at the Enhanced Outpatient (EOP) or higher level of care,[1] and had a history of previous inpatient hospitalizations.  According to CDCR medical records, at the time that he was referred by staff in the administrative segregation housing unit to the crisis bed unit, Mr. Padilla had been observed to be suicidal, delusional and illogical, and psychotic, was responding to internal stimuli, throwing trash in his cell, and displaying poor hygiene, had a strong odor coming from his cell, and had refused medications for at least three weeks.  He was deemed "gravely disabled" by mental health staff in the crisis bed unit upon admission.

After admission to the crisis bed unit on July 1, treatment records indicate that Mr. Padilla's mental state failed to stabilize and progressively deteriorated: he was grossly disheveled, refusing to shower or come out of his cell, some days refusing meals, sitting or lying naked in the cell in his own urine, appearing agitated with an altered thought process, and responding to internal stimuli, his cell was in disarray with trash, cartons, and an unknown substance on the floor, and his mattress smeared with filth.

CDCR policy requires that an inmate-patient who cannot be stabilized in a mental health crisis bed unit within ten days be referred and transferred to an inpatient psychiatric hospital.  However, Defendant Wagner, the treating psychiatrist in the mental health crisis bed unit, and Defendant LaClaire, the treating psychologist, did not initiate this transfer.  Moreover, even though Mr. Padilla was not compliant with his psychotropic medications and, being gravely disabled, was not competent to make decisions about whether to accept or refuse this medication, Defendant Wagner elected not to initiate the non-emergency involuntary medication process.  Rather, Defendants Wagner and LaClaire left Mr. Padilla in the crisis bed unit without necessary treatment intervention. At one point,

---

[1] As defined by CDCR policy, EOP level of care is for prisoners with "acute onset or significant decompensation of a serious mental disorder" who are unable to function in the general prison population due to their mental illness.

1    Defendants Wagner and LaClaire even attempted to transfer Mr. Padilla back to an administrative

2    segregation cell—not because Mr. Padilla had stabilized, but because then he would be another

3    doctor's problem when he "inevitably" further decompensated, as Dr. Wagner testified.  Defendant

4    Wagner testified that although the mental health crisis bed treatment team recommended that the non-

5    emergency involuntary medication process be started for Mr. Padilla, Wagner was hoping that if he

6    could get Mr. Padilla transferred back to administrative segregation, then that unit's psychiatrist would

7    have to do the paperwork rather than Wagner.

8           The refusal of Defendants Wagner and LaClaire to provide Mr. Padilla with appropriate

9    treatment and referral to a higher level of care in violation of CDCR policy not only deprived Mr.

10   Padilla of necessary medical care, but also set him up for the violent cell extraction to which he was

11   ultimately subjected.  Defendants' assertion throughout this litigation that the treatment team

12   determined Mr. Padilla did not require involuntary medication is contradicted by the documentary

13   evidence, as well as their expert's testimony, indicating that Mr. Padilla met the criteria for

14   involuntary medication at numerous points prior to July 24, 2012 (the date of the cell extraction), and

15   at several points CDCR staff in fact indicated that procedures should be initiated for non-emergency

16   involuntary medication—but Wagner chose not to do so.

17          On July 24, 2012, Defendant Wagner ordered custody staff to forcibly remove Mr. Padilla

18   from his cell to administer emergency involuntary medication because Mr. Padilla had flooded his cell

19   and was naked rolling in urine and attempting to ingest his own feces.  Defendants Castro, Godina,

20   and Drew formed a cell extraction team that proceeded to unleash a massive amount of OC spray on

21   Mr. Padilla in less than ten minutes, emptying first an entire MK-46 canister of OC spray followed by

22   three MK-9 canisters into his cell.  Defendants administered canister after canister despite the

23   obviousness of Mr. Padilla's inability to follow their orders due to his mental health state.  Finally,

24   Defendants opened the cell door and rushed Mr. Padilla, violently taking him to the ground. After the

25   cell extraction team placed Mr. Padilla in 5-point restraints pursuant to Defendant Wagner's orders, no

26   Defendant made sure that Mr. Padilla was properly washed of the OC spray.  Rather, Defendant Kaiser

27   medically "cleared" Mr. Padilla without examination and despite having heard him screaming and

28   crying through the extraction, while she herself was coughing and overcome by the OC spray

emanating from his body, even while she was wearing a filtration mask. Defendant Wagner than kept Mr. Padilla tied down in full-body restraints for three continuous days, still coated in OC spray, in violation of CDCR policies and procedures although Mr. Padilla posed no immediate threat in violation of CDCR policies and procedures.

And even after Defendants initiated this extraction for the stated purpose of administering involuntary medication to Mr. Padilla because of the severity of his mental illness, Defendants Wagner and LaClaire still failed to refer and transfer him to an appropriate inpatient hospital in continued violation of CDCR policy. As a result, Mr. Padilla was in the mental health crisis bed unit rather than an inpatient psychiatric hospital for approximately three more weeks after the cell extraction, and then cycled back and forth between the administrative segregation and crisis bed units at Corcoran for the next three months until he was finally transferred to an inpatient psychiatric hospital in November 2012.  Once in an actual inpatient setting, Mr. Padilla finally received treatment that helped him stabilize.

Defendants' refusal to refer Mr. Padilla to inpatient treatment as necessary and required by CDCR policy, and refusal to initiate the involuntary medication process for 24 days, evidences deliberate indifference to Mr. Padilla's mental health needs. Defendant Wagner's decision to keep Mr. Padilla in five-point restraints for three days despite the fact that the medical notes indicate he was "calm," "cooperative," and "normal," during this period, provides yet another basis on which to hold him liable for deliberate indifference.

With respect to Defendants Stainer and Gipson, who were responsible for the policies, procedures, and practices used at Corcoran, including with respect to use of force and discipline, the federal court in *Coleman* already determined that the policies, procedures, and practices used against Plaintiff in 2012 were deliberately indifferent to mental health needs in violation of the Eighth Amendment, almost twenty years after those findings were first made in the original *Coleman* trial. Defendants Stainer and Gipson acknowledged in their depositions that they were aware that use of force and discipline were not supposed to be used against inmates with serious mental illness in ways that punished or exacerbated such illness.  Defendants Stainer and Gipson also admitted that they did not take any actions to ensure that force and discipline were not, in fact, used against prisoners such as

Plaintiff in a manner that punished or exacerbated mental illness.  As Defendant Wagner admitted in his deposition testimony, he was aware that the result of his decision not to provide Plaintiff treatment would be a forced cell extraction. This is because administrator and supervisory Defendants' policies, procedures, and practices dictated that an inmate who did not follow orders to cuff up and leave his cell would be forcibly extracted, and Defendants failed to provide any direction or training for modifying these policies, procedures and practices when faced with an inmate in mental health crisis who could not make rational decisions about following orders. At trial, Plaintiff will present the video of his cell extraction, which graphically shows the pain and suffering resulting from Defendants' indifference to his mental health. Plaintiff will also show evidence that he was charged and found guilty of a disciplinary violation despite CDCR's own psychologist determining that his behavior arose from his mental illness, and that Defendants Robicheaux and Johnson levied punishments specifically contraindicated for his mental health.

Plaintiff will also present evidence that, as a result of federal court proceedings in 2013 and 2014, CDCR—led by Defendant Stainer—prohibited several of the kinds of force and punishment to which Mr. Padilla was subjected, including the use of OC against prisoners in mental health crisis beds, and initiated new training for custody and mental health staff on de-escalation prior to use of force on inmates with mental illness.  These measures, taken twenty years after a federal court first found CDCR to be violating inmates' Eighth Amendment rights in this same manner, demonstrate that Defendants could and should have taken action to remediate the risks and harm to Mr. Padilla, but did not.  Plaintiff will therefore be able to demonstrate deliberate indifference by these administrator Defendants.

**B.    Excessive Force**

On July 24, 2012, when Mr. Padilla had been in the crisis bed unit for 24 days without medication and without a referral to inpatient hospitalization, and had deteriorated to a state in which he was languishing in his own waste and attempting to ingest feces, Defendants violently extracted him from his cell by emptying four canisters of OC spray—1 MK-46 and 3 MK-9s—into his cell, which Plaintiff's expert describes as an amount of OC designed for crowd control, not for use against a single unclothed and unarmed inmate confined to a cell. That the use of pepper spray was excessive

and injurious in Plaintiff's case is evident from several factors: (1) with respect to Defendants' use of pepper spray, certain cell extraction defendants wore not only protective gear but all wore gas masks, a reasonable indication the officers knew of the potentially harmful respiratory effects of pepper spray; (2) Mr. Padilla was not provided any form of respiratory protection at any time and was completely naked throughout the event allowing for skin and lung exposure; (3) during the extraction, Mr. Padilla was screaming in pain, confused, disoriented, trying to comply with instructions but unable to; and (4) Defendants continued to administer additional canisters of OC spray even after it was evident it was not having the desired effect. The cell extraction team then tackled Mr. Padilla to the ground and shackled him in five-point restraints pursuant to orders from Defendant Wagner for almost 72 hours, while refusing to wash off the incredibly potent OC spray which remained on his body, despite the fact that Defendants' comments starting after the first blast of pepper spray was administered, regarding the need for a shower, signal their awareness of the potential harmful effects and a corresponding need for decontamination.

Plaintiff's use of force expert—a former director of the Washington State prison system—will explain that policymaker Defendants Stainer and Gipson failed to place any limitations at all in their use of force policies regarding the amount of OC spray that officers could unleash on an unarmed inmate alone in a cell or necessary waiting times between applications of OC, violating correctional standards. Defendants' policies allowed for crowd control mechanisms, including the use of an MK-46 OC canister the size of a fire extinguisher, to be used against Plaintiff in the absence of any actual imminent threat, and gave no direction as to what levels of OC spray and force could be used in what contexts. As Plaintiff's expert will testify, these policies and procedures are outside the norms for correctional practices nationwide and allowed for the use of massive amounts of OC spray against unarmed inmates in their cells unparalleled in other correctional systems.

### C.     Failure to Protect from Harm

After admission to the crisis bed unit on July 1, treatment records indicate that Mr. Padilla's mental state failed to stabilize and further progressively deteriorated.  Despite knowing that this mental decompensation would inevitably lead to cell extraction for emergency involuntary medication, both Defendants Wagner and LaClaire deliberately withheld necessary treatment and refused to refer Mr.

1    Padilla to a higher level of care.

2          During the cell extraction on July 24, 2012, Defendants failed to protect Mr. Padilla from harm

3    by using unreasonable and unnecessary force and restraint against him.  Each Defendant involved in

4    the extraction knew that the other Defendants were using, or were threatening to use, unreasonable

5    force against Plaintiff, particularly through the use of four canisters of OC spray.  Each Defendant

6    could have taken action to stop the use of unreasonable force against Plaintiff but refused or failed to

7    do so.  Moreover, each Defendant interacting with Mr. Padilla after the use of the OC spray could have

8    taken action to wash him from the spray, but refused to do so.  Specifically, Defendant Kaiser

9    medically cleared Plaintiff following the use of force, despite the fact that he had not been

10   decontaminated.  And Defendant Wagner deliberately allowed Mr. Padilla to remain in restraints for 3

11   days by giving him changing requirements that he knew Mr. Padilla could not fulfill, and when he

12   knew Mr. Padilla was not a threat to himself or others.

13         And the supervisory Defendants were responsible for ensuring that all other Defendants were

14   appropriately trained in order to protect Mr. Padilla from harm and that policies and procedures were

15   in place to sufficiently protect Plaintiff from harm.  These Defendants failed to implement and/or

16   correct unconstitutional policies and procedures that exposed prisoners in Mr. Padilla's condition to

17   exactly the type of serious harm that occurred with Mr. Padilla.

18         **D.     Punishment Based on Mental Illness**

19         After the July 24, 2012 extraction, Defendants charged Mr. Padilla with "obstructing a peace

20   officer in the performance of his duties in the use of force," despite a mental health clinician's

21   assessment that at the time of the cell extraction, Mr. Padilla's mental health state included

22   "delusions/false thoughts/paranoia" and Mr. Padilla "didn't seem to understand consequences of not

23   complying with a custody officer."  Despite the clinician's advisement that Mr. Padilla would "benefit

24   from therapy & activities that provide reality orientation…social interaction/talking with others and

25   things that help prompt his memory," the disciplinary hearing officer, Defendant Robicheaux, assessed

26   Mr. Padilla 90 days loss of credit and 30 days loss of privileges including loss of dayroom, TV/radio,

27   visits, family visits, special purchase, telephone, and quarterly package, effective upon release from

28   the mental health crisis bed.  This means that even when Mr. Padilla was released from the crisis bed,

1   he would be deprived of virtually all of his opportunities for external stimuli, which totally

2   contradicted every recommendation made by the clinician.  The use of force and discipline against Mr.

3   Padilla were ratified throughout the entire chain of command of CDCR, including the supervisors and

4   administrators named in this lawsuit: Defendants Drew (Sgt.), Godina (Lt.), Castro (Capt.), Johnson

5   (Assoc. Warden), Gipson (Warden), and Stainer (Dir. of Division of Adult Institutions).

6           While Defendants assert that this punishment was revoked in full, they have not proffered any

7   admissible evidence supporting this claim.  Plaintiff, on the other hand, can demonstrate that

8   Defendants Robicheaux and Johnson specifically and deliberately ordered that this punishment be

9   inflicted upon Plaintiff in a manner that threatened to destabilize his mental health if he were able to

10  recover enough to be discharged from the mental health crisis bed.  Defendants' charging and finding

11  of Mr. Padilla as guilty for a disciplinary violation punished him for mental illness and violated the

12  ADA and Eighth Amendment.  Indeed, because the policies and procedures Defendants Stainer and

13  Gipson implemented and failed to correct were insufficient to prevent this type of violation from

14  occurring, subsequent to federal court proceedings in *Coleman*, CDCR—led by Stainer—explicitly

15  prohibited charging an inmate-patient subjected to a cell extraction for the purpose of involuntary

16  medication with a disciplinary violation.  This is evidence that Defendants could and should have

17  altered their policies earlier to prevent this violation of Plaintiff's rights, but refused to do so until

18  ordered—yet again—by a federal court.

19          **E.    Supervisory Liability**

20          Plaintiff will present evidence demonstrating that supervisory Defendants failed to adequately

21  train custody staff who led and participated in the cell extraction regarding identifying basic symptoms

22  of mental health crisis, and failed to adequately train custody staff on how to interact with an inmate-

23  patient in mental health crisis or attempt to de-escalate a situation involving an inmate-patient in

24  mental health crisis.  Defendants also failed to adequately train and supervise mental health staff,

25  including Defendant Wagner, who, according to his testimony, was unaware of any differences

26  between a mental health crisis bed unit designated by CDCR's own policies for stays of ten days or

27  less when a patient could be stabilized, and CDCR's inpatient hospitals, designed for longer-term stays

28  and intensive mental health treatment.   Defendants failed to implement basic use of force policies,

protocols, and review processes to ensure that uses of force were reasonable, necessary, and accounted

for the mental health status of inmates.  Defendants' discipline of Mr. Padilla for behavior resulting

from his mental illness violated Defendants' own policies and procedures as well as the ADA and the

Constitution.  Plaintiff has evidence that supervisory Defendants failed to appropriately supervise the

disciplinary process to ensure it did not punish inmates for mental illness.

### F.      Disability Discrimination

Defendant Stainer, in his official capacity, discriminated against Mr. Padilla on the basis of his

disabilities and/or denied him the benefits of public services, programs, and activities on violation of

the ADA by: (1) failing to provide appropriate training to CDCR officers regarding how to respond to

persons with physical and mental impairments; (2) failing to adopt appropriate policies, procedures,

and practices to ensure that custody staff would respond reasonably in dealing with a mentally ill

person who was experiencing an episode of psychological distress; and (3) by allowing for and

ratifying disciplinary action against Mr. Padilla for actions found by CDCR's own mental health staff

to be related to his mental illness and imposing a punishment found by CDCR's own mental health

staff to be detrimental to his mental health. In addition to the evidence described above, the

supervisors and officers on the cell extraction team testified in deposition that they did not receive

training on identifying, communicating with, or de-escalating individuals who may be in a mental

health crisis such that they could take this into account when interacting with them.

### G.      Punitive Damages

Defendants' actions and failures to act were malicious, oppressive, and/or in reckless disregard

of Plaintiff's rights. Key examples include Defendant Wagner's repeated testimony in prior federal

court proceedings and at his deposition that he willfully denied treatment to Mr. Padilla, and violated

CDCR policies, in order to avoid having to do additional paperwork.  In so doing, Defendant Wagner

created the otherwise avoidable situation that resulted in the violent cell extraction of Mr. Padilla.

Moreover, Wagner *continued* to deny Mr. Padilla adequate treatment even after this extraction, again

in violation of CDCR's own policy and procedure.  Defendant Drew's actions during the cell

extraction reveal his hostility towards Mr. Padilla and the way in which he deployed his prejudice

about mental illness to maliciously escalate the use of force against Mr. Padilla during the cell

extraction.  Defendant Drew also initiated disciplinary charges against Mr. Padilla for "willfully" defying officers' orders despite ample evidence to the contrary.  Defendant Robicheaux purposefully imposed discipline on Mr. Padilla for behavior a clinician had already found directly resulted from his mental illness and was not voluntary, in violation of CDCR policy and procedures, and justified his decision by willfully ignoring his training and maintaining that, despite mental illness, Mr. Padilla had to be "punished." And Defendant Stainer testified that—even after the *Coleman* Court found Plaintiff's cell extraction to be an example demonstrating CDCR's continuing violation of the constitutional rights of inmates with serious mental illness and supporting an order that CDCR had to change its policies, procedures, practices, and training on use of force—he used this incident as *positive* example to train custody and mental health staff regarding use of force against inmates with serious mental illness.  The continued failure of one of the highest-level custody administrators at CDCR to acknowledge the problems with the treatment and cell extraction of Plaintiff is the very definition of ratification and deliberate indifference.  Moreover, Defendants Stainer and Gipson were aware of the 1995 findings of the *Coleman* Court that required protections for prisoners with serious mental illness from being subjected to punitive measures without regard for their mental health, and chose not to implement policies, procedures, practices, training, and review procedures that would actually protect prisoners in Mr. Padilla's situation until ordered to do so—again—by a federal court in 2013 and 2014.  Their reckless disregard for their clearly established Constitutional obligations warrants an award of punitive damages.

## IV.   EVIDENTIARY ISSUES

Due to his mental health condition, and consequent inability to complete his deposition by a deadline set by the assigned Magistrate Judge in the case, Plaintiff is currently unable to testify at trial on his own behalf. Accordingly, on December 30, 2016, Plaintiff filed a motion to substitute witness, asking that his Guardian ad Litem Cynthia Gonzalez be allowed to testify regarding the damage Defendants' actions had on Plaintiff.  Defendants opposed this motion.  At the Final Pretrial Conference on January 27, 2017, the Court requested additional briefing regarding this motion. This briefing was submitted, and the motion remains pending.

There are also numerous pretrial motions that remain pending, including Plaintiff's request for

judicial notice of the *Coleman* decisions relevant to this action, Plaintiff's motion to exclude the forty trial witnesses Defendants' disclosed for the first time in their pretrial statement January 13, 2017, the parties' motions *in limine*, and Defendants' motion to change venue.

Plaintiff's motions *in limine* are to: (1): Exclude References to Plaintiff's Absence from Trial or Why Plaintiff is Unable to Testify Other Than Proposed Statement; (2) Exclude Characterization or Argument By Defendants' Counsel Regarding Plaintiff's Demeanor, Conduct, or Dangerousness;(3) Exclude Testimony and Argument that Punishment for Plaintiff Was Not Implemented or Was Revoked; (4) Exclude Defendant Michael Stainer from Being Proffered as an Expert and Testifying as to Use of Force Practices Outside of His Direct Experience; (5) Exclude Photographs and Mug Shots from Plaintiff's Custody File; (6) Exclude Any Testimony that Defendants Wagner or LaClaire Were the "Designee" of the Chief of Mental Health; (7) Exclude Evidence and Argument Relating to the Constitutionality of CDCR Use of Force Policies, Procedures, and Practices; (8) Exclude Portions of Opinion Testimony of Defendants' Retained Expert Dr. John M. Dusay; and (9) Exclude the Introduction of Plaintiff's Criminal and Prison Disciplinary History Other Than Proposed Statement.

## V.      RELIEF SOUGHT

As a result of Defendants' actions, Plaintiff's ability to recover from mental health crises and actively participate in mental health treatment has been severely damaged. Defendants compromised his ability to trust medical help, exacerbated and confirmed his worst fears as well as his paranoia and anxiety about others being out to hurt him, and left him in a state of decompensation for weeks and months such that it caused long-term harm to his brain.

Plaintiff seeks compensatory and punitive damages, and costs of suit, including reasonable attorneys' fees, and any other relief the court deems just and proper. Plaintiff's attorney's fees are not subject to the PLRA because Plaintiff was no longer incarcerated when he filed suit.

Dated: April 3, 2017

Respectfully Submitted,
HADSELL STORMER & RENICK LLP

By:   _/s/ - Lori Rifkin_____
        Dan Stormer
        Lori Rifkin
        Caitlan McLoon
        Attorneys for Plaintiff